## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **1) NICK SHAFFER and CHARLA SHAFFER, Individually, and**<br>**2) NICK AND CHARLA SHAFFER, As Parents and Next Friends of HOPE SHAFFER, Deceased,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | Case No. 5:22-CV-00151-R<br>Judge David L. Russell |
| **v.** | ) ) | |
| **1) TOYOTA MOTOR CORPORATION,**<br>**2) TOYOTA MOTOR NORTH AMERICA, INC.**<br>**3) TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.,**<br>**4) TOYOTA MOTOR MANUFACTURING MISSISSIPPI INC.**<br>**5) TOYOTA MOTOR SALES, USA, INC.**<br>**6) GULF STATES TOYOTA, INC.** | ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO TOYOTA DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [DOC. 116] AND BRIEF IN SUPPORT

Glendell D. Nix, OBA #13747
S. Shea Bracken, OBA #30496
Andy J. Campbell, OBA #30512
Nicole Snapp-Holloway, OBA #18472
**MAPLES, NIX & DIESSELHORST**
15401 North May Ave.
Edmond, Oklahoma 73013
T: (405) 478-3737
F:(405) 513-5005

*Attorneys for the Plaintiff*

**Dated: September 23, 2024**

# Table of Contents

*Case Summary* .............................................................................................. *1*

*Summary of the Argument* ......................................................................... *1*

*Plaintiffs' Response to Defendants' Statement of Material Facts* ................... *5*

*Additional Facts Precluding Summary Judgment* ........................................ *5*

    COMPLAINTS ABOUT TOYOTA'S SEAT DESIGN ............................ 5

    THE SEAT DESIGN IS DEFECTIVE ...................................................... 7

    FMVSS 207 ................................................................................................ 7

    TOYOTA'S INVOLVEMENT IN RULE MAKING PROCESS ............. 9

    TOYOTA WITHHELD INFORMATION FROM THE GOVERNMENT ......... 11

    TOYOTA'S TESTING ............................................................................ 12

    MEYER'S TESTING ............................................................................. 13

    MEYER'S CONCLUSIONS ABOUT SUBJECT CRASH ..................... 14

    SUGGESTIONS AND REASONABLE ALTERNATIVES ..................... 16

ARGUMENT AND AUTHORITY ............................................................ 18

    The Standard for Summary Judgment ..................................................... 18

    Facts Inferring that FMVSS 207 is Inadequate ....................................... 19

    The Court May Not Weigh the Credibility of The Experts ...................... 21

    Toyota Withheld Information Relevant to the Adequacy of FMVSS 207 ............. 23

*A Punitive Instruction Cannot Be Denied at this Juncture* ........................ *24*

*CONCLUSION* ......................................................................................... *29*

*CERTIFICATE OF SERVICE* ................................................................. *30*

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*American Honda Motor Company, Inc. v. Milburn,* No. 21-1097, 2024 WL 3210146 ..... 3, 20, 21

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) ............................................ 22

*Attocknie v. Carpenter Mfg.*, 1995 OK CIV APP 54 ....................................................... 19

*Badillo v. Mid Century Ins. Co.*, 2005 OK 48, ¶ 66, 121 P. 3d 1080 ............................... 28

*Floyd v. Dodson*, 1984 OK CIV APP 57 .......................................................................... 28

*Glossip v. Chandler*, 554 F. Supp. 3d 1176, 1197 (W.D. Okla. 2021) ............................ 23

*Hightower v. Kansas City S. Railroad Co.*, 2003 OK 45 .................................................. 25

*Kirkland v. General Motors Corp. ,* 1978 OK 52 ............................................................... 2

*Maldonado v. City of Altus,* 433 F.3d 1294, 1301 (10th Cir.2006) .................................. 18

*Mangrum v. Ford Motor Credit Co.*, 1978 OK 57 ........................................................... 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43-44, 103 S. Ct. 2856, 2867 (1983) .................................................................................................. 24

*O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1096 (10th Cir.1999) ...................... 18

*Okla. Farm Bureau Mut. Ins. Co. v. Omega Flex, Inc.*, No. CIV-22-18-D, 2024 U.S. Dist. LEXIS 47102, at *11-14 (W.D. Okla. Mar. 18, 2024) ........................................... 21, 22

*Payne v. DeWitt,* 1999 OK 993 ....................................................................................... 26

*Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) ..................................................... 23

*Plotke v. White,* 405 F. 3d 1092, 1093-94 & 1103 (10th Cir.2005) ............................ 18, 22

*Reed v. Fichencord*, 1923 OK 841 .................................................................................. 25

*Scribner v. Hillcrest Medical Center*, 1992 OK CIV APP 117, ¶ 12, 866 P. 2d 437 ....... 25

*Shuman v. Laverne Farmers Coop*, 1991 OK CIV APP 2 ................................................ 25

*Slocum v. Phillips Petroleum*, 1983 OK 112 ................................................................... 27

*Sopkin v. Premier Pontiac, Inc.*, 1975 OK CIV APP 47 .................................................. 26

*Stinnett v. Safeway, Inc.,* 337 F.3d 1213, 1216 (10th Cir.2003) ....................................... 18

*Thiry v. Armstrong World Indus.*, 1983 OK 28 ...................................................... 4, 27, 29

*Trainor v. Apollo Metal Specialties, Inc.,* 318 F.3d 976, 979 (10th Cir.2003) .................. 18

*Williams v. Baldrey*, 1915 OK 852 ................................................................................ 25

*Wright v. Ford Motor Co.*, 508 F.3d 263, 273-74 (5th Cir. 2007) ................................... 18

<u>Statutes</u>

23 O.S. § 9.1 ..................................................................................................................... 24

76 O.S. § 57.2 .................................................................................................................... 2

**PLAINTIFF'S RESPONSE IN OPPOSITION TO TOYOTA DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

COME NOW the Plaintiffs, by and through their counsel of record, and submit the following Response to Toyota Defendants' Motion for Summary Judgment. [Doc 116] In opposition to Defendants' motion, Plaintiffs show the Court the following:

## Case Summary

On January 15, 2020, Hope Shaffer was killed in a rear-end car crash while riding in a 2020 Toyota Corolla. At the time of the crash, Hope occupied the rear passenger seat, and George Voss, a driving instructor, occupied the front passenger seat. Plaintiffs allege that the 2020 Toyota Corolla's front passenger seatback was defectively designed; more specifically, that the seatback was not strong enough to keep Mr. Voss in place and prevent him from intruding into Hope Shaffer's survival space. Plaintiffs allege Mr. Voss ramped over his seat, and the back of his head impacted the front of Hope's head. Hope died from blunt force head trauma.

Because the seatback was not designed to restrain a modern adult in a rear end crash, the seatback yielded (or collapsed backwards) excessively, allowing the front seat passenger to ramp over the seat and collide with the backseat passenger, Hope Shaffer.

## Summary of the Argument

Defendants ask the Court to dismiss Plaintiffs' product liability claims, alleging that their compliance with FMVSS 207 provides a rebuttable presumption that their seat back is not defective. Defendants also ask the Court to preclude any instructions to the jury on

1

punitive damages. Defendants' arguments are flawed in both their legal standards as well as their analysis.

It is not in dispute that defendants designed and manufactured the seat Hope Shaffer was in when she was killed in the subject rear end crash; therefore, Plaintiffs must establish that the seat was defective, and that the defect made the seat unreasonably dangerous. *Kirkland v. General Motors Corp.*, 1978 OK 52, ¶¶ 28-31, 521 P. 2d 1353, 1363. Toyota argues that the seat was designed in accordance with the government standards in FMVSS 207, and therefore, under 76 O.S. § 57.2, a rebuttable presumption arises that they are not liable for any injury caused by the seat, because it was not defective.[1]

As discussed below, Plaintiffs offer more than sufficient evidence to rebut the presumption given by 76 O.S. § 57.2(A). As discussed below, Plaintiffs present evidence that: a) FMVSS was inadequate to protect the public from seat back failures, and b) that Toyota has withheld or misrepresented information relevant to the federal government's determination of the adequacy of the safety standards in FMVSS 207.

In particular, the fact that FMVSS 207 has not been significantly changed since it was first implemented in 1967 is astounding.  Considering the obvious and widespread advances in technology in the past fifty (50) years, it is remarkably suspicious that FMVSS 207 has not changed. In fact, Toyota is heavily involved in the rulemaking process; and

---

[1] Plaintiffs note that by invoking 76 O.S. 57.2(A), Defendants admit that FMVSS 207 "governed the product risk" that caused the harm, which in this case is the risk of injury to a backseat occupant in a rear end crash. 76 O.S. § 57.2(A).

2

Toyota has a team of lobbyists based in Washington, D.C., to further Toyota's interests. But their involvement is often disjointed and inconsistent within their own suggestions.

Notably, FMVSS 207 does not account for the presence of an occupant in the front right seat. It is incongruous that the regulatory standards for seat *strength* does not consider the mass of an occupant and the effect that may have on a seat's rearward deformation. Clearly, FMVSS 207's standards are inadequate to establish any meaningful measurement of a seat's performance in a rear impact crash.

There is also credible evidence that Toyota has withheld or misrepresented information to the federal government about issues with their seatbacks and the adequacy of FMVSS 207. Thus, Plaintiffs can show sufficient evidence from which a reasonable jury could find the presumption is rebutted.

To challenge Plaintiffs facts showing that FMVSS 207 is inadequate, Defendants rely heavily on *American Honda Motor Company, Inc. v. Milburn,* No. 21-1097, 2024 WL 3210146 (Tex. June 28, 2024) (Attached hereto as Ex 1). But this opinion "has not yet been released for publication in the permanent law reports *and is subject to revision or withdrawal until it is.*" Ex 1, *Milburn* (emphasis added). In fact, a motion for rehearing was just filed in *Milburn* on August 4, 2024. Ex 2, *Milburn* Motion for Rehearing. Thus, not only are Defendants relying on an opinion that is *not* controlling in this jurisdiction, but it's also not *controlling in the jurisdiction from which it hails*.

Despite this, Defendants argue that under *Milburn*, Plaintiffs are required to put forth a "comprehensive review of the various factors and tradeoffs NHTSA considered in adopting FMVSS 207." And that Plaintiffs must "produce sufficient evidence that NHTSA

'engaged in an improper or erroneous decision-making process' when it approved FMVSS 207." Defendants' Motion, p. 2, citing *Milburn*. But this analysis is not required under Oklahoma law in general, and certainly not at the summary judgment stage.

Defendants' arguments are invalid because 1) *Milburn* is not controlling; 2) *Milburn* is distinguishable at several points, including that it was a review of a *jury verdict after trial,* not a motion for summary judgment; and 3) Oklahoma law and this district's opinions and orders establish a very different standard than Defendants take from *Milburn.* Plaintiffs can more than meet their burden to establish a question of material facts sufficient to overcome Defendants' Motion for Summary Judgment as to the rebuttable presumption.

With respect to Plaintiffs' claims for punitive damages, Defendants again argue standards that are not *current* Oklahoma law. The cases cited by Defendants were all decided prior to 1995, when Oklahoma changed from a malice based punitive damages statute to a structure with three categories, beginning with *reckless indifference*. Given the disputed facts below, it would be "at best speculative, premature, ill advised and academic" to dismiss Plaintiffs' claims for punitive damages at this point in the case. *Thiry v. Armstrong World Indus.*, 1983 OK 28, ¶ 7, 661 P.2d 515, 520 (Opala, concurring).

Below is a plethora of material facts from which a reasonable jury could find that Plaintiffs rebutted the presumption that the seat back at issue was not defective. Further, there are numerous facts from which a reasonable jury could infer that Defendants were at the very least, recklessly indifferent to the rights of passengers to be safe in their vehicles. Thus, although Plaintiffs can likely meet the burden now, it would not be proper to consider an instruction for punitive damages until after all the evidence is introduced at trial.

4

## Plaintiffs' Response to Defendants' Statement of Material Facts

1-4: Admitted.

5. Plaintiffs admit that the Subject Vehicle complied with FMVSS 207 but deny that this standard is adequate to protect the public from harm in rear end crashes.

## Additional Facts Precluding Summary Judgment

1. The parties' biometrics experts agree the subject crash had a delta-v between 18mph and 22mph. Ex 3, Raphael Report, p. 25; Ex 4, Tr. Ziejewski, p. 156:15-156:17.

2. The investigating officer of the subject crash would not expect a fatal injury from a collision with a 20.3 delta-v.  Ex 5, Tr. Harrison, Sgt., p. 72:10-72:12. Out of hundreds of thousands of investigations, he cannot recall one with a similar delta-v, that resulted in a fatality. Ex 5, Tr. Harrison, Sgt., p. 71:02-74:01.

3. Toyota designed and manufactured the 2020 Corolla to their specifications, including the front passenger seat Plaintiffs allege is defective.  Ex 6, Tr. Miyatake, p. 14:22-15:10; 16:03-16:17. The seat is consistent with Toyota's philosophy of seat design. Ex 6, Tr. Miyatake, p.  18:05-18:11.

4. The Corolla is one of Toyota's top selling cars, and they sold 334,000 model year 2020 Corollas in the United States. Ex 7, Tr. Hare, p. 64:08-64:23, p. 65:10-65:19.

## *COMPLAINTS ABOUT TOYOTA'S SEAT DESIGN*

5. Toyota has been aware of concerns, and received reports of, seat back failures in rear-end collisions for more than ten years.  Ex 7, Tr. Hare, p. 33:21-34:24. These complaints are commonly reported to NHTSA. Ex 7, Tr. Hare, p. 32:22-33:20.

6.  Before 2020, Defendants knew there were complaints of poor seat back performance where the seat would deform rearward too far, resulting in occupant-to-occupant contact, and causing injury to back seat occupants. Ex 7, Tr. Hare, p. 77:07-78:07, p. 80:05-80:21. In fact, before 2020, Defendants knew that a study found one-tenth of the severe injuries in rear impact crashes could be attributed to seat back deformation, rather than other causes. Ex 7, Tr. Hare, p. 61:01-62:20.

7.  By letter dated May 25, 2016, United States Senators Markey and Blumenthal communicated with Defendants expressing concerns about "front seat back failures. . . which occur primarily during rear-end collisions or crashes" and put back seat passengers, especially infants and children, at serious risk of injury or death." Ex 7, Tr. Hare, p. 48:03-49:04; Ex 8, May 25, 2016, letter, TOY-SHAFFER-15732-15734.

8.  The senators advised Toyota about "a child rear impact study commissioned by the Center for Auto Safety" that found "approximately 50 children placed behind occupied seats have died annually in rear impact incidents in the last 15 years." Ex 7, Tr. Hare, p. 49:05-49:14; Ex 8, May 25, 2016, letter, TOY-SHAFFER-15732-15734.

9.  The Senators also noted in their May 2016 letter, that "weak seat strength standards" undermine the advice to place children in back seats. And that there "has been long-standing concern for the Federal Motor Vehicle Safety Standard 207… is not sufficient to mitigate injury or death of a rear seat occupant due to seat back collapse in a rear-end collision." Ex 7, Tr. Hare, p. 51:02-51:11; Ex 8, May 25, 2016, letter, TOY-SHAFFER-15732-15734. Despite this notice, in 2016 Defendants were still

recommending that children sit in the rear seats of Toyota vehicles, including the 2020 Toyota Corolla. Ex 6, Tr. Miyatake, p. 75:24-76:04.

### THE SEAT DESIGN IS DEFECTIVE

10. Plaintiffs' engineering expert, Steven E. Meyer, was asked to evaluate the crashworthiness associated with the restraint system of the 2020 Corolla, relative to rear impacts. He focused on the restraint system of the right front position (outboard position).  Ex 9, Tr. Meyer p. 6:17-7:07. In rear impacts the "seat itself is the primary restraint component. Ex 9, Tr. Meyer, p.  7:08-7:18.

11. The right front seat in the 2020 Corolla is defective with respect to rear impact performance. Its defects are associated with its under-design from a strength energy absorption robustness perspective." This makes the seat too structurally weak to be effective in rear-end impacts. Ex 9, Tr. Meyer, p.  156:04-156:14.

12. Defective seats are generally not defined by a particular component but are "a function of making the entire seat stronger and more robust and testing it as a system. Their design needs to be approached as a system." Ex 9, Tr. Meyer, p. 156:15-157:04.

13.  This defective system design of the front right seat makes it unreasonably dangerous to the back seat occupants in rear end impacts. Ex 9, Tr. Meyer, p. 33:22-34:05.

### FMVSS 207

14. FMVSS 207 requires two tests related to seat back performance, a "rearward static load" test and a "static rearward moment" test.  Neither are dynamic tests. Ex 6, Tr. Miyatake, p. 34:19-36:02, 39:05-39:07.

15. The rearward static load test, commonly called a 20G test, "simulates a rear impact" under 20G's of force.   These *sled* tests are conducted without dummies, because FMVSS 207 does not require it. They check only for seat damage and for a failure with the lock mechanism. Ex 6, Tr. Miyatake, p. 34:19-35:07.

16.  The regulatory language in FMVSS 207 requires the 20G test be done with "20 times the mass of the seat in kilograms multiplied by 9.8."[2] This calculation does not account for any variation in the weight of an occupant.  Ex 10 49 CFR §571.207.

17.  FMVSS 207 also requires a static rearward moment test, where the seat is pulled backward at 3,300-inch pounds. As with the sled test, they check only for seat damage and for a failure with the lock mechanism. Ex 6, Tr. Miyatake, p. 35:08-35:19.

18. But the 3,300-inch pounds static rearward moment test required by FMVSS 207 "provides no useful engineering data. All it does is simply say that" the seat back can withstand 3,300 inch-pounds of rearward force.  Ex 9, Tr. Meyer, p.  95:25-96:09. From "an engineering point of view, from a design point of view" it does not reflect anything "about its failure mode or its crashworthiness or what it's going to do dynamically" in a rear end impact. Ex 9, Tr. Meyer, p. 96:21-96:24.

19. Toyota admits that its seat designs "well exceed" the requirements of FMVSS by a "sufficient margin." Ex 6, Tr. Miyatake, p.  37:03-37:12, p. 38:09-38:14; Ex 7, Tr. Hare, p. 51:12-52:01; Ex 9, Tr. Meyer, p. 78:02-78:09.  Defendants claim that they have no

---

[2] The calculation produces a measurement of *force,* in Newtons: Force = Mass (Mass of seat x 20) * Acceleration (due to gravity, rounded to 9.8).

concerns about the requirements in FMVSS 207 vis a vis their products, because their seats are well above the standard. Ex 7, Tr. Hare, p. 52:15-52:25.

20. But the seat strength test requirements of FMVSS 207 do not provide for the presence of an occupant. These testing standards are inadequate relative to the prediction of real-world crash performance. Ex 9, Meyer Report dated July 12, 2024, p. 17.

21. Defendants do not believe that the strength standard in FMVSS 207 is enough to reduce accidents in the marketplace. Ex 6, Tr. Miyatake, p. 36:20-37:01. In fact, "207 is one element of accidents. . .in the marketplace, and you cannot determine the safety. . . by looking at that alone." Ex 6, Tr. Miyatake, p. 39:16-39:19.

22. But Defendants do not believe that the standards in FMVSS 207 are inadequate. Ex 7, Tr. Hare, p. 53:02-53:18.

23. Meyer agrees with Toyota that seats cannot be infinitely rigid and should "balance energy absorption." Yielding and absorbing energy . . is sound science. Ex 9, Tr. Meyer, p. 77:06-77:22. This balance, including the movement of the occupants, is important to reduce the risk in the marketplace. Ex 6, Tr. Miyatake, 37:14-37:23.

***TOYOTA'S INVOLVEMENT IN RULE MAKING PROCESS***

24. Toyota's seat design meets FMVSS 207 which was implemented in 1967, and the standard has not been modified since then. Ex 7, Tr. Hare, p. 42:22-42:24, p. 53:19-54:01; Ex 6, Tr. Miyatake, p. 35:20-36:02.

25. Although no changes have been made to FMVSS 207, there have been extensive discussions about the standard over the years, including numerous petitions filed by

consumer safety groups and automobile engineers to modify FMVSS 207 as it applies to seat backs. Ex 7, Tr. Hare, p. 52:03-52:13, p. 75:08-75:17.

26. In December 1998, the NHTSA stated that the standards in FMVSS 207 were "inadequate" to protect occupants in rear end crashes. And that "advances in technology have made possible significant improvement in the ability of the car seat to add appreciably crash victim occupant protection. . ." Ex 7, Tr. Hare, p. 39:06-41:01; Ex 11, Certified Copy of Press Release from NHTSA, December 1998.

27. Defendants have a governmental affairs office in Washington, D.C. that "works with the government on emerging issues and regulatory issues." Ex 7, Tr. Hare, p. 67:20-68:16. Stephen Ciccone is the Group Vice President, and the senior officer for Toyota in Washington, D.C. Ex 12, Tr. Ciccone (from *Reavis*), p. 6:20-8:25.

28. Mr. Ciccone is a registered lobbyist, and Toyota employs at least six other lobbyists in his office, as well as others in firms that are retained by Toyota. Ex 12, Tr. Ciccone (from *Reavis*) p. 114:11-115:13; Ex 13, TMNA Lobbying Report Q2 2016, pp. 1-3. The Government Affairs office communicates with members of congress, members of the executive branch, including the Secretary of Transportation, as well as NHTSA. Ex 13, Tr. Ciccone (from *Reavis*) p. 12:1-12:24.

29. Toyota has submitted comments to the NHTSA suggesting that the strength requirements of FMVSS 207 should be increased. Ex 7, Tr. Hare, p. 43:24-45:16; Ex 14, Letter from TMNA dated January 29, 1993, TOY-SHAFFER 15682-15685. But that same letter objected to including dynamic testing in the FMVSS 207 requirements.

Ex 7, Tr. Hare, p. 45:17-46:12; Ex 14, Letter from TMNA dated January 29, 1993, TOY-SHAFFER 15682-15685.

***TOYOTA WITHHELD INFORMATION FROM THE GOVERNMENT***

30.  In May 2016, Senators, Markey and Blumenthal, requested information from Toyota on the number of complaints and reports of collapsed front seats they received in each of the last ten years. Defendants admit this information is readily available to them in their databases. Ex 7, Tr. Hare, p. 54:08-55:05; Ex 8, May 25, 2016, letter, TOY-SHAFFER-15732-15734.

31. The Senators also requested information about the number of lawsuits they have been involved in for incidents that allege front seat back failure. Defendants admit that this information is readily available to them from their databases. Ex 7, Tr. Hare, p. 56:22-57:08; Ex 8, May 25, 2016, letter, TOY-SHAFFER-15732-15734.

32. The Senators also requested information from Toyota "regarding your company's efforts to protect passengers against the threat of front seat back failures. . . which occur primarily during rear-end collisions or crashes put back seat passengers, especially infants and children, at serious risk of injury or death." Ex 7, Tr. Hare, p. 48:03-49:04; Ex 8, May 25, 2016, letter, TOY-SHAFFER-15732-15734.

33.  Despite being asked questions that they could easily answer with readily available information, Defendants did not attempt to answer those questions in its response to the Senators. Ex 7, Tr. Hare, p. 58:13-59:01; Ex 15, TMNA Response letter, TOY-SHAFFER-14886-14887.

11

34. Defendants' response to the Senators included reference to a letter submitted by the Association of Global Automakers and the Alliance of Automaker Manufacturers, but that letter does not respond to any of the Senator's seven questions either. Ex 7, Tr. Hare, p. 59:24-60:24; Ex 16, Letter from Auto Alliance and Global Automakers, TOY-SHAFFER-14879-14885.

*TOYOTA'S TESTING*

35. Toyota performs their own "unique evaluations" and testing to determine whether seats perform properly. These evaluations are beyond the requirements of FMVSS 207 and consider energy absorption and movement of the occupants. Ex 6, Tr. Miyatake, p. 37:14-38:07. This includes the TSF 6252 G-1 test, which is a dynamic "rear impact sled test that is done for purpose of evaluating the seat." Ex 6, Tr. Miyatake, p. 40:18-41:02. Toyota runs this test at two delta-v rates: 30 km/hr (19mph) and 36 km/hr (22.4 mph). Ex 6, Tr. Miyatake, p. 41:13-42:02.

36. Toyota's dynamic seat testing standard in TSF 6252 G-1 was implemented in the 2000s and has had at least one revision, as of 2014. Ex 6, Tr. Miyatake, p. 48:23-49:18.

37. If a seat dynamically tilts rearward too far, a front seat occupant could ramp over the seat and collide with the back seat occupant. Ex 6, Tr. Miyatake, p. 46:14-46:20.

38. Defendants' standard under TSF 6252 G-1 requires that the "maximum seat back dynamic backward tilting angle" be within 25° during the 30 km/hr (19mph) delta-v sled test. Ex 6, Tr. Miyatake, p. 41:16-41:19. But to limit rearward dynamic deflection to about 25°, that seat would have to be substantially stronger than the requirements of 207. Ex 9, Tr. Meyer, p. 95:14-95:24. In fact, the 207 test on the 2020 Corolla showed

a seat strength that was 2.5 times higher than what is in the regulation. Ex 6, Tr. Miyatake, p. 88:14-88:19.

39. Although it could be recorded at both 30 km/hr (19mph) and 36 km/hr (22.4 mph) delta-v, the "maximum seat back dynamic backward titling angle" is only recorded on the 30 km/hr (19mph) delta-v test. Ex 6, Tr. Miyatake, p. 41:13-43:14. Toyota states that they "do not have a target for the rearward tilting angle" on the 36 km/hr (22.4 mph) delta-v sled test. Ex 6, Tr. Miyatake, p. 43:15-45:05.

40. Part of the rationale for not recording the maximum backward angle during the 36 km/hr (22.4 mph) test is that the 30 km/hr (19mph) delta-v "covers about 85% of the accidents in the field." Ex 6, Tr. Miyatake, p. 43:15-43:20.

41. Toyota uses 172-pound, American Male 50th Percentile dummies in their TSF 6253 G-1 testing as a "representative of the US." Ex 6, Tr. Miyatake, p. 61:14-62:15.

42. But Toyota's test results for the 2020 Corolla front passenger seat during the 30 km/hr (19mph) test show that even with the AM50, "the lower torso coming up off the seat and the occupant is ramping, even in the lower energy event." Ex 9, Tr. Meyer, p. 19:13-20:04. At the 22mph delta-v, with the 50th percentile male dummy the occupant comes significantly out of the seat. "We see 43° of elastic or dynamic deflection, 24° of plastic." This suggests that the design is poor and won't hold up in a real world, reasonable loading environment. Ex 9, Tr. Meyer, p. 93:21-94:03.

***MEYER'S TESTING***

43. Plaintiffs' engineering expert tested the front right seat's crashworthiness "in a more reasonable way than" Toyota did. Ex 9, Tr. Meyer, p. 99:19-100:03. Meyer's testing

13

shows what the seat can and cannot do at a higher energy level; that the seat will deform rearward and recline beyond its ability to contain the occupant, and as it does that, the occupant will slide up and over the top of the seat to the extent that angular displacement allows. Ex 9, Tr. Meyer, p.  102:07-102:17.

44.  Mr. Meyer used a 95th percentile (AM95) occupant dummy during a 36 km/hr (22mph) sled test.  And "from an energy perspective…it's very close to the subject crash. Ex 9, Tr. Meyer, p.  97:10-98:02.

## *MEYER'S CONCLUSIONS ABOUT SUBJECT CRASH*

45.  During a rear impact, the seat must be able to: resist the force exerted on the seatback from the occupant; withstand and absorb a given amount of energy; and restrain/contain the occupant within the confines of the seat to ensure the occupant does not dangerously intrude into the rear occupant space. Ex 17, Meyer Report dated July 12, 2024, p. 27.

46.  From a physics point of view, both the force and energy exerted onto the seatback in a rear impact event are linearly dependent on the mass, or weight, of the occupant in the seat. Ex 17, Meyer Report, dated July 12, 2024, p. 27. The lack of consideration of an occupant in the right front seat renders the testing standards inadequate relative to the prediction of real-world crash performance. Simple compliance with minimal and static standards of FMVSS will not ensure that a seat is safe when occupied and loaded dynamically in a rear end crash.   Ex 17, Meyer Report dated July 12, 2024, p.  17.

47. The 50th percentile male dummy is 172 pounds and the 95th percentile male is 223 pounds.  There would be approximately 30% more force and energy exerted on the seat

14

back in a test with a 95th percentile ATD compared to a test with a 50th percentile ATD, run at the same collision pulse. Ex 17, Meyer Report, dated July 12, 2024, p. 27.

48. CDC data indicates that in 2020, the 50th percentile adult male in the U.S. weighed approximately 192.6 pounds. The average male in the United States is 20 pounds heavier than the AM50 dummy Toyota runs in their dynamic testing. Ex 6, Tr. Miyatake, p. 61:14-62:15. The anticipated occupants and users of the Toyota Corolla will include occupants larger than the 50th percentile ATD. Ex 17, Meyer Report, dated July 12, 2024, p. 27.

49. The Corolla seat was not designed with any size occupant in mind other than the 50th percentile ATD (5'9", 172 pounds) in the rear impact environment. Ex 17, Meyer Report, dated July 12, 2024, p. 27.

50. Toyota's design criteria limiting the occupant weight to 172 pounds at their chosen and specified relatively minimal delta-v (22mph) will not provide any information with respect to the seat's crashworthiness under more foreseeable crash circumstances including larger statured occupants. Ex 17, Meyer Report, dated July 12, 2024, p. 27.

51. The testing done by both Toyota and Mr. Meyer support the premise that Mr. Voss intruded into Hope's survival space sufficient to result in contact such that Mr. Shaffer hit the back of Mr. Voss's head. Ex 9, Tr. Meyer, p. 17:13-18:10, p. 19:06-19:12, p. 30:10-30:17.  In a rear impact they all would be going rearward, so Mr. Voss would hit Ms. Shaffer. Ex 9, Tr. Meyer, p. 40:16-41:07.

52. There is physical evidence supporting the premise that Mr. Voss ramped up over the seat, as shown by the plastic deformation; dynamic deformation; belt evidence; injury

to the back of Voss' head; and Hope's anterior injury. Ex 9, Tr. Meyer, p. 18:11-18:16; p. 20:18-21:08, p. 30:18-31:04, p. 113:07-113:23.

53. Considering the delta-v, the amount of energy in the collision versus the amount of energy and the capability of seat, the general physics also support the conclusion that Mr. Voss ramped over the front passenger seat into Hope's survival space. Ex 9, Tr. Meyer, p. 21:09-21:17.

54. The latch plate on Voss' seatbelt was loaded, indicating he was sliding, moving rearward and ramping out from under the belt. Ex 9, Tr. Meyer, p. 21:18-21:25. The belt loads only when it is "trying to get longer." If Mr. Voss wasn't ramping at all, it would not have loaded. Ex 9, Tr. Meyer, p. 22:01-22:10.

55. The plastic deformation in Voss' seat was about 14° and then another 10°-20° of dynamic deflection. Ex 9, Tr. Meyer, p. 18:17-19:05, p. 22:15-22:25. The cross-member bar that was deformed rearward is about at Mr. Voss's shoulders from the photograph. Ex 9, Tr. Meyer, p. 26:01-26:09.

*SUGGESTIONS AND REASONABLE ALTERNATIVES*

56. Meyer agrees with Toyota that the seats cannot be infinitely rigid, that they should "balance energy absorption." Yielding and absorbing energy and ride-down is sound science. Ex 9, Tr. Meyer, p. 77:06-77:20.

57. Meyer would recommend including a dynamic requirement in 207 and to consider effective restraint, containment to prevent gross intrusion into the backseat. Ex 9, Tr. Meyer, p. 78:10-79:09. Meyer suggests: 1) a sled test, and/or 301 type test w/ higher delta v. (30). Then with containment, you need camera coverage sufficient to evaluate

16

the kinematics of the dummy within the seat. They need to define a reasonable occupant survival space or non-intrusion zone for the rear compartment. Put all these together. Ex 9, Tr. Meyer, p. 80:09-81:24.

58. Toyota's designs should protect occupants up the 95th percentile, which is approximately 200 pounds. Ex 9, Tr. Meyer, p. 48:10-48:25. Toyota's testing should be done with the 95th percentile dummies in delta-v test at 30-35 mph. Then "design to constrain that." "The structural integrity of the vehicles typically handles that, and if you maintain the compartment, the next step is to provide effective restraint. That's a basic packaging engineering concept. Ex 9, Tr. Meyer, p. 79:10-80:04.

59. Meyer provided the results of a test on a 2002 Corolla side-by-side with a Sebring. This test includes more energy than the subject collision and shows that an alternate design like the Sebring seat would not have intruded into Hope's survival space like the 2020 seat did. Ex 9, Tr. Meyer, p. 164:21-165:07.

60. Had a seat been in place with similar characteristics to the Sebring, Meyer does not believe that there would have been injurious contact with the right rear occupant by the right front occupant. Ex 9, Tr. Meyer, p. 165:09-165:13.

61. The Sebring test shows an alternative design that was feasible both technologically and economically prior to 2020; and had a seat of that robustness been in production, it would have protected Hope in this crash. Ex 9, Tr. Meyer, p. 165:20-166:04.

## ARGUMENT AND AUTHORITY

***The Standard for Summary Judgment***

Summary judgment is proper when only when the moving party can show *beyond a reasonable doubt* that there is no material fact in dispute and *judgment* is appropriate as a matter of law. *Trainor v. Apollo Metal Specialties, Inc.,* 318 F.3d 976, 979 (10th Cir.2003). When considering a Motion for Summary Judgment, "all inferences arising from the record . . . mut be drawn *and indulged* in favor of the [nonmovant]." *Plotke v. White,* 405 F. 3d 1092, 1093-94 & 1103 (10th Cir.2005) (emphasis added) (citing *Stinnett v. Safeway, Inc.,* 337 F.3d 1213, 1216 (10th Cir.2003)).   Additionally, on summary judgment, the evidence must be viewed in context, not simply in segmented parts. *Maldonado v. City of Altus,* 433 F.3d 1294, 1301 (10th Cir.2006) (quoting *O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1096 (10th Cir.1999)).

Defendants argue that Plaintiffs cannot rebut the presumption that their product was not defective.  But the issues must be considered in the proper context of a motion for summary judgment.  Importantly, in products liability cases, even a question of fact about *whether* the presumption has been rebutted "will be submitted to the jury." *Wright v. Ford Motor Co.*, 508 F.3d 263, 273-74 (5th Cir. 2007) (emphasis in original). This is consistent with Oklahoma cases reviewing summary judgment vis a vis products liability claims.

> To avoid summary judgment, an opposing party need only show that evidence regarding whether the product was defective is subject to conflicting interpretations of such nature that reasonable minds might differ as to its significance. *Barber v. General Electric Company,* 648 F.2d 1272, 1276 (10th Cir. 1981).

18

*Attocknie v. Carpenter Mfg.*, 1995 OK CIV APP 54, ¶¶ 19-20, 901 P.2d 221, 228.

Therefore, Plaintiffs need only present enough to create an inference that we have rebutted the presumption; at the point it becomes a fact for the jury to decide. The questions really become as simple as:

1. Have Plaintiffs offered facts that infer that FMVSS 207 is not adequate?

2. Have Plaintiffs offered facts that infer that Defendants withheld information from NHTSA related to the adequacy are of FMVSS 207?

***Facts Inferring that FMVSS 207 is Inadequate***

As set out in Plaintiffs' lengthy statement of facts, there are more than sufficient facts to infer *both* paths to rebut the presumption that Defendants' seats are not defective. Here are a few of the facts that infer that FMVSS 207 is not adequate to protect the public:

- NHTSA Dec 1998 Press release stating that 207 is inadequate to protect occupants in rear impacts;

- May 2016 two United States Senators advise Defendants by letter that studies indicate FMVSS 207 is inadequate and that children are dying in rear seat positions because the seat back is failing;

- Defendants admit that the strength standard in FMVSS 207 is not enough to reduce accidents in the marketplace;

- FMVSS 207 does not take in to account any technologies advanced after 1967, including dynamic testing, and the weight or mass of an occupant;

19

- Defendants test their seats well beyond the bounds of FMVSS 207's mandate, including using dynamic testing, albeit with an occupant dummy that is not indicative of the weight of the average American;

- Defendants and other manufacturers lobby on a broad scale to control the rule making process and have managed to keep any changes from being made for over fifty (50) years.

In this case, FMVSS 207 has not been altered in almost fifty (50) years. It is difficult to comprehend the scope of the technological changes in *everything* that have come in the last fifty (50) years. So, it would be illogical to deny that the passage of time alone, may affect the adequacy of a regulation intended to protect passengers involved in collisions in vehicles. In fact, the lack of change over time can, by itself, form the basis for a finding that the standard is inadequate. Even the *Milburn* opinion recognizes that a dramatic passage of time could support a finding that the agency rule was inadequate.

> …we do not foreclose the possibility that subsequent developments could demonstrate that the standard was no longer adequate to protect the public from unreasonable risks of injury at the time of the compliant product's manufacture. For example, a material change in technology or a proliferation of new studies or data about risks and injuries associated with a compliant product could demonstrate the standard's inadequacy.

*Am. Honda Motor Co. v. Milburn*, 67 Tex. Sup. Ct. J. 1329 (2024). Similarly, from *Milburn,* the changes made to FMVSS 208 (in *Milburn*) compared to the *lack* of changes to FMVSS 207 are a stark contrast. FMVSS 208 (seat belt/restraints), which has been modified many times since it was implemented in 1967, to include requirements for head restraints, passive restraints, automatic seatbelts, and airbags. Those changes are related to

20

the real-world advances in technology and experience understanding the risks related to vehicle crashes. The opinion in *Milburn* cited the changes as evidence that NHTSA did not "ignore any red flags." *Am. Honda Motor Co. v. Milburn*, 67 Tex. Sup. Ct. J. 1329 (2024).

And yet Defendants argue that "there is an abundance of evidence in the record that NHTSA is acutely aware of the risk, *and upon careful consideration of a variety of factors, has adopted a regulation that is adequate.*" Defs' Motion, p. 6. This is intellectually insulting considering the court's own statements in *Milburn* that "a material change in technology or a proliferation of new studies or data about risks and injuries associated with a compliant product could demonstrate the standard's inadequacy." *Id.* Indeed, this suggestion is almost insidious when taken in concert with the scope of Toyota's lobbying efforts – along with other manufacturers – to prevent any modification of FMVSS 207.

### *The Court May Not Weigh the Credibility of The Experts*

Defendants' motion attempts to conflate the opinions of Plaintiffs' expert, Steven Meyer, in this case with the *Milburn* case. Indeed, they spend almost six (6) pages trying to compare them. But Mr. Meyer's opinions, and review and testing in this case are distinct. And complaints about the non-movant's experts is not enough to grant summary judgment. Another court in this district recently considered a motion for summary judgment alleging that plaintiff "has no proof that the governing standards were inadequate or that Omega Flex committed some sort of fraud in the approval process. . ." *Okla. Farm Bureau Mut. Ins. Co. v. Omega Flex, Inc.*, No. CIV-22-18-D, 2024 U.S. Dist. LEXIS 47102, at *11-14 (W.D. Okla. Mar. 18, 2024).

The court noted that plaintiff relied "primarily on its retained experts' opinions" to show that "the standards were inadequate to protect the public from unreasonable risks of injury or damage" because they "did not contemplate lightning's effect on CSST." *Id.* In denying the motion for summary judgment, the court found that plaintiff, "through its retained experts' Rule 26 reports, presents minimally sufficient evidence to create a genuine issue of material fact as to whether" defendant's product was defective. *Id.*[3]

When a defendant moves for summary judgment, the judge must ask himself not whether he thinks the evidence favors one side or the other, but whether a *fair-minded* jury could return a verdict for the plaintiff on the evidence presented. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). Most importantly, the court may not make credibility determinations or weigh the evidence and must disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.* "Credibility determinations [and] the *weighing of the evidence*. . . are jury functions, not those of a judge." *Plotke v. White,* 405 F. 3d 1092, 1093-94 & 1103 (10th Cir.2005).

---

[3] The filings in *Okla. Farm Bureau Mut. Ins. Co.* reflect multiple exchanges of expert opinions and criticism of those opinions. In that respect, "the Court is not in a position to weigh the parties' competing expert testimony." *Okla. Farm Bureau Mut. Ins. Co. v. Omega Flex, Inc.*, No. CIV-22-18-D, 2024 U.S. Dist. LEXIS 47102, at *11-14 (W.D. Okla. Mar. 18, 2024) (internal citations omitted). In this case, Defendants rely solely on *Milburn* to suggest that Mr. Meyer's opinions are insufficient. As discussed, that case is inapplicable, and a review of the basis for Mr. Meyer's opinions reflect an intense review and analysis of the facts using Mr. Meyer's knowledge, education and experience. And Defendants have not moved the Court to exclude any of Mr. Meyer's opinions.

Even if Plaintiffs had not presented evidence of Defendants' corporate representatives, and their own experts, and from government documents, the Court would be ill advised to base a summary judgment ruling on criticism of the expert for the non-movant.  The "approach of weighing the credibility of the competing expert reports amounts to improper fact-finding. Indeed, competing expert opinions present the classic battle of the experts and it is up to [the trier of fact] to evaluate what weight and credibility each expert opinion deserves." *Glossip v. Chandler*, 554 F. Supp.  3d 1176, 1197 (W.D. Okla. 2021) (quoting *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005)).

***Toyota Withheld Information Relevant to the Adequacy of FMVSS 207***

In 2016 members of the United States Senate requested information from Defendants on seat back issues.  The Senators asked for all complaints and lawsuits related to seat back issues for the last 10 years, and information on what efforts they were taking to "protect passengers against the threat of front seat back failures…which occur primarily during rear-end collisions or crashes [and] put back seat passengers, especially infants and children, at serious risk of injury or death."

The Senators also sought efforts to protect passengers against the threat of front seat back failures. . . which occur primarily during rear-end collisions or crashes put back seat passengers, especially infants and children, at serious risk of injury or death." Ex 8, May 25, 2016, letter, TOY-SHAFFER-15732-15734. Defendants admitted that they had the information, but the simply did not provide it.  Obviously, Defendants did not feel the need to cooperate with the Senators' requests, likely because they felt that their lobbying arm would manage any pressure to respond with substantive information. Without taking into

23

consideration the question of *whether such evidence, by itself,* rebuts the presumption that Defendants are not liable for a defect product, Toyota's marketing and lobbying efforts clearly play a significant role in the rule making process.  And the fact that the rule making process is never pushed through, makes Toyota's "compliance" questionable, at best.

Indeed, *Motor Vehicle Mfrs. Ass'n* makes it clear that evidence related to the *rule making process* is relevant to this inquiry. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43-44, 103 S. Ct. 2856, 2867 (1983). And the United States Supreme Court has made it clear common sense cannot substitute for obvious deficiencies in an agency process or decision.

> Normally, an agency rule would be arbitrary and capricious if the agency has … entirely failed to consider an important aspect of the problem, … or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S. Ct. 2856, 2867 (1983) (internal citations omitted).

## **A Punitive Instruction Cannot Be Denied at this Juncture**

Under Oklahoma law, a plaintiff may recover punitive damages when the conduct of the defendant evinces *reckless disregard for the rights of others* or *defendant has acted intentionally and with legal malice* or *has engaged in conduct that is life threatening.*  23 O.S. § 9.1. "Reckless disregard" means the defendant was aware or indifferent that its conduct put others at an unnecessary risk of injury." *Scribner v. Hillcrest Medical Center*,

1992 OK CIV APP 117, ¶ 12, 866 P. 2d 437.  Reckless disregard can be proven through circumstantial evidence.

Relying on cases discussing a punitive damage statute that was repealed in 1996, Defendants suggest that *at this stage,* the Court must find "clear and convincing" *evidence* of "wanton or reckless disregard." This is erroneous.  In fact, there is long standing precedent that the question of punitive damages is for the jury. The "question of exemplary damages, where properly pleaded, is a question of fact for the jury." *Reed v. Fichencord*, 1923 OK 841, ¶ 3, 96 Okla. 3, 4, 219 P.  937, 939.  When there is *any* evidence to support an inference either of gross negligence or reckless disregard/indifference for the safety of others, the trial court is required to submit punitive damages to the jury and to give jury instructions on that issue.  *Hightower v. Kansas City S. Railroad Co.*, 2003 OK 45, ¶ 38 n. 28, 70 P. 3d 835 (citing *Shuman v. Laverne Farmers Coop*, 1991 OK CIV APP 2, 809 P. 2d 76).

If "there is some evidence reasonably tending to support" a punitive instruction, "the trial court should submit the question to the jury." *Id.* And the measure of "some evidence" is slight as noted by the Oklahoma Supreme Court in *Williams v. Baldrey*, 1915 OK 852: we believe there was some evidence, *slight though it may be*, tending to prove the issue, and that therefore the court did not err in submitting the same to the jury." *Williams v. Baldrey*, 1915 OK 852, ¶ 8, 52 Okla. 126, 132, 152 P.  814, 815. And when slight evidence exists, "it was not only proper for the trial court to submit the question to the jury, but it was his *duty* to do so." *Reed v. Fichencord*, 1923 OK 841, ¶ 3, 96 Okla. 3, 4, 219 P.  937,

939. *See also Mangrum v. Ford Motor Credit Co.*, 1978 OK 57, ¶ 10, 577 P. 2d 1304, 1306.

It is only necessary that there be *some* evidence that would "give rise to an inference of" the elements of punitive damages. *Sopkin v. Premier Pontiac, Inc.*, 1975 OK CIV APP 47, ¶ 22, 539 P. 2d 1393, 1397. Thus, any evidence that *gives rise to an inference that Defendants were recklessly indifferent*, is sufficient to instruct the jury on punitive damages. *Sopkin v. Premier Pontiac, Inc.*, 1975 OK CIV APP 47, ¶ 27, 539 P. 2d 1393, 1397-98.

Similarly, in *Payne v. DeWitt,* 1999 OK 993, our Supreme Court discussed the concept of "reckless disregard" as used in the punitive damage statute and observed "punitive damages are allowable when there is evidence of reckless and wanton disregard of another's rights from which malice and evil intent may be inferred. *Graham v. Keuchel,* 1993 OK 6, 847 P. 2d 342, 363 (citing *Mitchell v. Ford Motor Credit Company,* 1984 OK 18, 688 P. 2d 42, 45). Oppressive intent may also be inferred from "complete indifference to consequences, conscious or reckless disregard of the safety of others" or "gross negligence." *Graham, supra* at 363 (quoting from *Mitchell, supra* at 45-46 n. 8); *Sunray DX Oil Co. v. Brown,* 1970 OK 183, 477 P. 2d 67, 70; *Payne* at footnote 7.

Most importantly, in products liability cases, a "reckless disregard for public safety" will give rise to a punitive damage instruction. See *Thiry v. Armstrong World Industries*, 1983 OK 28, ¶ 26, 661 P. 2d 515, 518-19.

> To meet this standard the manufacturer must either be aware of, or culpably indifferent to, an unnecessary risk of injury. Awareness should be imputed to a company to the extent that its employee[s] possess such information.

26

Knowing of this risk, the manufacturer must also fail to determine the gravity of the danger or fail to reduce the risk to an acceptable minimal level. "Disregard for the public safety" reflects a basic disrespect for the interests of others.

…

A manufacturer's fault in failing to deal with a product defect increases with the gravity of the resulting risk of harm to the public. As the costs of correcting or reducing the danger decrease, so does the credibility of excuses for failing to do so. As the manufacturer's awareness of the existence and gravity of the product defect increases, so does its duty to correct the problem and its culpability for failing to do so. The time lapse in responding to a product defect, its reasons for not acting further, and the nature of steps actually taken to correct the defect shed light on the manufacturer's values of profits over safety, and therefore its culpability. If the manufacturer deliberately deceived the public about its product's safety, it will usually be especially blameworthy and deserving of punishment.

*Thiry v. Armstrong World Indus.*, 1983 OK 28, ¶¶ 26-28, 661 P. 2d 515, 518-19.

Even malice may be <u>presumed</u> when a person commits willful acts in reckless disregard of another's rights or safety. *Slocum v. Phillips Petroleum*, 1983 OK 112.  Below are some of the facts Plaintiffs have presented that infer Defendants disregard for the public safety:

- Interfering and obstructing the rule making process by refusing to respond to inquiries about seat back failures;

- Carefully constructing their dynamic testing as to ensure safety only to a point that covers "85% of the accidents in the field."

- And refusing to measure the rearward angle at the higher delta-v because it will show the likelihood of failure for the other 15% of rear impact crashes.

- Ignoring notice of specific failures in their own seat backs;

- Ignoring notice from regulatory bodies that studies show weaking in their design in rear impact crashes, putting backseat occupants at risk for unnecessary and serious injuries;

- Continuing to test with outdated models for the average percentile weights of Americans;

The Court is not permitted to weigh the evidence to determine whether punitive damage instructions are to be submitted.  It is only where there is *no evidence whatsoever* including inferential or circumstantial that the Court may refuse to instruct the jury on exemplary damages after the evidence is in.  *Floyd v. Dodson*, 1984 OK CIV APP 57.  All of these must include consideration of the evidence *presented at trial.*

Although it is an issue of law, whether a punitive instruction should be given cannot be decided in a vacuum. If there is competent evidence presented at trial "upon which a reasonable jury could find reckless disregard," the instruction must be given.  *Badillo v. Mid Century Ins. Co.*, 2005 OK 48, ¶ 66, 121 P. 3d 1080, 1106 (emphasis added). But the question of whether competent evidence exists cannot be made *until* the evidence has been presented at trial.

Lastly, Defendants suggest that there must be evidence of some underlying conduct that is malicious or punitive. In his concurring opinion in *Thiry,* Justice Opala was clear:

> There is neither historical nor legal basis for confining exemplary damages to cases in which the underlying claim is founded on some fault concept. Punitive damages recovery is traditionally available at common law in actions founded on several legally cognizable theories which impose liability without regard to the actor's fault.

*Thiry v. Armstrong World Indus.*, 1983 OK 28, ¶ 4, 661 P.2d 515, 520 (Opala, concurring)

## **CONCLUSION**

Plaintiffs have presented facts sufficient to rebut the presumption that Defendants seat was not defective.  This includes numerous facts establishing the inadequacy of antiquated standards in FMVSS 207;  as well as facts showing that Defendants willfully withheld information from members of the United States Senate that they requested to assist them in reviewing the adequacy of FMVSS 207.  Finally, Plaintiffs have shown numerous facts from which a jury could infer that Defendants were reckless indifferent to the rights of the public, who, like Ms. Shaffer, could be unnecessarily injured – or killed – as an innocent passenger riding in their vehicles.

WHEREFORE, for all the foregoing reasons, Toyota Defendants' Motion for a Summary Judgment should be denied in its entirety.

Respectfully submitted,


 s/ S. Shea Bracken
_____
Glendell D. Nix, OBA #13747
S. Shea Bracken, OBA #30496
Andy J. Campbell, OBA #30512
Nicole Snapp-Holloway, OBA #18472
**MAPLES, NIX & DIESSELHORST**
15401 North May Ave.
Edmond, Oklahoma 73013

**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

This will certify that on the 23rd day of September 2024, I served these initial disclosures by mailing and email this document to the following:

| | |
|---|---|
| Mary Quinn Cooper<br>Andrew L. Richardson<br>Katie G. Crane<br>MCAFEE & TAFT, P. C.<br>Williams Center Tower II<br>Two West Second Street, Suite 1100<br>Tulsa, OK 74103<br>Maryquinn.cooper@mcafeetaft.com<br>Andrew.richardson@mcafeetaft.com<br>Katie.crane@mcafeetaft.com | David P.  Stone<br>Suzanne H. Swaner<br>NELSON MULLINS RILEY &<br>SCARBOROUGH, LLP<br>5830 Granite Parkway, Suite 1000<br>Plano, TX 75024<br>David.stone@nelsonmullins.com<br>Suzanne.swaner@nelsonmullins.com |


 s/ S. Shea Bracken
_____