

# Am. Honda Motor Co. v. Milburn

Supreme Court of Texas

September 13, 2023, Argued; June 28, 2024, Opinion Delivered

No. 21-1097

**Reporter**

2024 Tex. LEXIS 543 *; 67 Tex. Sup. J. 1329

American Honda Motor Co., Inc., Petitioner, v. Sarah Milburn, Respondent

**Notice:** PUBLICATION STATUS PENDING. CONSULT STATE RULES REGARDING PRECEDENTIAL VALUE.

**Prior History:** [*1] On Petition for Review from the Court of Appeals for the Fifth District of Texas.

Am. Honda Motor Co. v. Milburn, 668 S.W.3d 6, 2021 Tex. App. LEXIS 9512, 2021 WL 5504887 (Tex. App. Dallas, Nov. 24, 2021)

## Core Terms

seat, safety standards, detachable, belt, regulation, manufacturers, seat-belt, seatbelt, passenger, unreasonable risk, inadequacy, complied, misuse, rebutted, jurors, anchor, rear, unreasonable danger, lap, rebut a presumption, compliance, designated, injuries, nonliability, promulgated, rebuttable, mandatory, risks, safety regulation, design defect

## Case Summary

### Overview

HOLDINGS: [1]-In this products liability action involving an automobile manufacturer's alleged negligent design of a seat-belt system, the 2011 vehicle's design complied with mandatory federal safety standards that were applicable to the vehicle at the time of manufacture and governed the product risk that allegedly caused harm, entitling petitioner to a presumption of nonliability.

### Outcome

Judgment reversed.

## LexisNexis® Headnotes

Evidence > Inferences & Presumptions > Presumptions > Creation



5:22-cv-151-R
**EXHIBIT**
**Plfs' 1**
Obj to Defs' Motion for Summary Judgment

Torts > Products Liability > Types of Defects > Design Defects

Evidence > Inferences & Presumptions > Presumptions > Rebuttal of Presumptions

### HN1[⬇] Presumptions, Creation

Tex. Civ. Prac. & Rem. Code § 82.008 entitles a manufacturer to a rebuttable presumption that it is not liable in a products liability action based on a product's design if the manufacturer establishes that the design complied with applicable federal safety standards or regulations that governed the product risk that allegedly caused harm. Tex. Civ. Prac. & Rem. Code § 82.008(a). The claimant may then rebut that presumption by establishing that the standards or regulations were inadequate to protect the public from unreasonable risks of injury or damage. § 82.008(b)(1).

Torts > Products Liability > Types of Defects > Design Defects

### HN2[⬇] Types of Defects, Design Defects

A products liability claim involving a design defect requires proof that the product's design rendered it unreasonably dangerous, taking into consideration the utility of the product and the risk involved in its use, and that a safer alternative design existed. Tex. Civ. Prac. & Rem. Code § 82.005(a). When the product at issue is a motor vehicle, the vehicle's compliance with applicable federal motor vehicle safety standards is often presented as evidence tending to show the design was not defective. A motor vehicle safety standard is a minimum standard for motor vehicle or motor vehicle equipment performance, 49 U.S.C.S. § 30102(a)(10), and a vehicle may not be manufactured for sale absent compliance with all applicable safety standards, § 30112(a)(1). Under federal law, such compliance does not exempt the manufacturer from liability at common law. § 30103(e).

Torts > Products Liability > Theories of Liability > Negligence

Torts > Products Liability > Theories of Liability > Strict Liability

Torts > Procedural Matters > Commencement & Prosecution > Venue

### HN3[⬇] Theories of Liability, Negligence

Under Texas law, a products liability action can be based on negligence or strict liability, among other theories. Tex. Civ. Prac. & Rem. Code § 82.001(2).

Evidence > Inferences & Presumptions > Presumptions > Rebuttal of Presumptions

Torts > Products Liability > Theories of Liability > Misrepresentation

### HN4[⬇] Presumptions, Rebuttal of Presumptions

Tex. Civ. Prac. & Rem. Code § 82.008 entitles a product manufacturer to a presumption that it is not liable for injuries caused by its product's design if the manufacturer establishes that (1) the design complied with mandatory federal safety standards or regulations, (2) the standards or regulations were applicable to the product at the time of manufacture, and (3) the standards or regulations governed the product risk that allegedly caused the harm. That presumption, however, is rebuttable. A claimant may rebut the presumption by establishing either that the mandatory federal safety standards or regulations applicable to the product were inadequate to protect the public from unreasonable risks of injury or damage or that the manufacturer, before or after marketing the product, withheld or misrepresented information or material relevant to the federal government's or agency's determination of adequacy of the safety standards or regulations at issue in the action. Tex. Civ. Prac. & Rem. Code § 82.008(b).

Evidence > Burdens of Proof > Allocation

### HN5[⤓]  Burdens of Proof, Allocation

The defendant bears the burden of proof to establish an affirmative defense and obtain the requisite jury findings.

Governments > Legislation > Interpretation

### HN6[⤓]  Legislation, Interpretation

In interpreting a statute's plain language, courts construe the words and phrases chosen by the Legislature in context.

Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

Evidence > Weight & Sufficiency

### HN7[⤓]  Substantial Evidence, Sufficiency of Evidence

An appellate court reviews legal sufficiency challenges to a jury's verdict by considering whether the evidence at trial, viewed in a light favorable to the verdict, would enable reasonable and fair-minded people to reach the verdict under review.

Torts > Products Liability > Types of Defects > Design Defects

### HN8[⤓]  Types of Defects, Design Defects

Whether a product's design is defective and whether the applicable safety standards with which the design complies are inadequate to protect the public necessarily constitute distinct inquiries. If the standard for rebutting the presumption mirrored the standard for a product defect, then the presumption would serve no purpose at all. Accordingly, a determination that an applicable federal safety standard is inadequate to

protect the public from unreasonable risks of injury requires something other than proof of a product's defective design—that is, something more than a conclusion that the risks outweighed the benefits with respect to the particular product design at issue.

**Counsel:** For Texas Trial Lawyers Association, Amicus Curiae: Mr. John Blaise Gsanger, Ms. Laura Gutierrez Tamez.

For The American Tort Reform Association, Amicus Curiae: Mr. Jonathan D. Urick, Catherine L. Eschbach, H. Sherman Joyce, Mr. William R. Peterson, Michael A. Tilghman II, Charles H. Haake, Lauren Sheets Jarrell.

For The Chamber of Commerce of the United States of America, Amicus Curiae: H. Sherman Joyce, Mr. William R. Peterson, Charles H. Haake, Catherine L. Eschbach, Michael A. Tilghman II, Mr. Jonathan D. Urick, Lauren Sheets Jarrell.

For Texas Association of Defense Counsel, Amicus Curiae: Mr. Michael W. Eady, Samantha McCoy, Ms. Ruth G. Malinas.

For American Honda Motor Co., Inc., Petitioner: Ms. Rachel Anne Ekery, Ms. Yesenia Cardenas-Colenso, Mr. William J. Boyce, Mr. Scott P. Stolley, Mr. Kurt C. Kern, Mr. Wallace B. Jefferson.

For Texas Civil Justice League, Amicus Curiae: Mr. George S. Christian.

For Sarah Milburn, Respondent: Mr. Jeffrey S. Levinger, Mr. James L. Mitchell, Ms. Charla G. Aldous, Mr. Caleb Miller, Mr. Brent R. Walker.

For The International Association of Defense Counsel, Amicus Curiae: [*2]  Mr. Manuel Lopez, Mr. Robert M. Randy Roach Jr.

For The National Association of Manufacturers, Amicus Curiae: Catherine L. Eschbach, Charles H. Haake, Lauren Sheets Jarrell, Mr. Jonathan D. Urick, H. Sherman Joyce, Michael A. Tilghman II, Mr. William R. Peterson.

For Product Liability Advisory Council, Inc., Amicus Curiae: Ms. Joy M. Soloway.

For The Alliance for Automotive Innovation, Amicus Curiae: Michael A. Tilghman II, Mr. William R. Peterson, Lauren Sheets Jarrell, H. Sherman Joyce, Charles H. Haake, Catherine L. Eschbach, Mr. Jonathan D. Urick.

**Judges:** JUSTICE LEHRMANN delivered the opinion of the Court, in which Chief Justice Hecht, Justice Blacklock, Justice Busby, Justice Bland, Justice Huddle, and Justice Young joined. JUSTICE BLACKLOCK filed a concurring opinion, in which Justice Busby joined. JUSTICE DEVINE filed a dissenting opinion, in which Justice Boyd joined.

**Opinion by:** Debra H. Lehrmann

## Opinion

In this products liability action involving an automobile manufacturer's alleged negligent design of a seat-belt system, the primary issue presented concerns the statutory rebuttable presumption of nonliability that attaches when a product's design complies with applicable federal safety standards. The trial [*3]  court

rendered judgment on the jury's verdict in the plaintiff's favor, and the court of appeals affirmed. The court of appeals held, among other things, that legally sufficient evidence supports the jury's findings that the presumption of nonliability applied and that the presumption was rebutted. We hold as a matter of law that the presumption both applied and was not rebutted. Because that holding is dispositive, we reverse the court of appeals' judgment and render judgment for the manufacturer without addressing the remaining issues.

## I. Background

### A. The Seat-Belt System

The standard seat-belt system in motor vehicles is a Type 2 system that integrates the shoulder belt and lap belt into one continuous piece of webbing with three points of attachment. Typically, the shoulder belt attaches to the car's frame or seat, the lap belt attaches to the car's floor or seat, and the passenger creates the third point of restraint by pulling the belt across her body and latching it into a buckle next to her hip.

The seat-belt system at issue here is a ceiling-mounted detachable Type 2 anchor system, which is used in the third-row middle seat of the 2011 Honda Odyssey, among many other vehicles. [*4] The belt in the 2011 Odyssey is mounted to the ceiling on the right side of the middle seat and has a detachable anchor that latches into a minibuckle at the right hip. When the anchor is attached, the passenger creates the third point of restraint by buckling the belt at her left hip. But if the passenger fastens the belt in that way when the anchor is not attached, and the passenger fails to reattach the anchor, the passenger's lap will remain unbelted. A key-like object is required to detach the anchor.

The reason for the detachability feature is to allow the seat belt to retract into the ceiling, which in turn facilitates the rear seat's folding flat into the floor pan, significantly increasing the amount of cargo space without risking damage to the seat belt. Generally, the anchor is intended to remain connected when the seat is in the upright position. The Odyssey's owner's manual contains warnings about using the seat belt when the anchor is detached, and an additional warning label is located on the seat belt itself. It is undisputed that the detachable-anchor system used in the rear middle seat of the 2011 Odyssey complies with mandatory federal regulations, as the Federal [*5] Motor Vehicle Safety Standards expressly allow that system to be used in passenger cars manufactured after September 1, 2007, in the middle seating position of a seat for which the seat back can be folded nearly or fully flush with the floor. *See* 49 C.F.R. § 571.208, S4.2.7.4.

### B. The Accident

On the evening of November 14, 2015, Sarah Milburn went out with five friends to a bar in Uptown Dallas. Shortly after midnight, the group decided to meet up with other friends at a different bar a short distance away. A member of the group called an Uber, and Uber driver Arian Yusufzai picked them up in a 2011 Odyssey. Milburn sat in the third-row middle seat. That seat's detachable anchor was not latched, and the webbing was retracted into the ceiling-mounted retractor. Milburn fastened her seat belt by pulling

the belt down from the ceiling across her body and attaching it to the buckle at her left hip, leaving her lap unbelted.[1]

As the Odyssey entered an intersection, a pickup truck hit the minivan on the passenger side, causing it to overturn and come to rest on its roof.[2] The impact caused Milburn to move forward and to the right until her neck was "clotheslined" by the shoulder-strap portion of the belt. While [*6]  the other five passengers exited the van unassisted, paramedics extracted Milburn on a backboard and took her to the hospital. Milburn, who was twenty-three years old at the time of the accident, suffered severe injuries to her cervical vertebrae that rendered her a quadriplegic.

## C. The Lawsuit

Milburn sued Honda, Uber Technologies and two of its subsidiaries, Yusufzai, and the Odyssey's owner.[3] Before trial, Milburn settled with all defendants except Honda and amended her petition to assert only product liability claims against Honda. Milburn alleged that the Odyssey was "defective and unreasonably dangerous in that it was not adequately designed, manufactured or marketed to minimize the risk of injury." More specifically, she alleged that Honda was negligent in (1) designing the Odyssey "with a third-row center seatbelt system which an ordinary passenger would likely not be able [to] use as designed because the intended method of use was dangerously unclear, confusing, counter intuitive, and misleading"; (2) failing to adequately test and evaluate the usability and safety of the seat belt system; and (3) failing to provide adequate warnings and instructions.[4]

Honda raised several affirmative [*7]  defenses in its answer. Relevant here, Honda first pleaded that the Odyssey's compliance with mandatory federal safety standards gave rise to a presumption of nonliability under Texas Civil Practice and Remedies Code Section 82.008. *HN1*[⬆] That statute entitles a manufacturer to a rebuttable presumption that it is not liable in a products liability action based on a product's design if the manufacturer establishes that the design complied with applicable federal safety standards or regulations "that governed the product risk that allegedly caused harm." TEX. CIV. PRAC. & REM. CODE § 82.008(a). The claimant may then rebut that presumption by establishing that the standards or regulations "were inadequate to protect the public from unreasonable risks of injury or damage." *Id.* § 82.008(b)(1).

As an additional affirmative defense, Honda pleaded that, under Civil Practice and Remedies Code Chapter 33, its liability should be reduced by the "percentage of responsibility" attributable to Milburn, the settling defendants, and the driver of the pickup truck. As to the Uber entities specifically, Honda alleged that their negligence, negligent undertaking, and fraudulent and negligent misrepresentations were

---

[1] As the court of appeals described, conflicting evidence was presented at trial regarding whether Milburn was wearing her seat belt at all. 668 S.W.3d 6, 27-28 (Tex. App.—Dallas 2021). It was within the jury's province to resolve that factual dispute.

[2] The police report concluded that Yusufzai ran a red light. There was also testimony that he entered the intersection as the light changed from yellow to red.

[3] Milburn's parents were also named plaintiffs, but they later nonsuited their claims. The named defendants were American Honda Motor Co., Inc.; Honda Motor Co., Ltd. (which was later nonsuited); Uber Technologies, Inc.; Rasier, LLC; Uber USA, LLC; Arian Yusufzai; and Dawood Kohistani.

[4] Although Milburn alleged design, manufacturing, and marketing defects in her petition, only a design-defect claim was submitted to the jury.

a producing cause of Milburn's injury. Milburn specially excepted to Honda's pleadings relating to the Uber entities' proportionate responsibility [*8] under Chapter 33, arguing that (1) submission of the Uber entities for comparative apportionment would be improper because Uber's liability was derivative of another tortfeasor (Yusufzai) and thus (2) all evidence regarding the allegations against the Uber entities should be excluded as irrelevant. Milburn then moved for partial summary judgment, arguing no viable legal claim would permit the submission of the Uber entities in a proportionate-responsibility question. The trial court granted the motion.

The parties proceeded to a three-week jury trial. Milburn presented two expert witnesses to testify about the seat-belt system's design. Joellen Gill, a human factors engineering consultant,[5] testified that the seat-belt system's design was defective from a human factors perspective because it was foreseeable that owners would not reliably maintain the belt in the anchored position and that passengers would neither fasten the unanchored belt correctly nor recognize that they were belted incorrectly. And she concluded that Honda did not adequately mitigate those foreseeable risks. In so opining, Gill explained that her conclusions were supported by two "usability studies" conducted by Milburn's [*9] counsel in which fifty out of fifty-three people asked to fasten an unanchored seat belt in a 2011 Odyssey's rear center seat did so incorrectly. Honda sought to exclude Gill's testimony on the grounds that she was not qualified and that her testimony was unreliable; Honda further sought to exclude the usability studies as unreliable and unscientific. The trial court denied those requests.

Milburn also presented the expert testimony of Steven Meyer, a mechanical engineer specializing in automotive safety, who concluded that the likelihood of the seat belt's incorrect usage, weighed against the utility of the additional cargo space, rendered the system unreasonably dangerous as designed. He further testified that a safer alternative design that is both economically and technologically feasible is an "all-belts-to-seat" (ABTS) system, meaning the belt is attached to the seat, with no detachability feature, and thus cannot be erroneously used as a two-point belt.[6]

Honda presented its own engineering and human factors experts to testify about the product's design. Michael Klima, a mechanical engineer, opined that the Odyssey's seat-belt system was "well-designed, consistent with peers out [*10] in the motoring public today." He further opined that the ABTS alternative design Meyer suggested would require additional seat height and bulk, which in turn would interfere with the ability to retract the seat into the floor. Nathan Dorris, a human factors and safety consultant, opined that the design of the seat-belt system was "reasonably safe . . . from a human factors perspective," taking into account expected knowledge and attitudes regarding seat belts, including the expectation of a lap belt and the ability to ask a driver for assistance.

Honda's corporate representative testified that no other complaints or lawsuits regarding the seat belt had been filed and that the system "is used widely throughout Honda and the rest of the industry and has been for almost 20 years." When asked whether Honda conducted any usability studies with respect to the detachable seat belt in the 2011 Odyssey, he explained that Honda would not have done such a study "since it wasn't a new technology" and was "used in the marketplace for almost over 10 years before it

---

[5] Gill described human factors engineering, which began as a discipline in the 1950s, as combining traditional design engineering and cognitive psychology to consider how people interact with the products and systems that engineers design, with the goal of making those systems safer.

[6] Both the detachable system used in the Odyssey's rear middle seat and the ABTS design that Meyer endorsed are "Type 2" systems in that they have three points of attachment. The difference is the detachability feature.

was applied to this vehicle." Honda began using roof-mounted detachable seat belts in its vehicles in 2001 or 2002 and had used them [*11] in the Odyssey since 2005.

In a single liability question, the jury was asked whether Honda was negligent in designing the 2011 Odyssey and whether Honda's negligence, if any, proximately caused Milburn's injury. The charge instructed the jury that "[f]or American Honda to have been negligent, there must have been a defect in the designing" of the Odyssey. The charge went on to define "design defect" as "a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. For a design defect to exist there must have been a safer alternative design." In turn, the charge defined "safer alternative design" as

> a product design other than the one actually used that in reasonable probability (1) would have prevented or significantly reduced the risk of the injury in question without substantially impairing the product's utility and (2) was economically and technologically feasible at the time the product left the control of American Honda by the application of existing or reasonably achievable scientific knowledge.

(Formatting altered.) The jury answered "yes" to the liability question.

The charge [*12] then asked the jury two questions about the Odyssey's compliance with federal safety regulations. The jury first found that the Odyssey's design complied with mandatory federal safety standards or regulations "that were applicable to the product at the time of manufacture and that governed the product risk that allegedly caused harm," meaning that the statutory presumption of nonliability applied. However, the jury also found that those standards or regulations were "inadequate to protect the public from unreasonable risks of injury or damage," meaning Milburn rebutted that presumption.

The jury went on to find that Milburn's and Yusufzai's negligence also proximately caused the injury in question and attributed 63% of the responsibility to Honda, 32% to Yusufzai, and 5% to Milburn. Finally, the jury found that approximately $37 million in damages would fairly and reasonably compensate Milburn for her injuries. The trial court rendered judgment on the verdict, reducing the amount awarded by 5% for Milburn's proportionate responsibility and applying a credit based on Milburn's settlements with the other defendants. Because the jury attributed more than 50% of the responsibility to Honda, [*13] the trial court deemed Honda jointly and severally liable for Milburn's recoverable damages. *See* TEX. CIV. PRAC. & REM. CODE § 33.013(b)(1). Accordingly, the trial court's judgment ordered that Milburn recover from Honda just under $26 million in damages and prejudgment interest.

Honda appealed, arguing that the evidence was legally and factually insufficient to support the jury's finding that Honda negligently designed the Odyssey, proximately causing the injury in question, and the jury's finding that the nonliability presumption was rebutted. Honda further argued that the trial court erred in excluding the settling Uber entities from the jury's consideration of proportionate responsibility.

The court of appeals affirmed. 668 S.W.3d 6 (Tex. App.—Dallas 2021). On the sufficiency issues, the court concluded that the case amounted to a "battle of the experts" and that it was within the jury's province to resolve the conflicting evidence in Milburn's favor. *Id*. at 20, 26. In so holding, the court rejected Honda's challenges to Gill's qualifications and the reliability of her testimony. *Id*. at 22-24. Regarding the evidence of a safer alternative design, the court concluded that Meyer sufficiently explained how the ABTS system could be implemented while maintaining the stowaway feature of [*14] the rear seat and that, even if his testimony on that point was conclusory, conflicting evidence was presented about whether the loss of cargo space associated with the stowaway seat would substantially

impair the utility of the product. *Id*. at 25-26. On the proportionate-responsibility issue, the court of appeals held that (1) Honda's negligence theories could not support submission of the Uber entities to the jury to apportion liability because those entities' liability was derivative of Yusufzai's and (2) no evidence supported a fraud or negligent-misrepresentation claim. *Id*. at 31-34.

In its petition for review, Honda renews its legal sufficiency challenges to the jury's findings of regulatory inadequacy and negligence.[7] Honda alternatively argues that it is entitled to rendition of judgment under federal conflict-preemption principles. Finally, Honda asserts that, if rendition is inappropriate, it is nevertheless entitled to a new trial because the trial court erred in refusing to submit the Uber entities in the proportionate-responsibility question.

## II. Discussion

*HN2*[↑] A products liability claim involving a design defect requires proof that the product's design rendered it unreasonably dangerous, [*15] taking into consideration the utility of the product and the risk involved in its use, and that a safer alternative design existed. *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009); TEX. CIV. PRAC. & REM. CODE § 82.005(a).[8] When the product at issue is a motor vehicle, the vehicle's compliance with applicable federal motor vehicle safety standards is often presented as evidence tending to show the design was not defective. A motor vehicle safety standard is "a minimum standard for motor vehicle or motor vehicle equipment performance," 49 U.S.C. § 30102(a)(10), and a vehicle may not be manufactured for sale absent compliance with all applicable safety standards, *id*. § 30112(a)(1). Under *federal law*, such compliance does not exempt the manufacturer from liability at common law. *Id*. § 30103(e). But under *Texas law*, it does under certain circumstances.

Specifically, in 2003, the Legislature enacted Civil Practice and Remedies Code Section 82.008 in response to "a finding that manufacturers and sellers were being held liable in products liability cases even though the products at issue complied with all applicable federal safety standards." *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 869 (Tex. 2014). *HN4*[↑] Section 82.008 entitles a product manufacturer to a presumption that it is not liable for injuries caused by its product's design if the manufacturer establishes that (1) the design complied with mandatory federal safety standards or regulations, [*16] (2) the standards or regulations were applicable to the product at the time of manufacture, and (3) the standards or regulations governed the product risk that allegedly caused the harm. *Id*. (citing TEX. CIV. PRAC. & REM. CODE § 82.008(a));[9] *see also Wright v. Ford Motor Co.*, 508 F.3d 263, 271 (5th Cir. 2007) ("Section

---

[7] In the court of appeals, Honda argued the evidence was insufficient as to both negligence and proximate cause. 668 S.W.3d at 12-14. Honda does not challenge causation in this Court.

[8] *HN3*[↑] Under Texas law, a products liability action can be based on negligence or strict liability, among other theories. *See* TEX. CIV. PRAC. & REM. CODE § 82.001(2); *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999). Only a negligence question was submitted to the jury in this case; however, as noted, the jury was instructed that for Honda to have been negligent, "there must have been a defect in the designing of the 2011 Honda Odyssey." "Defective design" was defined in accordance with the applicable common-law and statutory requirements.

[9] Section 82.008(a) states in full:

In a products liability action brought against a product manufacturer or seller, there is a rebuttable presumption that the product manufacturer or seller is not liable for any injury to a claimant caused by some aspect of the formulation, labeling, or design of a product if the product manufacturer or seller establishes that the product's formula, labeling, or design complied with mandatory safety

82.008(a) is not limited to preemptive regulations, and, in fact, appears to assume non-preemptive regulations . . . .").[10]

That presumption, however, is rebuttable. A claimant may rebut the presumption by establishing either that "the mandatory federal safety standards or regulations applicable to the product were inadequate to protect the public from [*17]  unreasonable risks of injury or damage" or that "the manufacturer, before or after marketing the product, withheld or misrepresented information or material relevant to the federal government's or agency's determination of adequacy of the safety standards or regulations at issue in the action." TEX. CIV. PRAC. & REM. CODE § 82.008(b). Only the rebuttal ground premised on inadequacy of the applicable federal safety standards is at issue.

As in other cases addressing Section 82.008, the parties and the lower courts here treated the applicability of the presumption as an affirmative defense, on which Honda bore the burden of proof, and the presumption's rebuttal as an exception to or matter in avoidance of that defense, on which Milburn bore the burden.[11] *See Kia Motors*, 432 S.W.3d at 870 n.5 (noting that Kia raised the presumption as an affirmative defense in its pleadings and challenged the jury's verdict in part because no evidence was presented rebutting the presumption); *Wright*, 508 F.3d at 274 (noting that if the rebuttal evidence relied on by the plaintiff "presents a fact question [with respect to regulatory inadequacy], then, in a jury tried case, it appears logical to conclude that the statute proceeds on the assumption that any such fact question as *whether* the presumption has been rebutted [*18]  will be submitted to the jury"). The statutory language supports that treatment to some extent, as a defendant manufacturer or seller must "establish[]" that the presumption applies due to the product's compliance with applicable safety standards, TEX. CIV. PRAC. & REM. CODE § 82.008(a), and if it does so, the claimant must then "establish[]" the inadequacy of those safety standards to rebut the presumption, *id*. § 82.008(b). As discussed below, however, the presumption's applicability in the first instance will rarely lend itself to resolution by the factfinder.

Further, considering the statutory context and structure of Section 82.008,[12] the presumption, when applicable, essentially presents an independent hurdle that the claimant must clear to establish a manufacturer's or seller's liability on a defective-design claim. If the manufacturer establishes the presumption's applicability and the claimant fails to rebut it, the manufacturer is "not liable" on the claim, and further inquiry into the claim's elements is immaterial. *Id*. § 82.008(a). But if the claimant rebuts the presumption, the defendant's compliance with applicable safety standards becomes just another piece of evidence relevant to whether the product was defectively designed.

---

standards or regulations adopted and promulgated by the federal government, or an agency of the federal government, that were applicable to the product at the time of manufacture and that governed the product risk that allegedly caused harm.

TEX. CIV. PRAC. & REM. CODE § 82.008(a).

[10] Notwithstanding the federal statute's express statement that compliance with federal law does not exempt a manufacturer from liability at common law, Honda maintains that federal law preempts Milburn's claims. Because we hold that Honda is not liable under Texas law, we need not reach its preemption argument.

[11] *HN5*[⬆] *See Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 156 (Tex. 2015) (noting that the defendant bears the burden of proof "to establish [an affirmative] defense and obtain the requisite jury findings"); *Walters v. Cleveland Reg'l Med. Ctr*., 307 S.W.3d 292, 295 (Tex. 2010) (discussing the plaintiff's burden with regard to the open-courts exception to the statute-of-limitations defense).

[12] *HN6*[⬆] In interpreting a statute's plain language, we construe the words and phrases chosen by the Legislature in context. *Aleman v. Tex. Med. Bd*., 573 S.W.3d 796, 802 (Tex. 2019).

## A. Applicability [*19] of Presumption

We first address the presumption's applicability: whether the 2011 Odyssey (1) complied with mandatory federal safety regulations that (2) were applicable to the Odyssey at the time of its manufacture and (3) "governed the product risk that allegedly caused the harm." *Id.* The federal safety regulations at issue—the Federal Motor Vehicle Safety Standards—are promulgated by the National Highway Traffic Safety Administration (NHTSA).

Although this issue was presented to the jury—who resolved it in Honda's favor—and Milburn challenged the finding on appeal on no-evidence grounds, Milburn also favorably cites a recent Fifth Circuit decision for the proposition that the presumption's applicability is a question of law for the court. *Kim v. Am. Honda Motor Co.*, 86 F.4th 150, 169-70 (5th Cir. 2023). As we implied in *Kia Motors*, we agree that the presumption's applicability, at least in most instances, will be a question of law rather than one of fact. *See* 432 S.W.3d at 874 (holding as a matter of law that the presumption did not apply because the pertinent federal safety standards did not govern the product risk that allegedly caused the harm). Determining a product's compliance with identified, mandatory safety regulations that were applicable to the product at the [*20] time of manufacture will typically be a straightforward affair with little room for disagreement. Indeed, there is no dispute here that the 2011 Odyssey complied with the mandatory motor vehicle safety standards that govern seat belts and were applicable to the Odyssey at the time of its manufacture.

The only disputed issue is whether those standards "governed the product risk that allegedly caused the harm." But that question too lends itself to resolution as a matter of law, *see id.*, because it requires the interpretation of a government agency's regulation in order to determine its relation to the relevant product risk—a quintessentially judicial task. *See Wal-Mart Stores, Inc. v. Xerox State & Loc. Sols., Inc.*, 663 S.W.3d 569, 577 n.26 (Tex. 2023) ("As we do, federal courts interpret regulations by applying similar construction principles used to interpret statutes."); *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006) ("Statutory construction is a question of law . . . ."). While we do not foreclose the possibility that there could be disputed relevant facts, whether the presumption applies in the first instance will generally be a question of law. With that backdrop in mind, we examine the pertinent safety standards and the product risk they allegedly govern.

NHTSA promulgated the Federal Motor Vehicle Safety Standards [*21] in accordance with congressional direction to prescribe such standards for the purpose of "reduc[ing] traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101; *see also* 49 C.F.R. § 571.1. Most pertinent here is Safety Standard 208, which "specifies performance requirements for the protection of vehicle occupants in crashes." 49 C.F.R. § 571.208, S1. The regulation's stated purpose is "to reduce the number of deaths of vehicle occupants, and the severity of injuries, by specifying vehicle crashworthiness requirements in terms of forces and accelerations measured on anthropomorphic dummies in test crashes, *and* by specifying equipment requirements for active and passive restraint systems." *Id.* § 571.208, S2 (emphasis added).

With narrow exceptions, Safety Standard 208 requires all passenger cars manufactured on or after September 1, 2007, to be equipped with a "Type 2 seat belt assembly that conforms to Standard No. 209

and to S7.1 and S7.2 of this standard at each rear designated seating position."[13] *Id.* § 571.208, S4.1.5.5.1. The regulations go on to state:

> Any inboard designated seating position on a seat for which the entire seat back can be folded (including the head restraints and any other part of the vehicle attached [*22] to the seat back) such that no part of the seat back extends above a horizontal plane located 250 mm above the highest [seat reference point] located on the seat may meet the requirements of S4.1.5.5.1 [to equip the car with a Type 2 seat belt assembly that conforms to Standard 209 and to S7.1 and S7.2 of Standard 208] by use of a belt incorporating a release mechanism that detaches both the lap and shoulder portion at either the upper or lower anchorage point, but not both. The means of detachment shall be a key or key-like object.

*Id.* § 571.208, S4.1.5.5.2. The third-row middle seat of the 2011 Odyssey qualifies as such an "inboard designated seating position on a seat for which the entire seat back can be folded . . . ." *Id.* Thus, Safety Standard 208 expressly authorizes "use of a belt incorporating a release mechanism that detaches both the lap and shoulder portion at either the upper or lower anchorage point, but not both," as the means of equipping the vehicle with the required Type 2 seat-belt assembly for that seating position. *Id.* The Odyssey undisputedly complies with that standard by using a belt with a release mechanism that detaches both the lap and shoulder portion at the lower anchorage point, [*23] with a key-like object as the means of detachment.

Relying largely on our decision in *Kia Motors*, Milburn argues that the Odyssey's compliance with Safety Standard 208 is irrelevant because it does not govern the product risk at issue—specifically, "the risk that owners, drivers, and passengers will fail to reliably use the detachable seat belt system in a correct manner." Honda responds that the product risk at issue is the dual detachability of the lap and shoulder belt, which the regulation expressly allows. We do not view those risks as mutually exclusive, as the risk of misuse accompanies a detachable seat-belt system. And for the reasons discussed below, we also conclude that Safety Standard 208 governs that risk.

We begin with a discussion of *Kia Motors*, which guides our inquiry on this issue and is cited by both parties to support their opposing positions. That case involved a products liability suit against Kia for injuries suffered when a vehicle's frontal air bag failed to deploy during a collision due to allegedly defective wiring connectors in the air-bag system. *Kia Motors*, 432 S.W.3d at 868. The vehicle complied with Safety Standard 208's requirement that it be equipped with front driver's side and passenger's side [*24] air bags that met certain protection criteria during a crash test. *Id.* at 870 (citing 49 C.F.R. § 571.208, S5.1, S6). Nevertheless, we held that Section 82.008's presumption of nonliability did not apply because the regulation had no bearing on the risk associated with the alleged product defect: "the risk of occupant injury due to the failure of the air bag to reliably activate and deploy." *Id.* at 874. We noted that the result would have been different, and the presumption would have applied, had the alleged defect been the lack of specific occupant-restraint equipment—such as a third frontal air bag—that the regulation did not require. *Id.*

Milburn argues that, just as the regulation at issue in *Kia Motors* "presume[d] air bag deployment" and did "not measure or apply to air bag failure rates," *id.* (emphasis omitted), the regulations applicable to seat

---

[13] The referenced standards govern requirements for seat-belt assemblies such as hardware, durability, adjustment, and latch mechanisms. *See* 49 C.F.R. §§ 571.208, S7.1, S7.2; 571.209.

belts "all presume that the seat belts are correctly being used in their intended manner" and do not contemplate the risk of misuse. That assertion ignores an important distinction between the air-bag regulations at issue in *Kia Motors* and the seat-belt regulations at issue here. It is true that the Safety Standards' mandated crash tests measure the efficacy of seat belts when used in their intended manner, just as [*25] they measure the efficacy of air bags when they properly deploy. However, unlike the air-bag regulations reviewed in *Kia Motors*, the seat-belt regulations are not limited to how seat belts perform in a crash; they also contemplate equipment types, locations, and designs for various seating positions. And they expressly authorize the precise design that Milburn alleges is defective: a system with a release mechanism that detaches both the lap and shoulder portion at the lower (or upper) anchorage point. In that respect, the hypothetical we posited in *Kia Motors*—that the presumption would apply to an alleged defect premised on the lack of a third frontal air bag when the regulation only required two—is instructive. Milburn essentially alleges that the Odyssey was defective because it used a dual-detachable seat-belt system in the third-row center seat instead of an ABTS system. But while Safety Standard 208 mandates a Type 2 assembly in that seating position, it does not mandate an ABTS system. Instead, NHTSA deliberately chose to allow the dual-detachable system.[14]

Indeed, any detachable system necessarily involves a risk of misuse, and that risk was contemplated when NHTSA assessed whether to allow this [*26] type of system at all; that is, the risk of misuse was part of the cost—benefit analysis. NHTSA said as much in its published comments in 2004 to the final rule amending Safety Standard 208 to allow the dual-detachable system. *See* 69 Fed. Reg. 70904, 70908-09 (Dec. 2004). In those comments, NHTSA noted that the then-existing standard permitted detachability of the shoulder portion of the belt in certain seating positions but that many manufacturers were already using "a 'minibuckle' design that permits the entire belt to detach from the seat and retract into the upper shoulder anchorage," like the one at issue here. *Id.* at 70908. That design was also being used in seats for which manufacturers, at the time, were given the option of using either a Type 1 (lap-belt only) or Type 2 system, such as rear center seats and rear outboard seats located adjacent to an aisle. *Id.*; *see* 49 C.F.R. § 571.208, S4.1.4.2(a) (1989) (requiring most passenger cars manufactured on or after September 1, 1990, to be equipped with a Type 2 system "at every forward-facing rear outboard designated seating position"); *id.* § 571.208, S4.1.5.1(a)(2) (1993) (requiring most passenger cars manufactured on or after September 1, 1996, to be equipped with either a Type 1 or Type 2 seat belt assembly "at any rear designated seating [*27] positions that are not 'rear outboard designated seating positions'").

"Given the advances in safety belt technology," NHTSA was considering "whether it was appropriate to reconsider the detachability allowances for these seats." 69 Fed. Reg. at 70908. NHTSA continued:

> In the [Notice of Proposed Rulemaking], the agency acknowledged that for certain seat designs Type 2 belts could not be installed without integrating the upper shoulder anchorage into the seat back or permitting designs that allow for detachability of the shoulder belt. Because detachable belts can be misused, we were particularly interested in exploring the possibility of integrated belts.

*Id.* Ultimately, NHTSA concluded that "integrated [e.g., ABTS] belt designs are not an optimal design for all types of seats," and it "decided to retain the existing detachability provisions with some revision" and "to expand the detachability provision to the inboard seating position of folding seats [like those in the Odyssey], bus seats, and outboard seats adjacent to an aisle." *Id.* The limitation that prohibiting

---

[14] We do not address whether the presumption would apply had the regulation neither expressly precluded nor expressly authorized use of the detachable system.

detachability would have on effective use of cargo space and the increased cost associated with incorporating an integrated belt were both relevant [*28] to that expansion. *Id.* at 70908-09. In approving the dual-detachable minibuckle design, NHTSA also chose to expressly prohibit the use of a pushbutton mechanism to detach the belt, instead requiring use of a key-like object, to reduce the likelihood of inadvertently releasing the minibuckle. *Id.* Finally, NHTSA expressly "decided *against* permitting detachable belts at the *outboard* seating position of [folding] seats because . . . we believe manufacturers can use the roof or side pillars to attach the upper shoulder anchorage." *Id.* at 70909 (emphases added).

This discussion reflects a cost—benefit analysis involving the benefits of Type 2 detachable belts—including the kind of detachable belt used in the Odyssey—and the risks associated with their use. Indeed, the only discernible reason for limiting the use of detachable belts to certain seating positions is that the risk of misuse outweighs any potential benefits in other positions. NHTSA concluded that detachable belts were a sufficiently safe option for implementing a Type 2 seat-belt system at some seating positions considering the benefits associated with those systems, despite the recognized risk of misuse.

Milburn argues that the regulation itself does not [*29] discuss the risk that people will not understand how to operate the detachable system. True, but it does "specify[] equipment requirements for active and passive restraint systems" for the purpose of "reduc[ing] the number of deaths of vehicle occupants[] and the severity of injuries," 49 C.F.R. § 571.208, S2, and again, in promulgating those requirements NHTSA took into consideration the risk that detachable systems will be misused. As noted, in *Kia Motors*, the regulation's equipment requirements did not encompass (or even contemplate) the design aspects of the air-bag system intended to ensure that the air bag deployed when necessary. Here, the equipment requirements *did* contemplate and encompass certain design aspects of the seat-belt system intended to ensure adequate occupant restraint, including the allowance of Type 2 systems with a dual-detachable belt in certain seating positions.

We hold that the 2011 Odyssey's design complies with mandatory federal safety standards "that were applicable to the product at the time of manufacture and that governed the product risk that allegedly caused harm." TEX. CIV. PRAC. & REM. CODE § 82.008(a). Accordingly, Honda was entitled to Section 82.008's presumption of nonliability for injuries caused by the Odyssey's design. [*30] [15] We therefore turn to whether the presumption was rebutted.

## B. Rebuttal of Presumption: Evaluating Inadequacy of Safety Standard

We have not had occasion to address what is necessary to establish that "the mandatory federal safety standards or regulations applicable to the product were inadequate to protect the public from unreasonable risks of injury or damage" under Section 82.008(b)(1), thereby rebutting the presumption of nonliability. *See Kia Motors*, 432 S.W.3d at 874. However, the issue is squarely before us today.[16]

---

[15] Because the presumption applied as a matter of law, submission of the question to the jury was improper. However, because the jury found that the presumption applied, the error was harmless. *See* TEX. R. APP. P. 61.1(a).

[16] Several other states have statutes creating a similar rebuttable presumption that a product's design is not defective if it complied with applicable government standards. *See* COLO. REV. STAT. § 13-21-403; FLA. STAT. § 768.1256; IND. CODE § 34-20-5-1; KAN. STAT. § 60-3304; KY. REV. STAT. § 411.310; MICH. COMP. LAWS § 600.2946(4); N.D. CENT. CODE § 28-01.3-09; OKLA. STAT. tit. 76, § 57.2(A)-(B); TENN. CODE § 29-28-104(a); UTAH CODE § 78B-6-703(2). Of those, only two contain any direction about how to rebut the presumption: Oklahoma's statute is identical to our Section 82.008, OKLA. STAT. tit. 76, § 57.2(A)-(B), while Kansas's provides for rebuttal when "the claimant proves

The jury agreed with Milburn that the applicable safety standards were inadequate to protect the public, and Honda challenges the legal sufficiency of the evidence to support that finding. *HN7*[⬆] We review legal sufficiency challenges to a jury's verdict by considering whether the evidence at trial, viewed in a light favorable to the verdict, "would enable reasonable and fair-minded people to reach the verdict under review." *Pediatrics Cool Care v. Thompson*, 649 S.W.3d 152, 161 (Tex. 2022) (citations omitted).

In arguing the insufficiency of the evidence, Honda asserts that a showing that a federal safety standard was "inadequate to protect the public from unreasonable risks of injury or damage" requires the testimony of a "qualified regulatory expert." "Among other things," Honda continues, [*31] that expert "would need to explain why, in the context of the entire regulatory history and the delicate balance between absolute safety and commercial feasibility, the agency's determination was an 'inadequate' solution to 'protect' against an 'unreasonable' risk faced by the entire public." Here, Honda asserts, neither Gill nor Meyer evaluated or criticized the regulatory decision-making underlying NHTSA's adoption of the pertinent standard.

Milburn responds that the evidence demonstrates NHTSA "did not consider the risk that the detachable seat belt system would not be usable, and it did not require manufacturers to test for usability." Further, she criticizes NHTSA's decision to allow the detachable system as being driven by cost rather than safety. Finally, Milburn asserts that the absence of other customer complaints, lawsuits, and recalls cannot by itself overcome the jury's finding of regulatory inadequacy.

*HN8*[⬆] As an initial matter, we note that whether a product's design is defective and whether the applicable safety standards with which the design complies are inadequate to protect the public necessarily constitute distinct inquiries.[17] If the standard for rebutting the presumption [*32] mirrored the standard for a product defect, then the presumption would serve no purpose at all. *See TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 74 (Tex. 2016) ("In [construing a statute], we consider the statute as a whole, giving effect to each provision so that none is rendered meaningless or mere surplusage."). Accordingly, a determination that an applicable federal safety standard is inadequate to protect the public from unreasonable risks of injury requires something other than proof of a product's defective design— that is, something more than a conclusion that the risks outweighed the benefits with respect to the particular product design at issue.

The court of appeals essentially ignored this distinction, summarizing its analysis of regulatory inadequacy as follows:

> Like many product liability cases, this case was a battle of the experts. The Milburns' experts examined physical evidence, performed tests, reviewed data, performed calculations, criticized Honda's experts, and concluded that the federal standards pertaining to the ceiling-mounted detachable anchor seat belt system for the third-row middle seat were inadequate to protect the public from unreasonable risks of injury or damage. Honda's experts conducted the same examinations, [*33] tests, reviews, calculations, and critiques of the Milburns' experts, but concluded

---

by a preponderance of the evidence that a reasonably prudent product seller could and would have taken additional precautions," Kan. Stat. § 60-3304(a).

[17] By contrast, in Ohio, "[t]he extent to which [a product's] design or formulation conformed to any public or private product standard that was in effect when the product left the control of its manufacturer" is one of the statutory factors to consider in determining whether a product is defective in the first instance. Ohio Rev. Code § 2307.75(B)(4).

that the standards *were* adequate to protect the public. The jury properly exercised its prerogative to resolve this conflicting evidence and believed the Milburns' experts.

668 S.W.3d at 20. Assuming the admissibility of the evidence the court of appeals described,[18] the court of appeals made no effort to explain how the showing required to prove regulatory inadequacy is in any way distinguishable from the showing required to demonstrate that the design of the Odyssey's seat belt system for the rear center seat was defective—that is, unreasonably dangerous considering the product's utility and the risks involved in its use. *Timpte Indus.*, 286 S.W.3d at 311. Milburn similarly argues that "the fact that a product is defective [e.g., by virtue of its confusing design] is *some evidence* that the federal standards allowing [that] design are inadequate to protect the public."

But again, defective design and regulatory inadequacy are necessarily independent inquiries. And while evidence tending to show a product was defectively designed can certainly also be relevant to the adequacy of the regulation [*34] allowing that design, legally sufficient evidence of the former does not automatically amount to legally sufficient evidence of the latter. By conflating what is necessary to prove liability with what is necessary to rebut the presumption, both Milburn and the court of appeals render the presumption superfluous.

The dissent claims this conclusion rests on a faulty premise; the standards can mirror each other because the presumption highlights for the jury the significance of compliance with the federal standards, which benefits the manufacturer. *Post* at 6 (Devine, J., dissenting) (citing *Egbert v. Nissan N. Am., Inc.*, 2007 UT 64, 167 P.3d 1058, 1061 (Utah 2007)). We disagree. Had the Legislature merely wanted to highlight such compliance as part of the evaluation of whether a product is defectively designed, it could have done so. *See, e.g.*, OHIO REV. CODE § 2307.75. Instead, the Legislature chose to create an independent presumption that can be rebutted only by establishing the inadequacy of the standard itself, allowing manufacturers to reasonably rely on those standards when designing their products. And the dissent ultimately accepts that the standards do *not* mirror each other because one focuses on the particular product and its intended user, while the other focuses on the [*35] applicable safety standard and the public as a whole. *See post* at 7 (Devine, J., dissenting). On this point, at least, we agree.

At bottom, if Milburn's interpretation of the statute is correct, then the analysis is as follows: a defendant is liable for a defective design if the plaintiff proves X, unless the product complies with an applicable federal safety standard, in which case the defendant is not liable unless the plaintiff proves X (which has

---

[18] As noted, Honda unsuccessfully sought to exclude both Gill's testimony and the usability studies on which she partially relied, arguing that Gill, a human factors engineer, was not qualified and that neither her testimony nor the studies were reliable under *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995). Honda does not dispute that human factors engineering is a recognized scientific discipline. *See Mihailovich v. Laatsch*, 359 F.3d 892, 915 (7th Cir. 2004) (explaining that, "[b]roadly speaking, a human factors analysis focuses on the interaction between human behavior and the design of a machine[ or] product" and that an expert engaging in that analysis "will consider whether, in light of predictable human behavior, the design or condition of the subject item poses a potential hazard"); *see also* Douglas R. Richmond, *Human Factors Experts in Personal Injury Litigation*, 46 ARK. L. REV. 333, 337 (1993) (noting that "numerous corporations, industries, and organizations employ human factors experts," who "testify in all types of personal injury litigation"). Indeed, one of Honda's own witnesses was presented as a human factors expert. Rather, Honda notes Gill's lack of experience with the automotive industry in general and seat belts in particular, along with the fact that Gill was unfamiliar with the federal safety regulations governing seat belts. Milburn responds that "human factors experts need not have expertise on the specific product or industry at issue because their knowledge, skill, experience, training, and education apply universally across all products and industries in which humans are involved." Because we may assume without deciding that the trial court did not abuse its discretion in admitting Gill's testimony, we need not address the parties' disagreement about Gill's qualifications and the reliability of her testimony.

already been proven). Such a reading would effectively delete the presumption of nonliability. We do not read Section 82.008 to provide such illusory protection to compliant manufacturers.

Turning to the safety standard at issue, if evidence existed, for example, that NHTSA simply failed to consider the possibility of misuse associated with detachable belts or based its decision to allow detachable belts solely on cost without any consideration for safety, we do not disagree that such evidence could overcome the presumption that the regulation adequately protected the public. *See Nat'l Truck Equip. Ass'n v. NHTSA*, 711 F.3d 662, 667 (6th Cir. 2013) (noting, in the context of a challenge to the validity of a federal agency rule, that federal courts will invalidate an agency action if, among other things, the agency has [*36] "entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency" (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983))). But no such evidence was presented. Gill testified that she had not read the Safety Standards or the regulatory history, nor did she purport to evaluate NHTSA's decision-making process. And to the extent Meyer opined that the standards were inadequate, his reasoning was that the permitted detachable design was unreasonably dangerous; in other words, he disagreed with NHTSA's conclusion that the permitted design was *not* unreasonably dangerous. Meyer's conclusory opinion that NHTSA got it wrong is not enough.

Further, NHTSA's thorough documentation of its decision to approve the dual-detachable seat belt for use in vehicles like the Odyssey provides no indication that NHTSA simply failed to consider the risks associated with a detachable belt. Indeed, the risk of misuse associated with detachable belts is the very reason NHTSA was reconsidering the allowance of detachable belts at all. 69 Fed. Reg. at 70908.[19] NHTSA weighed the benefits associated with requiring a Type 2 belt assembly (rather than allowing manufacturers the option of a [*37] Type 1 or Type 2 system), the risk of misuse associated with a Type 2 system that incorporates a detachable belt, the cost and feasibility of requiring a fully integrated seat-belt system in certain vehicles—such as those with removable or folding seats—and the risk of inadvertently detaching the minibuckle used in the authorized design. Nothing in the record suggests that the conclusions NHTSA reached ran counter to the evidence before it. Moreover, NHTSA recognized that many manufacturers were already using the kind of dual-detachable system that NHTSA ultimately approved in the rule. It was certainly within the agency's province to consider the practical experience gleaned from the real-world use of the system, and there is no indication that NHTSA ignored any red flags related to that usage.

As another example, to the extent Milburn contends that NHTSA simply "got it wrong"—that is, improperly weighed the myriad factors that go into a motor vehicle safety standard—we agree with Honda that considerably more evidence of the various considerations NHTSA must take into account in making regulatory determinations about vehicle safety is required than Milburn presented. For instance, [*38] in discussing an earlier safety standard that gave manufacturers the choice of installing either a Type 1 or a Type 2 belt in the rear center seating position, the Fifth Circuit noted NHTSA's conclusion that requiring Type 2 belts "would yield small safety benefits and substantially greater costs, given the lower center seat occupancy rate." *Carden v. Gen. Motors Corp.*, 509 F.3d 227, 231 (5th Cir. 2007), *abrogated on other grounds by Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 131 S. Ct.

---

[19] Contrary to the dissent's accusation, *post* at 14-15 (Devine, J., dissenting), we do not simply "surmise[]" that NHTSA considered the risk of misuse in promulgating the standard. *See* 69 Fed. Reg. at 70908.

1131, 179 L. Ed. 2d 75 (2011). The lower occupancy rate in a rear center seat is a consideration that would affect any safety regulation applicable to that seating position, but Milburn's experts did not discuss it.

Further, as discussed, Milburn presented no evidence of other incidents involving injuries from a dual-detachable seat belt, which was already being utilized before Safety Standard 208 was amended to expressly authorize it. When asked about the significance of the absence of reported injuries, Gill dismissed it:

> What we don't know is if, indeed, there have been no complaints, how many people actually got into the car, the Honda Odyssey, sat in the second or third row center seat and put the seat belt on incorrectly with no consequences because there wasn't a crash.

While that's true, Gill did not discuss how either of those considerations—the [*39] lack of reports and any statistics indicating that the seat belts are nevertheless being misused—would have affected NHTSA's risk—benefit analysis. And although Gill opined that the driver of an Odyssey would be unlikely to reliably leave the seat belt in the anchored position when the seat is upright,[20] she did not discuss expectations regarding whether a driver would reliably attach the belt before transporting a passenger in the rear middle seat or how those expectations would affect NHTSA's analysis.

In enacting Section 82.008, the Legislature made a policy decision that manufacturers at risk of liability for injuries caused by an allegedly defective design are entitled to rely on a federal agency's cogent determination that the pertinent risks associated with that design are not unreasonable. NHTSA made such a determination with respect to the safety standard authorizing dual-detachable seat-belt systems in some vehicles and seating positions. Absent a comprehensive review of the various factors and tradeoffs NHTSA considered in adopting that safety standard,[21] as a general matter neither we nor a jury can deem

---

[20] Gill gave two principal reasons for her conclusion that a driver is unlikely to leave the seat belt in the anchored position. First, she stated that when the seat belt is anchored, it hangs down in the center of the vehicle and creates a visual obstruction. Our review of the record does not support that assertion. Rather, photographs of a "surrogate" 2011 Odyssey show the anchored belt suspended in front of the headrest of the rear seat on the right side of the vehicle, not obstructing the middle of the rear window. Second, Gill testified that because a tool is necessary to release the anchor, "that means you have to walk around the vehicle [and] get in through the side door" to do so, making it "inconvenient for a user who maybe wants to stow [and] unstow the seat frequently." While the need to use a key-like object makes detaching the anchor a more deliberate act, it is unclear why that requirement makes the process more complicated logistically. And while Gill also criticized the owner's manual as failing to adequately communicate the importance of reattaching the anchor when the seat is not stowed, Milburn did not pursue a marketing-defect claim, which is distinct from a defective-design claim. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997) (stating that "[a] product may be unreasonably dangerous because of a defect in marketing, design, or manufacturing"); *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 382 (Tex. 1995) (holding that liability for a marketing defect attaches "if the lack of adequate warnings or instructions renders an otherwise adequate product unreasonably dangerous"). In any event, while Gill testified that vehicle owners would not reliably leave the belt attached when the seat was not stowed, she said nothing about whether they would reliably attach the belt before transporting a passenger in the rear middle seat.

[21] Honda argues that a "regulatory expert" is always necessary to make this showing. While we do not foreclose the possibility that rebutting the presumption would *not* require an expert, certainly a witness familiar with the regulatory process for approving safety standards relating to the type of product at issue would be integral in most cases in demonstrating the inadequacy of a federal regulation. *Cf. Robinson v. Ethicon Inc.*, No. H-20-3760, 2021 U.S. Dist. LEXIS 210191, 2021 WL 5054648, at *7 (S.D. Tex. Nov. 1, 2021) (evaluating a proposed safer alternative design and holding that the plaintiff could have created a fact issue regarding the feasibility of that design by presenting expert testimony that the FDA likely would have approved it).

a particular regulation "inadequate" to prevent an unreasonable risk of harm to the public [*40] as a whole.[22]

That said, even in the absence of evidence that the standard was inadequate based on the information available to NHTSA when it was adopted, we do not foreclose the possibility that subsequent developments could demonstrate that the standard was no longer adequate to protect the public from unreasonable risks of injury at the time of the compliant product's manufacture. For example, a material change in technology or a proliferation of new studies or data about risks and injuries associated with a compliant product could demonstrate the standard's inadequacy.[23] We leave further exploration of the parameters of such a showing for another day, noting only that no evidence regarding such developments was presented here. As discussed, the record demonstrates a complete absence of prior complaints, lawsuits, or recalls associated with the Odyssey's seat-belt system. Nor is there evidence of complaints, lawsuits, or injuries related to any of the many other vehicles that used a roof-mounted detachable minibuckle system, either before or after the applicable regulation was adopted.

In sum, no evidence was presented that NHTSA engaged in an improper or erroneous [*41] decision-making process in approving the regulation that authorized the detachable seat-belt system used in the Odyssey's rear center seat, and no evidence was presented of post-approval developments that call the regulation's adequacy into question. Accordingly, legally insufficient evidence supports the jury's finding of regulatory inadequacy, and the presumption that Honda was "not liable" for the injuries allegedly caused by the Odyssey's design was not rebutted as a matter of law.[24]

## III. Conclusion

For the foregoing reasons, we hold that the 2011 Odyssey's design complied with mandatory federal safety standards that were applicable to the Odyssey at the time of manufacture and governed the product risk that allegedly caused harm, entitling Honda to a presumption of nonliability. We further hold that the presumption was not rebutted, as no evidence supports the jury's finding that the federal safety standards failed to adequately protect the public from unreasonable risks of injury. Accordingly, we reverse the court of appeals' judgment and render a take-nothing judgment for Honda.

Debra H. Lehrmann

Justice

**OPINION DELIVERED**: June 28, 2024

---

[22] The dissent asserts that in analyzing the evidence of a regulation's inadequacy to protect the public, we "unduly restrict[] the focus to the federal government's decision-making." *Post* at 9 (Devine, J., dissenting). Relatedly, the dissent opines that the considerations underlying the agency's adoption of a safety standard have no bearing on whether the standard is inadequate to protect the public. *Id.* at 21. We cannot agree. The agency's decision-making is what led to the regulation whose adequacy is being challenged. We fail to see how a jury could second-guess that decision without evaluating the process by which it was reached.

[23] As the concurrence notes, *post* at 4 (Blacklock, J., concurring), and contrary to the dissent's assertion, *post* at 3-4 (Devine, J., dissenting), nothing in our opinion should be read to limit the grounds on which the presumption may be rebutted. Indeed, we broadly recognize that, among other possible showings, a plaintiff could demonstrate to the jury that a federal agency simply got it wrong.

[24] In light of this holding, we need not address Honda's challenge to the sufficiency of the evidence supporting the jury's negligent-design finding or its challenge to the trial court's refusal to submit the Uber entities in the proportionate-responsibility question.

**Concur by:** James D. Blacklock

## Concur

JUSTICE BLACKLOCK, joined by [*42] Justice Busby, concurring.

I agree with the dissent that the Legislature has left it to Texas juries, not federal bureaucrats, to determine in products-liability cases whether "federal safety standards or regulations applicable to [a] product were inadequate to protect the public from unreasonable risks of injury or damage." TEX. CIV. PRAC. & REM. CODE § 82.008(b)(1). Under this statute, the fact finder has wide latitude to answer an unusual question, one that is neither a conventional question of fact nor a conventional question of law. Whether a federal regulation is "adequate" or "inadequate" to protect the public is really a question of policy and politics— which makes judicial application of this statute somewhat confounding.

I see no way to separate the question of a regulation's "adequacy" from the political value judgments of the person answering the question. A very lenient seat-belt-design regulation might look perfectly adequate to a juror who values liberty and lowering costs much more highly than he values safety. For decades, American cars were steel death traps compared to today's cars, and there were few seat-belt laws at all, much less federal regulation of the minute details of their design. Cars were more dangerous, [*43] but they were also cheaper and simpler. The world kept turning. Our government later decided to impose greater regulation in the name of safety, but many jurors might believe that the era of little or no regulation was perfectly "adequate."

On the other hand, a juror who values safety much more highly than liberty might conclude that any regulation that does not go as far as reasonably possible to ensure maximum safety for every passenger is inadequate—even if imposing the regulation would heighten costs and inconvenience drivers. This juror might conclude that a seat-belt-design regulation is not "adequate to protect the public" unless the car is prevented from moving if there is weight on the seat but the seat belt is not correctly fastened. Such a regulation might have protected Ms. Milburn and many others. But it also might impose significant costs on manufacturers and consumers, and it would surely be an impractical inconvenience for many drivers. How do we balance those competing values? One juror might call this strict regulation the product of a nanny state gone wild, while another juror might say we are crazy not to do it if it saves one life. Most jurors would fall somewhere [*44] in between.

Are any of these hypothetical jurors wrong? The only way for a court to say so would be for the court to make political value judgments of its own about the proper way to balance the competing interests at stake. For better or worse, when it comes to seat belts, such political value judgments are generally entrusted to the federal government's National Highway Traffic Safety Administration. The federal agency's balancing of the myriad values and interests at play results in a promulgated federal regulation. That regulation affects products-liability litigation in Texas, because the Legislature has created a rebuttable presumption that a vehicle manufacturer is not liable if it complied with the applicable federal standards. *Id.* § 82.008(a).

The presumption is rebutted, however, if the "federal safety standards or regulations applicable to [a] product were inadequate to protect the public from unreasonable risks of injury or damage." *Id.* § 82.008(b)(1). For the foregoing reasons, I understand this provision to authorize the fact finder to

substitute his own political judgment about the regulation's "adequacy" for that of NHTSA. It feels odd to call this essentially political judgment a "fact question," [*45] but that seems to be the statutory design, and so courts must apply it as best we can. I therefore agree with the dissent that a jury has very wide latitude to disagree with the federal agency's decision and, on that basis alone, to override the presumption of non-liability. Assuming the jury has been given a sufficient evidentiary predicate by which to second-guess the agency's decision (more on that below), a jury's disagreement with the agency's decision should be essentially unreviewable. A court cannot second-guess a jury's disagreement with a federal agency's value-laden policy judgments without imposing the court's own value-laden policy judgments. I see nothing in this statute that would authorize a court to do so.

Despite my agreement with many of the broad strokes argued by the dissent, I nevertheless concur in the Court's judgment and its opinion for two reasons. First, unlike the dissent, I do not read the Court's opinion to limit the grounds on which a plaintiff can demonstrate a regulation's inadequacy. *See post* at 3-4 (Devine, J., dissenting) (suggesting that the Court leaves open only two ways of demonstrating regulatory inadequacy). The Court does say that regulatory [*46] inadequacy can be shown by poking holes in the agency's decision-making process or by showing that new information has come to light since the regulation was enacted. *Ante* at 28-29, 33-34. But the Court never says these are the only two ways to rebut the presumption. Instead, the Court acknowledges that a plaintiff might argue simply that the federal agency "got it wrong"—that is, that the agency did an "inadequate" job balancing the many competing values and interests at stake, and the jury should therefore disagree with the agency's judgments and override the presumption. *Id.* at 30, 34 n.23. I read the Court's opinion to correctly leave this line of argument open, and I would not join the Court's opinion unless it did so.

Second, I agree with the Court on the following crucial point: "Absent a comprehensive review of the various factors and tradeoffs NHTSA considered in adopting [the] safety standard, as a general matter neither we nor a jury can deem a particular regulation 'inadequate' to prevent an unreasonable risk of harm to the public as a whole." *Id.* at 32-33 (footnotes omitted). Many, many considerations go into the creation of a federal regulation of this nature, and passenger [*47] safety is just one of them. Other obvious considerations are cost, convenience, and practicality. Surely there are others. A fact finder cannot validly judge a federal agency's balancing of these values unless he knows something about how the regulatory process works and has a sense of the many conflicting considerations and competing values—safety just one among them—that contributed to the promulgated regulation.

Honda's lead argument in this Court is not that the jury has no authority to conclude that the federal agency "got it wrong." Instead, Honda's argument is that we cannot validly ask a jury to say whether a federal agency "got it wrong" unless the jury has been informed about the regulatory process and the many competing considerations it entails. As Honda puts it, "a qualified regulatory expert would need to explain why, in the context of the entire regulatory history and the delicate balance between absolute safety and commercial feasibility, the agency's determination was . . . 'inadequate.'" Pet. Brief at 18. I agree.

Here, the plaintiff's two experts focused on establishing the defectiveness of the seat belt's design. Neither expert aided the jury in understanding the [*48] complex landscape confronting NHTSA when it made its decision. And without such testimony, there is no evidentiary basis for a finding that, all things considered, the regulation is "inadequate to protect the public." TEX. CIV. PRAC. & REM. CODE § 82.008(b)(1).

By focusing on the regulation's failure to promote passenger safety as strongly as it could have, the plaintiff's experts did essentially the opposite of what was required. They encouraged the jury to condemn the regulation based on the singular consideration of passenger safety. Their burden instead was to convince the jury that, balancing passenger safety with the many other relevant factors bearing on its decision, NHTSA's regulation was, all things considered, "inadequate." Because the plaintiff never presented such a case to the jury despite Honda's consistent argument that this was required, I agree with the Court that the jury's finding of regulatory inadequacy cannot stand.

With these points noted, I respectfully concur.

James D. Blacklock

Justice

**OPINION FILED**: June 28, 2024

**Dissent by:** John P. Devine

## Dissent

JUSTICE DEVINE, joined by Justice Boyd, dissenting.

Under Texas law, a product manufacturer is presumed not liable for injuries caused by a design defect when the design complied [*49] with applicable federal safety standards governing the alleged product risk.[1] But the Legislature expressly made this statutory presumption "rebuttable," entrusting our juries—not federal bureaucrats—to ultimately determine whether federal safety standards adequately protect Texas citizens. One way a plaintiff can rebut the presumption is to establish that the relevant standards "were inadequate to protect the public from unreasonable risks of injury or damage"; nothing more, nothing less.[2]

In this case, the jury found that (1) Honda designed an unreasonably dangerous detachable seatbelt system that caused a young woman to be clotheslined in a car crash, resulting in quadriplegia paralysis, and (2) the federal safety standard that greenlighted this design was inadequate to protect the public from unreasonable risks. The Court nevertheless overturns the jury's verdict. In doing so, the Court measures the evidence of the standard's inadequacy against newly crafted requirements that are not only extra-textual but also unduly deferential to the federal bureaucrats' decision-making process, which only sets forth the "bare minimum" standards for selling a vehicle.

I respectfully dissent [*50] and would affirm the jury's verdict. When the evidence is considered in light of the statute's plain language, which the charge tracked, it is legally sufficient to support the jury's express finding that the relevant federal safety standard was inadequate to protect the public. But even if the Court's newly adopted hurdles were proper, this grievously injured young woman should—at the very

---

[1] TEX. CIV. PRAC. & REM. CODE § 82.008(a).

[2] Id. § 82.008(b)(1). Alternatively, the plaintiff may rebut the presumption by establishing that the manufacturer "withheld or misrepresented information or material" relevant to the federal government's adequacy determination of the safety standards at issue. Id. § 82.008(b)(2).

least—be given a fair opportunity to clear them. The Court's unwillingness to remand for a new trial suggests an awareness that these statutory embellishments would be impossible to satisfy, which effectively converts the legislatively mandated "rebuttable" presumption into one that is conclusive.

# I

In construing statutes, the starting point must always be the text: "the alpha and the omega of the interpretative process."[3] Section 82.008(a) of the Texas Civil Practice and Remedies Code creates a "rebuttable presumption" that a product manufacturer is "not liable" for injury caused by a product design if the manufacturer establishes (1) the "design complied with mandatory [federal] safety standards or regulations" that (2) were "applicable to the product at the time of manufacture" and (3) "governed the product risk that allegedly caused the harm."[4] If a manufacturer [*51] meets this burden, Section 82.008(b)(1) allows the claimant to rebut the presumption by establishing that "the mandatory federal safety standards or regulations applicable to the product were inadequate to protect the public from unreasonable risks of injury or damage."[5]

Belying the statutory text, the Court adopts a new rule requiring a plaintiff to establish one of two limited options to demonstrate a standard's inadequacy and rebut the presumption of nonliability:

(1) the agency's *decision-making* in enacting the standard was either arbitrary or capricious—a highly deferential standard—or lacked "cogen[cy]" in light of a "comprehensive review of the various factors and tradeoffs . . . considered in adopting that safety standard,"[6] or

(2) *post-approval* developments rendered the safety standard no longer adequate to protect the public.[7]

If not, according to the Court, "neither we nor a jury can deem a particular regulation 'inadequate' to prevent an unreasonable risk of harm to the public as a whole."[8]

---

[3] *BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86 (Tex. 2017).

[4] TEX. CIV. PRAC. & REM. CODE § 82.008(a).

[5] *Id.* § 82.008(b)(1). For purposes of this analysis, I assume that Honda adduced sufficient evidence to invoke the statutory presumption.

[6] *Ante* at 29 (citing *Nat'l Truck Equip. Ass'n v. NHTSA*, 711 F.3d 662, 669 (6th Cir. 2013), which applied an "arbitrary and capricious" standard of review to invalidate federal agency action under the Administrative Procedure Act), 29-33 (requiring extensive evidence of "the various considerations" the federal agency "must take into account in making regulatory determinations" and a "comprehensive review of the various factors and tradeoffs").

[7] *Id.* at 33-34 (noting that "subsequent developments," including "a material change in technology or a proliferation of new studies or data about risks and injuries associated with a compliant product," could demonstrate a standard's inadequacy).

[8] *Id.* at 33. Although the Court denies limiting the rebuttal grounds to only two stated options, the Court fails to identify any others. *See id.* at 34 n.23; *infra* at note 60 and accompanying text.

But nothing in the statutory text so restrictively circumscribes the jury's role in determining this question of fact.[9] "When decoding statutory language, we are bound by the Legislature's [*52] prescribed means (legislative handiwork), not its presumed intent (judicial guesswork)."[10] According to the statute's plain language, manufacturers are entitled to rely on the federal regulation only insofar as the safety standard was—*in fact*—adequate "to protect the public from unreasonable risks of injury or damage."[11] Although a jury may be informed of and persuaded by a federal agency's decision-making process in promulgating the safety standard, the Legislature entrusted the final factual determination of that standard's adequacy to our juries alone, not federal agencies.[12]

The Court cabins the jury's role and divines these limitations by asserting, "If the standard for rebutting the presumption mirrored the standard for a product defect, then the presumption would serve no purpose at all."[13] But this argument rests on a faulty premise. In Utah, for example, the standards for a product defect and rebutting a similar presumption mirror each other: both require proof by a preponderance of the evidence that the product is unreasonably dangerous.[14] But the presumption is not "a nullity," according to our sister court, because it "gives a kind of legal imprimatur to [*53] the significance of compliance with federal standards," "benefit[ting] the manufacturer."[15] The presumption "clearly communicates" and

---

[9] *See Kim v. Am. Honda Motor Co.*, 86 F.4th 150, 170 (5th Cir. 2023) ("[W]hether the presumption has been rebutted is a question of fact for the jury."); *Wright v. Ford Motor Co.*, 508 F.3d 263, 274 (5th Cir. 2007) (noting that it is "logical to conclude" from the statutory language that whether the presumption has been rebutted is a fact question for the jury unless inadequacy is established as a matter of law).

[10] *BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86-87 (Tex. 2017).

[11] TEX. CIV. PRAC. & REM. CODE § 82.008(b)(1). The Court asserts that "the Legislature made a policy decision that manufacturers at risk of liability for injuries caused by an allegedly defective design are entitled to rely on a federal agency's cogent determination that the pertinent risks associated with that design are not unreasonable." *Ante* at 32. Perhaps legislators were motivated by this policy in enacting the rebuttable presumption, but the enacted language says nothing of the kind. *See In re Tex. Educ. Agency*, 619 S.W.3d 679, 687 (Tex. 2021) ("The polestar of statutory construction is legislative intent, which we determine from the enacted language."); *BankDirect*, 519 S.W.3d at 86 ("But our 181 legislators—who may have had 181 different motives, reasons, and understandings—nowhere codified an agreed purpose."). And perhaps this may be good policy, "but judicial policy preferences should play no role in statutory interpretation." *McLane Champions, LLC v. Hous. Baseball Partners LLC*, 671 S.W.3d 907, 918 (Tex. 2023); *see BankDirect*, 519 S.W.3d at 78 ("[D]ivining what the law *is*, not what the interpreter *wishes* it to be" is "the foremost task of legal interpretation.").

[12] To the extent federal law preempts a products-liability claim, the decision would be out of the jury's hands and for the federal agency. But federal preemption does not apply here because even if state tort liability has the practical effect of restricting a manufacturer's choice of seatbelt design, it "does not '[s]tand as an obstacle to the accomplishment . . . of the full purposes and objectives' of federal law." *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 336, 131 S. Ct. 1131, 179 L. Ed. 2d 75 (2011) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941)) (holding that a federal safety standard did not preempt a tort claim premised on a manufacturer's failure to install safer seatbelts; *see* 49 U.S.C. §§ 30102(a)(10) (describing a "motor vehicle safety standard" as a "minimum standard"), 30103(e) ("Compliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law."); *MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 487-99 (Tex. 2010) (holding that a motor vehicle safety standard did not preempt a state tort claim asserting that a bus manufacturer should have installed safer seatbelts and laminated-glass windows).

[13] *Ante* at 25.

[14] *Egbert v. Nissan N. Am., Inc.*, 2007 UT 64, 167 P.3d 1058, 1061 (Utah 2007) (citing UTAH CODE § 78-15-6(3), now numbered as § 78B-7-703); *Niemela v. Imperial Mfg., Inc.*, 2011 UT App 333, 263 P.3d 1191, 1196 n.4 (Utah Ct. App. 2011) ("The proof required to rebut the presumption appears to be identical to the proof required to establish the first element of a prima facie case. Thus, with or without the presumption, the plaintiff must prove by a preponderance of the evidence that the product is unreasonably dangerous." (internal citations omitted)).

"highlight[s] for the jury" "the significance of compliance,"[16] making a properly instructed jury "less likely to conclude that a product is unreasonably dangerous."[17] Thus, even if the standards mirror each other, the presumption would not be meaningless. And regardless, the effect of any mirroring provides no basis for importing extra-textual limitations on when a jury could find that a federal safety standard was inadequate to protect the public.[18]

I nevertheless agree with the Court that, in Texas, the statutory language governing rebuttal of the presumption does not perfectly mirror the liability standard. Rather, it shifts the factfinder's focus from the product and its intended user to the safety standard and to the public as a whole. As a result, when the presumption applies, liability generally may not be imposed unless a jury finds *both* that the product was defectively designed and that the applicable safety standard was inadequate.[19] Although these findings of fact are similar, the Court's approach is not necessary to imbue the presumption [*54] with meaning because the jury would weigh and balance the evidence under the separate inquiries differently.

To determine that a product is defectively designed, "the jury must conclude that the product is unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use."[20] In balancing whether the product's risks outweigh its utility—thereby rendering the product design unreasonably dangerous—this Court has specified five factors to be considered:

> (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of the general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations [*55] of the ordinary consumer.[21]

"This balancing is for the jury unless the evidence allows but one reasonable conclusion."[22]

---

[15] *Egbert*, 167 P.3d at 1062 (agreeing "that the Legislature must have intended to benefit the manufacturer by creating the presumption of nondefectiveness"); *see Niemela*, 263 P.3d at 1196 n.4 (noting that "the two standards, though identically worded, are not necessarily identically onerous" as a practical matter).

[16] *Egbert*, 167 P.3d at 1062.

[17] *Niemela*, 263 P.3d at 1196 n.4 (discussing *Egbert*, 167 P.3d at 1062).

[18] *See PHI, Inc. v. Tex. Juv. Just. Dep't*, 593 S.W.3d 296, 305 (Tex. 2019) ("[N]o court has the authority, under the guise of interpreting a statute, to engraft extra-statutory requirements not found in a statute's text.").

[19] *See Wright v. Ford Motor Co.*, 508 F.3d 263, 274 (5th Cir. 2007) ("[If] rebutting evidence is *not* such as to require as a matter of law that the federal standards be held inadequate, but rather presents a fact question in that respect, then, in a jury tried case, it appears logical to conclude that the statute proceeds on the assumption that any such fact question as *whether* the presumption has been rebutted will be submitted to the jury.").

[20] *Emerson Elec. Co. v. Johnson*, 627 S.W.3d 197, 205 (Tex. 2021) (quoting *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 432 (Tex. 1997)).

[21] *Id.* (quoting *Grinnell*, 951 S.W.2d at 432); *see id.* at 209 (noting that "[w]e would not today conclude that including a legally correct instruction about the[se] factors was charge error" and assuming, without deciding, that "a listing of the[se] factors would assist the jury in determining whether a design defect exists").

When a safety standard greenlights an unreasonably dangerous product to be sold on the open market, it exposes the public to the risks of injury or damage associated with that product's use. For that reason, these risk—utility considerations also would be pertinent to whether the standard was "inadequate to protect the public from unreasonable risks of injury or damage."[23] As with the design-defect inquiry, the balancing would be for a jury alone, so long as the conclusion is one a reasonable jury could reach. But given the statute's shift in emphasis for rebutting the presumption, a jury would balance these considerations differently by placing greater weight on the evidence of the factors that implicate the public as a whole. Rarely are these holistic inquiries conclusively proven as a matter of law,[24] and in most cases, a finding that a product is unreasonably dangerous would not necessitate a finding that the standard is inadequate to protect the public.[25]

By requiring both findings of fact to impose liability, the statutory scheme offers far more than [*56] what the Court describes as "illusory protection to compliant manufacturers."[26] In contrast, the Court unduly restricts the focus to the federal government's decision-making, deriving exclusive requirements to rebut the presumption—e.g., an arbitrary-or-capricious standard or a "comprehensive review"—that are neither expressed in nor contemplated by the statutory text. Honda likewise argues that "recognition of agency expertise . . . requires that a jury's evaluation of federal safety regulations must be cabined"; otherwise, a jury would have "free rein to second-guess and effectively overrule the expert determinations of federal agencies" and "nullif[y]" federal standards.

These policy arguments have no textual basis. The statute does not pose the question of whether the promulgating *federal agency*—rightly or wrongly—considered the safety standard adequate to protect the public. As I have already noted, a federal agency's determination may have persuasive force, but the inadequacy question is for the jury alone. Nor is this the power to nullify federal standards or overrule agency decisions. A federal safety regulation still serves as a minimum standard even if a jury disagrees with [*57] the promulgating agency and finds it inadequate to protect the public.[27] And by complying with the applicable minimum standard, a manufacturer acquires the protection of a presumption that imposes an additional hurdle before liability will attach while still bearing any resulting tort liability "as a cost of doing business."[28]

---

[22] *Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 10 (Tex. 2015).

[23] TEX. CIV. PRAC. & REM. CODE § 82.008(b)(1); *see ante* at 27 (acknowledging that evidence of a defective design "can certainly also be relevant to the adequacy of the regulation allowing that design").

[24] *See Genie Indus.*, 462 S.W.3d at 3 (noting that whether a product's risks outweigh its utility "is usually one of fact for the jury").

[25] I therefore disagree with the Court's characterization of my position as requiring the following analysis: "a defendant is liable for a defective design if the plaintiff proves X, unless the product complies with an applicable federal safety standard, in which case the defendant is not liable unless the plaintiff proves X (which has already been proven)." *Ante* at 28.

[26] *Id.*

[27] *See MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 495 (Tex. 2010) ("[W]e must be mindful that Congress generally intended the federal safety standards to set a minimum standard for performance and allowed juries to determine in particular cases if the vehicle manufacturer should have done more.").

[28] *Cf. Hyundai Motor Co. v. Alvarado*, 974 S.W.2d 1, 12 (Tex. 1998) ("[T]he imposition of common-law liability does not impose any particular safety standard upon a manufacturer; the manufacturer may choose to comply with the minimum federal standards and bear tort liability as a cost of doing business.").

## II

Because the question of whether a safety standard adequately protects the public falls squarely within the factfinder's discretion, I now turn to whether legally sufficient evidence supports the jury's finding. The "test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."[29] "All the record evidence must be considered 'in the light most favorable to the party in whose favor the jury verdict has been rendered,' and 'every reasonable inference deducible from the evidence is to be indulged in that party's favor.'"[30] Judgment against a jury verdict is proper "only when the law does not allow reasonable jurors to decide otherwise."[31] When measured against the charge, which tracked the statutory language establishing an injured party's rebuttal burden, the evidence here [*58] surpasses the low legal-sufficiency threshold.

As brief background, twenty-three-year-old Sarah Milburn suffered quadriplegia paralysis after being clotheslined by the shoulder strap of her seatbelt in a rollover collision while taking an Uber ride in a 2011 Honda Odyssey. Sitting in the middle seat of the third row, Milburn had pulled the ceiling-mounted belt across her body, attaching it to the buckle at her left hip. But because the belt's detachable anchor was not connected to the minibuckle at her right hip, her lap was left unrestrained. The following diagram depicts the configuration:



Honda designed this system so that when the anchor is detached and the belt has retracted into the ceiling, the seat may be folded down into a recessed compartment in the floor pan, providing extra cargo space. This design was incorporated into more than 800,000 Honda Odysseys that were sold in the United States from 2011 through 2017. No one disputes that Honda's design complied with safety standard 208 of the

---

[29] *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

[30] *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018) (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

[31] *City of Keller*, 168 S.W.3d at 823.

Federal Motor Vehicle Safety Standards (FMVSS 208), promulgated by the National Highway Traffic Safety Administration (NHTSA).[32]

The evidence presented at trial is legally sufficient to support the jury's finding that FMVSS 208 [*59] was inadequate to protect the public from unreasonable risks. First, the jury heard testimony that the seatbelt design was unreasonably dangerous, which the Court agrees is "relevant to the adequacy of the regulation allowing that design."[33] Milburn's human-factors expert, Joellen Gill, opined it was foreseeable that (1) owners would not reliably maintain the detachable seatbelt in the anchored position, (2) a person sitting in the third-row middle seat would not reliably use the seatbelt correctly, and (3) a passenger would fail to recognize that they were not properly buckled.[34] Milburn's engineering expert, Steven Meyer, discussed the importance of having a lap restraint during a rollover collision to hold the passenger's entire lower torso in place. If the passenger is wearing only a shoulder belt due to misuse by the vehicle owner or passenger, the seatbelt becomes an injurious and potentially fatal device because it is dangerously close to the passenger's neck. A safer, feasible alternative design that should have been used, Meyer opined, is an all-belts-to-seat design (also called a seat-integrated belt system) that is anchored at the top and bottom of the seat rather than the ceiling-mounted [*60] detachable belt design.[35]

Next, the jury heard testimony that FMVSS 208 is a "minimum standard" that does not account for the detachable belt's *usability*.[36] As Meyer explained, FMVSS 208 is the "bare minimum" that must be complied with to legally sell a vehicle in the United States, and because it "can only cover as much as [it] can cover," "a lot of it is left to the manufacturers." Meyer confirmed that nothing in FMVSS 208 addresses the risk that Milburn faced on the night of the accident—the risk that the belt would be improperly used with just the shoulder belt, leaving the passenger's lap unrestrained.

---

[32] *See* 49 C.F.R. § 571.208. Although Milburn does not dispute that FMVSS 208 "applied to the Odyssey and w[as] complied with," she challenges whether the safety standard governed the alleged product risk, *see supra* note 5, and was adequate to protect the public from unreasonable risks.

[33] *Ante* at 27.

[34] Gill also opined that Honda failed to effectively mitigate these hazards and that Milburn's actions were consistent with foreseeable human behavior. As a human-factors expert, Gill was qualified to testify about how people would interact with the detachable seatbelt system without having specialized experience in the automotive industry. *See, e.g.*, *Tyson Fresh Meats, Inc. v. Abdi*, No. 07-12-00546-CV, 2014 Tex. App. LEXIS 5693, 2014 WL 2447472, at *3-4 (Tex. App.—Amarillo May 28, 2014, pet. denied) (holding that the trial court did not abuse its discretion by admitting testimony from a human-factors expert). And to the extent Gill relied on usability studies conducted by Milburn's counsel, this did not render her testimony unreliable because the conditions in the studies were "substantially similar" to those during the accident. *See Fort Worth & Denver Ry. v. Williams*, 375 S.W.2d 279, 281-82 (Tex. 1964) (holding that out-of-court experiments are generally admissible when there is "a substantial similarity between conditions existing at the time of the occurrence which gives rise to the litigation and those in existence at the time the experiment is conducted for demonstration purposes").

[35] Honda argues there is no evidence of a safer, feasible alternative design. The court of appeals sufficiently addressed this issue, and I find no reversible error in its conclusion that Milburn "presented some evidence, and therefore legally sufficient evidence, to support the jury's finding that the [all-belts-to-seat] design is a safer alternative to the detachable anchor seat belt design." 668 S.W.3d 6, 26 (Tex. App.—Dallas 2021).

[36] *See* 49 U.S.C. § 30102(a)(10) (defining "motor vehicle safety standard" as "a minimum standard for motor vehicle or motor vehicle equipment performance"). Among other things, FMVSS 208 permits vehicle manufacturers, for certain inboard seating positions, to use "a belt incorporating a release mechanism that detaches both the lap and shoulder portion at either the upper or lower anchorage point, but not both," provided that the means of detachment is "a key or key-like object." 49 C.F.R. § 571.208.

Although NHTSA expressly recognized that "detachable belts can be misused,"[37] the text and regulatory history discussed in the Federal Register provide no express indication that the agency analyzed or tested for the risk of misuse, as the Court acknowledges.[38] The Court instead simply surmises that NHTSA must have considered the safety risks of misuse in its cost—benefit analysis.[39] On cross-examination, Honda's seatbelt expert, Michael Klima, also acknowledged that FMVSS 208 neither "analyzes the risk that people won't understand how to operate" the detachable seatbelt [*61] system nor requires any type of usability testing to determine whether people understand the double-latch system. According to Klima, this type of testing is left to the manufacturers to address however they deem fit.

Finally, the jury heard evidence that NHTSA's rationale for allowing the detachable seatbelt design was unsound. Meyer discussed that in promulgating FMVSS 208, NHTSA drew upon comments from automobile manufacturers to conclude that adopting a seat-integrated belt design would have cost only an additional $15 per seat, which he described as "not terribly expensive."[40] Although NHTSA found this system "particularly problematic for removable seats because of the added weight,"[41] Meyer explained that "[t]he weight penalty in this case would be irrelevant because it's a folding seat." Comparing the benefits of not spending $15 for a seat-integrated system to the risks of neck injuries, which are often "permanently debilitating" or "fatal," Meyer opined, "it's grossly outweighed."

By the end of trial, the jury had heard evidence that (1) FMVSS 208 is a minimum standard that allows manufacturers to produce and sell an unreasonably dangerous detachable seatbelt, [*62] (2) the standard does not adequately account for the risks associated with the seatbelt design, and (3) the seatbelt was incorporated not only in the vehicle at issue but also in more than 800,000 other vehicles sold to the public on the open market. Acting in its fact-finding role, the jury could credit this evidence over any contrary evidence in finding that FMVSS 208 was inadequate to protect the public from unreasonable risks of injury or damage. Because a reasonable jury could conclude that FMVSS 208 was inadequate to protect the public, the balancing and weighing of evidence is for the jury alone. The Court should not disturb its verdict.

## III

In a concurring opinion, JUSTICE BLACKLOCK explains that a safety regulation's adequacy to protect the public is a fact question requiring jurors to exercise an "essentially political judgment" that courts must not "second-guess" by imposing their "own value-laden policy judgments."[42] Consistent with my

---

[37] *Federal Motor Vehicle Safety Standards; Occupant Crash Protection*, 69 Fed. Reg. 70904, 70908 (Dec. 8, 2004) (codified at 49 C.F.R. pts. 571, 585).

[38] *Ante* at 22 (concluding that FMVSS 208 governs the risk of misusing detachable seatbelts despite acknowledging that "the regulation itself does not discuss the risk that people will not understand how to operate the detachable system").

[39] *Id.* at 22-23.

[40] *See Federal Motor Vehicle Safety Standards; Occupant Crash Protection*, 69 Fed. Reg. at 70908 (concluding that the total cost for an integrated belt would be approximately $47 while a detachable belt system would cost approximately $32).

[41] *See id.* ("[W]e have decided to expand the detachability provision to the inboard seating position of folding seats . . . . We believe that integrated belt designs are not an optimal design for all types of seats. They appear to be particularly problematic for removable seats because of the added weight.").

discussion above, I full-heartedly agree that "a jury's disagreement with the agency's decision should be essentially unreviewable."[43] Where we diverge is on what constitutes a "sufficient evidentiary predicate" for the jury to exercise that judgment. [*63] [44]

The concurrence would require a "qualified regulatory expert" to hold the jurors' hands as they exercise their political judgment.[45] Under that view, a regulatory expert is necessary to explain the historical context and the competing considerations and values an agency must balance in promulgating a safety regulation.[46] Such testimony may undoubtedly be relevant and admissible either to show that a safety regulation is inadequate to protect the public or as a controverting arrow in a manufacturer's quiver.[47] But I cannot agree that a qualified regulatory expert is always *required* to rebut the statutory presumption.

Jurors do not need a regulatory expert to tell them *how* to think, process information, or exercise their political judgment. "Expert testimony is required when an issue involves matters beyond jurors' common understanding,"[48] and individual judgment is certainly *not* beyond an individual juror's understanding. Jurors can second-guess a federal agency's decision without any *particular type* of expert spoon-feeding them the historical context and considerations that contributed to a promulgated regulation (to the extent such evidence is even necessary for them [*64] to exercise the independent judgment the statute contemplates).[49]

In this case, for example, Milburn's expert Meyer, a licensed lawyer as well as an engineer, testified that he had experience reviewing the Federal Register, which NHTSA uses to provide notice of its proposed rulemaking, solicit comments, and ultimately justify and publish its regulations. On cross-examination, Meyer read into the record and addressed portions of NHTSA's published rationale for adopting FMVSS 208.[50] In so doing, Meyer described NHTSA's role in the federal government, acknowledged that anybody could submit comments after a notice of proposed rulemaking,[51] and discussed the "history of the

---

[42] *Ante* at 3-4 (Blacklock, J., concurring).

[43] *Id.* at 4.

[44] *Id.* at 3.

[45] *Id.* at 5.

[46] *Id.*

[47] *Cf., e.g., Antrim Pharms. LLC v. Bio-Pharm, Inc.,* 950 F.3d 423, 430-31 (7th Cir. 2020) ("[C]ourts have permitted regulatory experts to testify on complex statutory or regulatory frameworks when that testimony assists the jury in understanding a party's actions within that broader framework."); *In re Fosamax Prods. Liab. Litig.,* 509 F. App'x 69, 72-73 (2d Cir. 2013) (relying on a regulatory expert's testimony to support a jury instruction regarding a Florida statute's analogous rebuttable presumption of nondefectiveness (citing FLA. STAT. ANN. § 768.1256(1))).

[48] *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 583 (Tex. 2006).

[49] As a practical matter, expert causation testimony is already required in most design-defect cases, a costly endeavor for all involved. *Mack Trucks,* 206 S.W.3d at 583; *Nissan Motor Co. v. Armstrong,* 145 S.W.3d 131, 137 (Tex. 2004). Increasing costs by requiring another type of expert—for the sole purpose of rebutting a statutory presumption—will only further impede individuals from bringing potentially meritorious design-defect claims.

[50] *See Federal Motor Vehicle Safety Standards; Occupant Crash Protection,* 69 Fed. Reg. 70904, 70904-16 (Dec. 8, 2004) (codified at 49 C.F.R. pts. 571, 585) (describing the background, summarizing public comments, explaining the requirements of the final rule, conducting a cost—benefit analysis, and adopting a final rule amending FMVSS 208).

standard" as a response to "a congressional mandate [Anton's Law[52] ] that the agency begin to phase in requirements for lap/shoulder belts for all rear seating positions wherever practical."[53] And in reference to the Federal Register, Meyer confirmed for the jury that NHTSA considered the following in adopting FMVSS 208:

- the possibility of requiring integrated belts;

- the cost of "strengthening both the seat and the floor pan" for an integrated belt, which would be "approximately $47" while "a detachable belt system would be $32"; [*65]
- "the additional weight added to a seat as a result of this strengthening," which would "make removability of the seats impractical" according to some submitted comments, although "[General Motors] noted that one of its vehicles has removable seats with an integrated seat belt";
- manufacturers appear to be moving away from removable seats towards fold-down seats to provide additional cargo-carrying capacity;
- "prohibiting detachability limits the effective use of the cargo-carrying space" because "the shoulder belt would extend from the upper anchorage down into the folded seat"; and

- the "possibility for misuse" of "only using the lap belt" could be reduced by requiring a minibuckle with a "key or key-like object to detach the belt," although this addresses a "different type of misuse" than only using the shoulder strap.[54]

In other words, the jury heard how NHTSA considered the competing considerations of safety, cost, convenience, and practicality in declining to require a seat-integrated belt and allowing a detachable belt for the middle seat of a vehicle's third row. With this testimony and the other trial evidence in mind, the jurors could make their own informed [*66] judgment as to FMVSS 208's adequacy to protect the public from unreasonable risks: they knew "something about how the regulatory process works" and had a "sense" of the "conflicting considerations and competing values" that contributed to the regulation's promulgation.[55]

In contrast to the concurrence, the Court implies that a regulatory expert may not be necessary.[56] Even so, its new requirements are no less onerous. According to the Court, a jury's inadequacy finding must be supported by "a comprehensive review of the various factors and tradeoffs NHTSA considered in adopting that safety standard."[57] The Court does not demarcate when a jury's review of relevant

---

[51] See, e.g., Federal Motor Vehicle Safety Standards; Occupant Crash Protection, 68 Fed. Reg. 46546, 46546-59 (proposed Aug. 6, 2003) (to be codified at 49 C.F.R. pts. 571, 585) (describing background and safety concerns, requesting comments, and proposing a rule amending FMVSS 208).

[52] Anton's Law (Improvement of Safety of Child Restraints in Passenger Motor Vehicles), Pub. L. No. 107-318, 116 Stat. 2772 (2002).

[53] See Federal Motor Vehicle Safety Standards; Occupant Crash Protection, 69 Fed. Reg. at 70904.

[54] See id. at 70908-09. In this Court, Honda acknowledges that the "jury could rely on NHTSA's comments to the Final Rule amending FMVSS 208" as evidence of what NHTSA considered and balanced "when promulgating FMVSS 208" and that, although the relevant portion of the Federal Register was not admitted into evidence, Meyer agreed on cross-examination "that Honda's counsel correctly read excerpts from the Final Rule to the jury."

[55] See ante at 5 (Blacklock, J., concurring).

[56] Ante at 33 n.21.

[57] Id. at 32-33.

considerations rises to the level of "comprehensive."[58] But in concluding that Milburn's evidence is legally insufficient, the Court instead nitpicks about her expert's failure to address granular considerations that the Court presumes "*would* have affected NHTSA's risk—benefit analysis."[59]

In effect, the Court requires that a plaintiff produce evidence addressing all possible considerations that conceivably could affect a federal agency's analysis in adopting the safety regulation at issue. But *what* the [*67] federal regulators considered is an entirely different question from whether the adopted safety standard is, in the jury's estimation, *inadequate to protect the public* as a matter of fact. Federal regulators could have considered everything they should have but still, at the end of the day, got it wrong. The jury does not need to hear about the regulatory process to conclude that compliance with the end product—a *minimum* safety standard—was not enough to protect the public. And although the Court pays lip service to leaving open the possibility that a federal agency "simply got it wrong,"[60] any such opening is illusory. Requiring the jury to evaluate all possible considerations at varying levels of granularity is nigh impossible—a herculean task to overcome. Neither Section 82.008(b)(1)'s plain language nor our legal-sufficiency standards require such a parsimonious approach.

Ultimately, a reviewing court must simply ask: was there a sufficient evidentiary basis from which reasonable jurors could exercise their political judgment to determine that a federal safety regulation was inadequate to protect the public from unreasonable risks of injury or damage? For all the reasons described above, the answer [*68] here is a resounding yes.

Under the language the Legislature enacted, a plaintiff seeking to rebut the statutory presumption need only establish that the applicable safety standard—whether rightly or wrongly adopted—was inadequate as a matter of fact to protect the public from unreasonable risks of injury or damage. Where text is clear, it is determinative, and "[p]lain language disallows ad-libbing."[61] Forsaking this cardinal principle, the Court engrafts onto Section 82.008(b)(1) an atextual and heightened deference-to-the-agency standard for injured Texans to rebut the nonliability presumption. Milburn should not be forced to suffer the consequences of the Court's deviation from the statutory text. She proffered legally sufficient evidence to meet the statutory burden as written, and the jury found in her favor.

But even if it were proper to overturn the jury's verdict, justice demands—at a minimum—that Milburn have a fair opportunity to present evidence to satisfy the Court's newly articulated standard for rebutting the presumption.[62] "The case for remand is especially compelling in cases where, as here, [the Court has] substantially clarified the law."[63] And the Court has previously done so when interpreting [*69] a "unique

---

[58] The Court merely states that "considerably more evidence of the various considerations . . . is required than Milburn presented." *Id.* at 30.

[59] *See id.* at 31 (emphasis added); *see also id.* at 30-32 (criticizing Milburn for not addressing how NHTSA's analysis would have been affected by the lower occupancy rate in a rear center seat, the lack of reports or statistics of misuse, or the expectations of whether a driver would have reliably attached the detachable belt before transporting a passenger).

[60] *Id.* at 33 n.23.

[61] *BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 80 (Tex. 2017).

[62] *See* TEX. R. APP. P. 60.3 ("[T]he Supreme Court may, in the interest of justice, remand the case to the trial court even if a rendition of judgment is otherwise appropriate.").

statutory provision"—like the one here—as a matter of first impression.[64] I cannot join the Court's opinion or judgment when the Court improperly rejects the jury's verdict and rubs salt in the wound by rendering, rather than remanding. I would respect the jury's verdict and affirm the court of appeals' judgment, but failing that, I would give Milburn a fair chance at securing recompense for Honda's business choices. Because the Court does otherwise, I must respectfully dissent.

John P. Devine

Justice

**OPINION FILED**: June 28, 2024

---

**End of Document**

---

[63] *Rogers v. Bagley*, 623 S.W.3d 343, 358 (Tex. 2021)); *see, e.g., Carowest Land, Ltd. v. City of New Braunfels*, 615 S.W.3d 156, 159 (Tex. 2020) (holding that substantial clarification of the law warranted remand); *Hamrick v. Ward*, 446 S.W.3d 377, 385 (Tex. 2014) (observing remand is "particularly appropriate" when the losing party may have presented their case differently).

[64] *See 20801, Inc. v. Parker*, 249 S.W.3d 392, 394-96, 400 & n.5 (Tex. 2008) (remanding after interpreting "for the first time today" a "unique statutory provision" because the plaintiff "could not have reasonably anticipated the standard we announce today"); *In re Doe 2*, 19 S.W.3d 278, 283 (Tex. 2000) (noting that the rule for remand "is particularly well-suited to situations such as this one, where courts must apply the requirements of a unique or novel statutory scheme"); *ante* at 23-24 (noting that the interpretation of this statutory provision is a matter of first impression); *ante* at 3 (Blacklock, J., concurring) (acknowledging the statute's unique and unusual nature); *see also Low v. Henry*, 221 S.W.3d 609, 621 (Tex. 2007) (remanding in the interest of justice to allow parties to present evidence responsive to newly expressed guidelines for imposing sanctions under Chapter 10 of the Civil Practice and Remedies Code); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 26 (Tex. 1994) (remanding in the interest of justice because the trial was conducted at a time when no opinion from this Court had specifically addressed the standards governing the imposition of punitive damages in bad-faith lawsuits and because the decision represented a "substantial clarification" of the standard).