# Delta V Biomechanics

930 Commercial Street
Palo Alto, CA  94303

Telephone
FAX

5:22-cv-151-R
**EXHIBIT**
**Plfs' 3**
Obj to Defs' Motion for Summary Judgment

July 30, 2024

Mary Quinn Cooper
McAfee & Taft
Williams Center Tower II
Two W. Second Street, Suite 1100
Tulsa, OK  74103

### RE:   Shaffer v Toyota

Dear Ms. Cooper:

This letter summarizes results of the investigation carried out to date in the above-referenced litigation. The following sections provide descriptions of the incident, review the injuries to the plaintiff, and present the analysis of the event. My opinions are stated to a reasonable degree of engineering and medical certainty. My education, experience and training relative to the opinions set forth in this report are outlined in my curriculum vitae, which is attached to this report. Testimony history and rate schedules are also attached as appendices.

## Materials Received and Reviewed

The list contained in Appendix A describes materials that were received from your office and subsequently reviewed. The bibliography includes technical literature reviewed in conjunction with this matter.

## Event Description

The following description is a synopsis based on the Oklahoma Traffic Collision Report and City of Oklahoma City Police Department Incident Report, which recorded a two-vehicle collision at around 12:36 PM on January 15, 2020. The collision occurred on the westbound Interstate 240 off ramp approximately 72 feet west of South Byers Avenue in Oklahoma City, Oklahoma.

- Vehicle 1 was a black 2020 Toyota Corolla bearing Oklahoma license plate KAC203 and a vehicle identification number (VIN) of 5YFEPRAE1LP057494.
- Vehicle 2 was a red 2000 Chevrolet Silverado bearing Oklahoma license plate GDC265 and a VIN of 2GCEC19T0Y1334870.

According to the police report, the student driver of the Corolla stopped on the I-240 exit ramp for Southeast 74th Street to look back to the right for approaching vehicles. The driver of the Silverado was also exiting I-240 and looked back to the east to check for westbound traffic on Southeast 74th Street. The Silverado driver believed the Corolla had already driven forward when he looked back forward and saw it still at a standstill. The Silverado was not able to stop, and its left front collided

with the right rear of the Corolla. The Corolla then traveled west, impacted a curb, traveled around 98 feet, and came to rest facing northwest. The Silverado traveled about 58 feet northwest before coming to rest facing northwest. Figure 1 shows the scene diagram from the Oklahoma Traffic Collision Report.



**Figure 1.** Collision diagram from police report.

Police documents indicate that there were three occupants in the Toyota Corolla at the time of the collision:

- Ayhana Rogers, a 15-year-old female born on March 13, 2004, was listed as the driver. She had been wearing her shoulder and lap belt, her airbag did not deploy, she was neither ejected nor extricated, and she sustained a non-incapacitating injury to the head, trunk (internal), and legs.
- George Arthur Voss, a 60-year-old male born on July 28, 1959, was listed as the right front occupant. He had been wearing his shoulder and lap belt, his airbag did not deploy, he was neither ejected nor extricated, and he sustained a non-incapacitating injury to the trunk (internal).
- Hope Shaffer, a 15-year-old female born on March 31, 2004, was listed as the right rear occupant. She had been wearing her shoulder and lap belt, her airbag did not deploy, she was neither ejected nor extricated, and she sustained a fatal head injury.

At the time of the incident, the weather was clear, and the light condition was daylight. The roadway was dry, uphill, curved to the right, and constructed of asphalt. The posted speed limit on I-240 was 60 miles per hour (mph), and the recommended speed for the exit ramp was 40 mph.

## Summary of Fact Witness Testimony

### *Ashley Zepeda, Deposition dated August 22, 2023*

- She was a patrol sergeant with the Oklahoma City Police Department on the day of the crash. (8-9)
- When she arrived on scene, she saw a black/dark-colored vehicle [Corolla] on the off-ramp with significant rear-end damage. A red [Silverado] truck was off on the service road facing west. Someone flagged her down, handed her paper towels, and said someone in the back seat of the black car [Ms. Shaffer] was injured. The front passenger [Mr. Voss] was turned around and rendering aid to Ms. Shaffer, who had significant blood coming from her face, nose, and mouth; he was holding paper towels up to try to stop the bleeding. (15-16)
- When she got to the Corolla, Ms. Shaffer was facing forward with her seat belt buckled and properly over the shoulder and lap. A large amount of blood was coming from Ms. Shaffer's face, specifically her nose and mouth. She did not know exactly from where the blood was coming because there were paper towels over Ms. Shaffer's face. The blood was a very deep dark red and kind of chunky. Ms. Shaffer was breathing and making noises. When she went around to the other side of the vehicle, Ms. Shaffer seemed to lose coconsciousness; her head dipped backwards, she became more lethargic, and her body became limp. (16-21)
- Mr. Voss put pressure on Ms. Shaffer's face with paper towels to try to control the bleeding. She let him continue holding pressure and did not put her hands on Ms. Shaffer. (22)
- She did not see any life-threatening or debilitating injuries on either the front seat passenger [Mr. Voss] or the driver, who was sitting on the curb in front of the vehicle. (23)

### *Earl Joe Reed, Deposition dated September 15, 2023*

- He has been a firefighter with the Oklahoma City Fire Department since 2018. On the day of the collision, he was an emergency medical technician basic and responded to the scene on light rescue 16. (6, 8, 17)
- Ms. Shaffer was sitting upright in the back seat of the vehicle. She was unconscious, the driving instructor [Mr. Voss] was turned around in his seat holding her head up, and she had blood coming from her mouth. (20-21)
- He went to the driver's side of the vehicle and helped first responder Jacob Woods get the backboard in and Ms. Shaffer out of the back seat. A large blood clot came out of Ms. Shaffer's mouth when they were about to move her out. (21-22)
- Ms. Shaffer was breathing but not moving voluntarily when she was loaded into the ambulance. He did not recall hearing any noises coming from her, nor did he ever see her conscious at the scene. (23, 32)
- Mr. Voss had a small laceration to the back of the head that was barely bleeding. He did not recall if they bandaged that wound. They tried to figure out what Mr. Voss might have hit his head on or what might have hit his head, and the only thing they could think of was Ms. Shaffer coming forward and her teeth maybe hitting the back of his head. (25, 30-31)
- He assumed the red substance on the B pillar was Ms. Shaffer's blood but did not know whose blood it was. (37-39)

### *Matthew Capshaw, Deposition dated September 15, 2023*

- He has been with the Oklahoma City Fire Department since 2000. He was a lieutenant and the officer in charge of the light rescue fire truck on the day of the crash. (11)

- He had an independent memory of the crash and could tell that it was a rear end when he arrived. He approached the Corolla from the passenger rear and saw three occupants inside. Ms. Shaffer was sitting upright and slumped over in the rear passenger seat with a lot of blood coming from her facial area (nose and mouth). She was unresponsive, having trouble breathing, and making gurgling noises like she was attempting to breathe. The front passenger seat was leaning backward towards the rear of the vehicle, and Mr. Voss was holding Ms. Shaffer's head up, possibly so she could breathe (because she was slumped over). He never heard her talk or see her make any voluntary movements or with her eyes open. (22, 26-27, 29, 37-41, 50)
- Engine 23 arrived when he was assessing the scene, took Ms. Shaffer out of the driver-side back door, and transported her immediately. (23)
- He did not provide any patient care and was not involved in removing her from the vehicle. No extrication tools were used to extract Ms. Shaffer from the vehicle. (27, 29)
- Mr. Voss had a laceration on the back of the head towards the rear and higher up that was bleeding and looked like teeth marks. It looked like Ms. Shaffer's mouth hit the back of Mr. Voss' head. (30-31, 35-36, 41)

### Terry Harrison, Deposition dated October 10, 2023
- He has been in law enforcement for 46 years and is a master sergeant on the fatality accident investigation team with the City of Oklahoma City Police Department. (7, 10)
- Everyone in the Corolla had been transported by the time he arrived on scene. (27-28)
- His investigation indicated that the Corolla had exited I-240 onto the ramp and was essentially stopped. The Corolla driver, Ms. Rogers, was looking back to the right to check for westbound traffic. Mr. Voss was the right front passenger. Ms. Shaffer, who was sitting in the right rear seat, was also likely looking back to the right and maybe even forward in her seat. The Silverado driver thought the Toyota had had gone, but it was still stopped, so he tried to stop but couldn't. (32-34, 88)
- On page 12 of the Oklahoma City Police Department Incident Report, "collided with the C pillar" should be "collided with the B pillar." He saw impact/compression points on the back of the passenger seat and blood evidence in the passenger compartment on the right-hand side in the front and back. There was probably some transfer from Mr. Voss trying to help Ms. Shaffer. (36-37)
- Initially, Ms. Shaffer would have moved backwards relative to the vehicle and her seatback came forward, but once the Silverado contacted the C pillar and rear seat, she would have recoiled off the seat and been propelled forward. Her head was turned to the right, and the vehicle rotated to the left, so the B pillar would have rotated right into her path. Part of her body, such as her shoulder and upper torso, hit the back of Mr. Voss' seat. Then, she had a strong impact with the B pillar that caused her fractures. There was a definite impression on the B pillar (see Figure 2) indicating that something had hit it, as well as a blood pattern where contact was made. The white area on the B pillar was an impact point, not from blood or smear, and matched up with the width of Ms. Shaffer's head injury (see Figure 4). (78-80, 82, 84-86, 98-99)
- Exhibit 15.3 (see Figure 2, left) shows a white area on the [passenger-side] B pillar that is a stress point and a very sharp corner, indicating something hitting that. There was also a blood pattern at that impact point. Ms. Shaffer had a scalp laceration in the left temporal region. Exhibit 15.4 (see Figure 2, right) shows occupant impact from Ms. Shaffer on the back of the

[right] front seat, probably from a hand, shoulder, or leg. There is also an outline of Mr. Voss' shoulder where he compressed the seat. (40, 42)



**Figure 2.**   Photos of the Corolla's passenger-side B pillar (left) and right front seat (*right*).

- Exhibit 15.5 (see Figure 3) shows impact points from Ms. Shaffer and the impact point on the [passenger-side] B pillar. (43)



**Figure 3.**   Photo of impact points on the Corolla.

- Exhibit 15.6 (see Figure 4) shows a narrow laceration or tearing of the skin in the temporal region on Ms. Shaffer. It was maybe a couple inches long, so whatever struck that area was a very narrow or sharp impact. Ms. Shaffer had a large amount of bleeding in the vehicle. (41)



**Figure 4**. Photo of Hope Shaffer at the hospital taken by the Oklahoma City Police Department.

- Exhibit 15.1 (see Figure 5, left) shows the front passenger-side door with some blood on the door handle. It's not high velocity but a print. He did not believe this came from the impact but was transfer from Mr. Voss' hands. Exhibit 15.2 (see Figure 5, right) shows gravitational blood on the back seat and passenger-side door panel, also going backwards and not high velocity. He believed this was also from Mr. Voss. (38-40)



**Figure 5**. Photos of the Corolla's front (*left*) and rear (*right*) passenger-side interior door panels.

- He determined that the Silverado's [front] bumper went over the Corolla's [rear bumper] and that the Silverado went from the back of the Corolla all the way to almost the latter's C pillar. The crash pulse was 234 milliseconds, which is longer than most, which are 80 to 100 milliseconds. The Corolla rotated about 90 degrees into a curb after the impact, went down an embankment, and came to rest facing westbound. (44-46, 49)
- As part of his investigation, he determined that Ms. Shaffer and Mr. Voss were both wearing their shoulder harnesses and lap belts properly. (70-71)

- Ms. Rogers' only injuries were complaints of soreness in her neck and back. Mr. Voss had a little bump on the back of his head, maybe to the left but mostly in the center, almost on the crown. (74-75)
- Ms. Shaffer's injuries accounted for the extreme blood loss in the vehicle. (77)

### George Arthur Voss, Deposition dated November 17, 2023

- He was a driver for Brown's Driving School and a state examiner. (9)
- He was 5'8" tall and weighed around 285 pounds on the day of the crash. He normally slid the seat all the way back and placed the seat in a comfortable position. If upright (i.e., 90 degrees) is 1, and laid all the way back is 10, his seat back was at 2-3 before the crash. Afterwards, it was in the same or a very similar position and not laid all the way down. (20-22, 80)
- At the time of the crash, he was in the [front] passenger seat, Ms. Rogers was the driver, and Ms. Shaffer was in right rear seat. Everyone was wearing a seat belt. (17-19, 22)
- He had a small mirror that attached to the left side of the visor that allowed him to see behind him. The mirror gave him a complete view out the back window and depending on the angle, a partial view of the left lane next to them. He could see part of the rear-seat passenger. (19-20)
- Ms. Rogers exited the highway and became confused at the end of the off ramp, so she slowed down to no more than 5 mph. He saw the pickup truck [Silverado] in the small mirror and knew that it was going to hit them. After the crash, he was still in his seat but to the left side. (22-24, 26, 118)
- Everyone's seat belt was still on after the collision. Ms. Rogers said she was okay but turned around and said that Ms. Shaffer was bleeding. He turned around and saw Ms. Shaffer unresponsive and sitting straight up with her head slumped down to the left on her left shoulder and blood leaking profusely from her nose. Ms. Shaffer's seat belt appeared to be in the appropriate position. He unbuckled his seat belt and tried to stop the bleeding with his hands, but all that did was change the body orifice out of which the blood was pouring (from nose to mouth), so he took his shirt off and placed it on her face. The pickup driver brought some paper towels. Ms. Shaffer's eyes were open when he first saw them, but they rolled back in her head and then closed. He tried to straighten Ms. Shaffer's head, but it fell limply back on her shoulder, so he assumed she had a broken neck. The only thing he heard Ms. Shaffer do was heave/breathe very heavily once or twice; she never said any words or made any audible sounds. (23-24, 26-29, 44, 127, 131)
- After help arrived, he unbuckled Ms. Shaffer's seat belt, and she was taken out through the driver side because both passenger-side doors would not open. (28)
- He got out of the vehicle and sat on the curb. He had blood on his hands and shirt. Someone asked if he wanted to go to the hospital, and he said no, but emergency personnel said he had blood and what looked like teeth marks on his head, so he went to the emergency room. He pointed to the location of his head injury (see Figure 6). There was a lump on his head, and it bled. He did not have any blood running down the back of his head, nor did his head abrasion require any stitches. (28-30, 32, 41-42, 60-61, 76)



**Figure 6.** George Voss pointing to the location of his head injury during his deposition taken on November 17, 2023 (images cropped from their original size).

- The mark on the back of his head can also be seen in Ashley Copeland's body worn camera video at around 8:53 (see Figure 7). (59)



**Figure 7.** Still image from Ashley Copeland's body worn camera video (image cropped from its original size).

- There was a period of time when he was unresponsive in the ambulance. He had initially asked to go to the VA in Oklahoma City, but he was instead taken to Oklahoma University (OU) [Medical Center] after he fainted. (37-38)
- He estimated that Ms. Shaffer was 5'6" tall and weighed 110 pounds. (126)

*Charla Marie Shaffer, Deposition dated February 1, 2024*
- She has been married Nick Shaffer for 31 years. Hope Shaffer was their daughter (6, 7)
- Exhibit 2 represents how Hope's teeth looked on the day of the crash (see Figure 8). (85)



**Figure 8**. Photograph of Hope Shaffer prior to the crash.

### *Ira Nick Shaffer, Deposition dated February 1, 2024*

- Exhibit 2 represents how Hope's teeth looked on the day of the crash (see Figure 8). (22)
- Exhibit 3 shows Hope's glasses in the vehicle (see Figure 9). (51)
- He went to the vehicle and retrieved Hope's glasses shortly after the latter's death. (57-58)



**Figure 9**. Hope Shaffer's glasses in the vehicle.

## Summary of Medical Records

### Hope Shaffer

Responding emergency personnel from the Oklahoma City Fire Department and EMSA arrived on scene to find Hope Shaffer unresponsive in the rear passenger seat of a four-door car with a Glasgow Coma Scale score of 3 and blood coming from her ears, nose, mouth, and groin area. First responders removed the patient from the vehicle via a long spine board, placed a cervical collar on her, suctioned excess blood from her airway multiple times, and intubated her. Firefighters noted a mass/lesion and swelling to the patient's head/face with significant depression of the left side of the skull. EMSA medics noted Ms. Shaffer to have a deformity/large closed skull fracture to the left front skull (see Figure 10); a left eye contusion with a non-reactive pupil; uncontrolled bleeding from the right ear and mouth; controlled bleeding from the nose and left ear; and labored and shallowing breathing with agonal respirations. The patient was transported to OU Medical Center (OUMC) for further evaluation and treatment. She became pulseless upon arrival to the hospital, and chest compressions were initiated while she was transferred to the Emergency Department (ED).



**Figure 10**. EMSA assessment diagram for Hope Shaffer.

The trauma nursing team at OUMC noted the following during a primary and secondary survey: a head contusion, a deformity to the left head, no eye opening, dilated pupils, left periorbital ecchymosis, hemotympanum, asystole, and hemorrhage in the perineal area (see Figure 11).

**Figure 11.** OUMC ED trauma nursing assessment sheet for Hope Shaffer.

Emergency medicine specialist Dr. James Kennedye also evaluated the patient and noted the following: anisocoria (right pupil 7 at millimeters, left pupil at 4 millimeters), left facial deformity, periorbital ecchymosis, no pulses, no signs of breathing, no cardiac activity, and suspected rectal/vaginal bleeding. A secondary survey in the trauma department was significant for a depressed left skull, an approximately 2-centimeter left brow laceration, left orbit ecchymosis, non-reactive pupils bilaterally, a bloody nose, blood from the vaginal area, and no movement of the extremities (see Figure 12).



**Figure 12.** OUMC trauma initial history and physical evaluation for Hope Shaffer.

Resuscitation efforts in the ED were ultimately unsuccessful, and Ms. Shaffer remained without a pulse or respirations. She was declared deceased at 1:10 PM on January 15, 2020.

The following day, forensic pathologist Dr. Edana Stroberg at the Oklahoma Medical Examiner's Office performed a limited autopsy of Ms. Shaffer and noted the following significant observations

and injuries: a laceration above the left eyebrow with underlying subgaleal and subscalpular hemorrhage of the left frontal skull, multiple skull base and left frontal skull fractures, diffuse subarachnoid hemorrhage, ventral left frontal and right temporal brain contusions, and hemo-aspiration (see Figure 13 and Figure 14). Her diagram also noted a 0.5 by 0.5 centimeter defect with surrounding abrasion with a 3 by 0.2 centimeter curvilinear abrasion to the left forehead, a 1.5 by 1 centimeter yellow abrasion to the right clavicular area, a 3 by 2 centimeter brown-red abrasion on the anterior superior left leg, and a 1 by 0.5 centimeter brown abrasion to the posterior right shoulder.



**Figure 13.** Autopsy diagram for Hope Shaffer, anterior and posterior views.



**Figure 14**. Autopsy photos of Hope Shaffer.

X-rays of the full body and head/neck were also taken (see Figure 15). Dr. Stroberg determined the decedent's probable cause of death to be blunt force trauma due to a motor vehicle collision and the manner of death to be accident. At the time of the collision, Hope Shaffer was 15 years old, measured around 5' 6" in height, and weighed approximately 113 pounds.



**Figure 15.** Postmortem X-rays of Hope Shaffer (center and right images cropped from their original size).

### George Voss
EMSA personnel found George Voss sitting on the curb at the collision scene and complaining of pain at the top of his head where there was a wound, as well as generalized neck and back pain. The patient denied any loss of consciousness and had full recall of the event. Medics noted a skin avulsion to the top of Mr. Voss' head, which he believed was from Ms. Shaffer's teeth. The patient had decreased lung sounds on the right and was placed in a cervical collar. Mr. Voss was initially transported to a local VA ED but was upgraded to OUMC following two brief syncopal episodes. The patient had a third syncopal episode as he was being transferred to the ED.

An evaluation by the trauma nursing staff at OUMC showed an abrasion to the posterior head (see Figure 16). During her examination, emergency medicine specialist Dr. Karyn Koller noted an atraumatic head and tenderness of the thoracic and lumbar spine. A secondary survey in the trauma department was remarkable for an abrasion to the occiput and diffuse thoracic and lumbar back tenderness (see Figure 17).

**Figure 16.** OUMC ED trauma nursing assessment sheet for George Voss.

**Figure 17.** OUMC trauma initial history and physical evaluation for George Voss.

X-rays of the chest and pelvis, as well as computed tomography (CT) scans of the brain, cervical spine, chest, abdomen, pelvis, and thoracolumbar spine, were all negative for acute injuries. Mr. Voss was diagnosed with a closed head injury and cervical strain, provided an Aspen collar for comfort, and discharged from the ED ambulatory and without complaints.

## Review of Accident Reconstruction

According to the reconstruction of Dr. Michelle Vogler at Design Research Engineering, the Chevrolet Silverado and Toyota Corolla were traveling at speeds of approximately 33 to 37 mph and 2 to 5 mph, respectively, at the time of impact. The Corolla experienced a delta V of about 18 to 22 mph with a principal direction of force (PDOF) of around 6 o'clock at the rear of the vehicle. There was substantial override of the Silverado's front bumper structure relative to the Corolla's

rear bumper structure during the collision sequence. The Silverado experienced a delta V of approximately 14 to 17 mph.


## Subject Vehicle Inspection

Delta V Biomechanics inspected the subject 2020 Toyota Corolla on October 6, 2021, in Edmond, Oklahoma. Digital photographs, notes and measurements were taken. Findings included, but were not limited to:

- The vehicle sustained severe rear-end damage, greater on the passenger side, and minor hood and left frontal damage.
- The rear and right rear door windows were broken.
- There were areas of transfer, dirty areas, drips, spots, and stains on the right front seat.
- The passenger-side of the rear seat back was displaced/deformed forward. There was broken glass, debris, dirty areas, dried blood, and spatter on the rear seat bottom.
- There were areas of plastic crazing, deformed areas, drips, blue fibers, and rubs on the right rear interior door panel.
- The driver's seat belt was found with the webbing stowed on the retractor. There were abrasions, dirty areas, impressions, and spots on the webbing. There were scratches on the latch plate plastic and metal surfaces.
- The right front seat belt was found with the webbing stowed on the retractor. There were abrasions, dirty areas, and spots on the webbing. There were scratches on the latch plate plastic and metal surfaces.
- The right rear seat belt was found with the retractor locked and approximately 55 inches of webbing between the seat bight and retractor outlet. There were deposits, dirty areas, scratches, smears, and strains on the webbing.
- Areas on the rear aspect of the right front seat back and head restraint, right rear door panel, and passenger-side B pillar trim fluoresced under ultraviolet light.


## Exemplar Inspection and Surrogate Study

Delta V Biomechanics conducted a surrogate study with an exemplar 2021 Toyota Corolla bearing a VIN of 5YFEPMAE5MP168943 on July 24, 2024, in Palo Alto, California. According to the vehicle year/model interchange database based on the National Highway Traffic Safety Administration's crash test database, the model year range that encompasses the subject 2020 Toyota Camry runs from 2019 to 2024.

The right front surrogate was a 59-year-old, 233-pound, 5'7-3/4" tall male with a seated height of 36-1/2". The right rear surrogate was a 15-year-old, 114-pound, 5'5-1/2" tall female with a seated height of 34-1/4". The surrogates were asked to sit in their respective seats and don their seat belts. The right front seat bottom was positioned full rear along its track and the seat back at approximately 10 degrees from vertical.

With his seat belt on, the right front surrogate looked toward the inboard sun visor where Mr. Voss testified that he had placed a small mirror in the subject vehicle (see Figure 18).



**Figure 18**.  Belted right front surrogate looking toward the inboard visor.

With her seat belt on, the right rear surrogate looked toward her right rear as if she were checking for traffic in an adjacent lane; in doing so, she moved forward and pulled a significant amount of webbing off of the retractor (see Figure 19).



**Figure 19**.  Belted right rear surrogate looking to the right rear.

The right rear seat back was latched and rotated forward approximately 15 inches with the female surrogate in the previous seating position. In this configuration, the left front aspect of the surrogate's forehead was adjacent to the passenger-side B pillar and the outboard rear of the right front seat back (see Figure 20).



**Figure 20**.  Belted right rear surrogate looking to the right rear with her seat back displaced approximately 15 inches forward from its original position.

## Injury Analysis

### Occupant Kinematics
During the rear impact, the Corolla was pushed forward by the Silverado, and its rear structures deformed and displaced as a result of direct contact by the Silverado. Ms. Shaffer, who was likely leaning forward and looking toward her right rear, was pushed forward by the intruding Silverado toward the passenger-side B pillar and seat back in front of her.

The crash forces caused the front seat occupants to move, relative to the vehicle, rearward and into their seat backs. However, the rear-seat occupant's forward motion preceded the front-seat occupants' rearward motion, interfering with the energy-absorbing rearward seat motion. The right front passenger, who was wearing his shoulder and lap belt, most likely remained within the confines of his seat. Ms. Shaffer's left leg abrasion and absence of a right leg injury is evidence of her asymmetrical position prior to impact and the interaction of her left, but not her right, lower extremity with the seat in front of her.

### Injury Mechanism
Hope Shaffer sustained fatal head and brain injuries consisting of depressed left frontal skull vault fractures, skull base fractures, cerebral contusions, and subarachnoid hemorrhage. Skull base fractures are almost uniformly fatal due to their proximity to vital structures such as the brainstem, major blood vessels, and cranial nerves. The significant trauma and forces necessary to cause skull base fractures often lead to direct injury to the brain itself, causing contusions, hemorrhage, or other traumatic brain injuries, which can be fatal. The base of the skull also houses the brainstem, which regulates many essential functions, including breathing and heart rate. Trauma to the brainstem can therefore be an immediate threat to life. In addition, damage to major blood vessels can lead to hemorrhage or vascular compromise, which can result in hypovolemia shock and rapidly lead to death (Baugnon 2014, Gan 2002, Simon 2023). Skull base fractures may result from impacts at any point around the circumference of the head (Harvey 1980). Ms. Shaffer sustained her fatal skull base fractures when her left forehead contacted a rigid structure in front of her as her body moved forward with the intruding Silverado toward the passenger-side B pillar and right front seat back/head restraint.

Depressed skull fractures usually result from a direct impact with a small blunt object (Biros 2010). Such impacts can include a fall onto a sharp corner of a piece of furniture, an impact with the pointed edge of a rock, a blow with a hammer, or an impact with the grab handle on a vehicle's A pillar. Spitz noted, "invariably, anytime a depressed skull fracture occurs, something penetrated, although, due to its elasticity, the skin may remain intact." An impact to the skull from a flat surface is unlikely to produce depression of bone fragments (Spitz 2006). When the area of contact is below a threshold size of approximately 2 square inches in radius, depressed skull fractures are likely to occur due to localized stresses at the impact site. In contrast, a contact area larger than this size will lead to distributed rather than concentrated loading (SAE J885 2011). The size and shape of a depressed skull segment is important to the understanding of the injury-causing object. A localized blow to the head will fracture the outer table of the skull, crushing into the inner table. The resulting depressed fracture will be approximately the same size and shape as the object that caused the injury (DiMaio 2001, Payne-James 2011, Saukko 2004, Spitz 2006, Yoshida 2000).

George Voss sustained a wound to his posterior head and a cervical strain during the collision sequence. Two-dimensional images and a three-dimensional reconstruction of Mr. Voss' head and brain CT scan show the exact location of Mr. Voss' head impact (see Figure 21); there is a small hematoma in the posterior parietal region, just biased to the right.

The area of contact to Mr. Voss' head is too broad to result in a depressed skull fracture to Ms. Shaffer. If Ms. Shaffer's teeth were to contact Mr. Voss' head in the area of his scalp wound, the left fronto-temporal region of her head would not make contact with his head, and in fact, there is no physical or testimonial evidence of any other contact to Mr. Voss' head. Furthermore, a significant contact between Ms. Shaffer's mouth and Mr. Voss' head would disrupt Ms. Shaffer's teeth. However, none of Ms. Shaffer's teeth were dislodged, and her parents both testified to the state of her dentition.



**Figure 21**.  Sagittal (*left*) and axial (*center*) images and 3-D reconstruction (*right*) of Mr. Voss' head and brain CT taken on January 15, 2020.

### Collision Severity
Since the total energy of a collision is directly related to vehicle speed, greater injury occurs with increasing crash severity. Based on a cumulative distribution plot, the rear impact to the Toyota Corolla, with a delta V of 18 to 22 mph, is in the 89th to 94th percentile of all crashes sampled from the National Automotive Sampling System Crashworthiness Data System between 1988 and 2007

(see Figure 22, Goertz 2010, Yaek 2020). These data indicate that the subject rear impact was a severe one.



**Figure 22.** Cumulative distributions of delta V for rear impacts with the subject crash in red (adapted from Goertz 2010).

## Front Seat Structure Systems

### *Optimizing Safety for All Occupants*
In a rear-end crash, the primary occupant interacting with the seat is the person sitting in the seat itself. Other occupants may interact with the seat either from their movements within the vehicle, the seat's movement within the vehicle, or some combination of both. The occupant of the seat may have a normal seated position with his or her buttocks centered in the seat bottom and his torso against the seat back. Alternatively, this occupant may be out of position as a consequence of volitional or forced movements away from a normal seated position. Regarding non-occupants, should a person move within the vehicle and collide with the seat, if possible, it should cushion the blow to the colliding occupant.

### *Energy Absorbing vs. Semi-Rigid Seats*
Increasing seatback strength limits its yield (and thus energy absorption) ability. While strengthening and stiffening the seatback may limit the seat back from encroaching into the rear seat occupant space, a stiffer seat also increases the risks of ramping towards the roof, hyperextension injuries, and rebound from the seat (Blaisdell 1993). Yielding seat backs are advantageous in the majority of real-world exposures. They are less sensitive than rigid seat backs

to occupant pre-impact position and they reduce forward rebound. They are also more forgiving to rear occupants in frontal collisions (Warner 1991).

A more yielding seat has been shown to perform more efficiently to absorb energy than a stiffer seat (Blaisdell 1993, Warner 2008, Edwards 2009) and a rotating, yielding seatback protects the occupant in severe delta V impacts (Martinez 1969, Edwards 2009). In collisions with a delta V over 30 mph, the severe injury risk was 3.8 times greater when the seat back had not rotated rearward.

Conventional yielding backrests use most of their energy absorption capability in the 5 to 20 mph delta V range, minimizing head-to-torso misalignment and protecting against serious injury exposure. A collision exceeding those levels can cause the front seat occupant to contact the rear seat occupant space (Blaisdell 1993). Energy absorption efficiency occurs in more easily yielding seats (see Figure 23).

A stronger, stiffer seat leads to amplified rebound and ramping, which increases the occupant's delta V during a collision, thereby increasing occupant injury risk. A rigidified seat can also act as a barrier to an unrestrained rear seat occupant's forward movement, causing the occupant to pivot upward with possible serious impact into the roof structure (Blaisdell 1993). In addition, rigid front seats expose drivers to hyperextension of the neck (see Figure 24).



**Figure 24.** In a semi-rigid seat, an occupant may be exposed to ramping and neck hyperextension in a collision (Warner 1991).

**Figure 23.** Energy-absorbing properties of UCLA test seat structures (Blaisdell 1993).

A study by Stephens found that semi-rigid seats subject drivers to excessive injury, compared with energy-absorbing seats (Stephens 2000). High peak head, chest and pelvis accelerations occurred as a result of limited deflecting seats (see Figure 25).

**Figure 25.**  Seatback angle and crash accelerations as a function of time, stiff vehicle with a yielding seat (*left*) and limited-yield seat (*right*). A yielding (energy-absorbing) seat back drastically lowers peak accelerations of the head, as well as chest and pelvis. (Stephens 2000).

The possible harm associated with a yielding seat (contact with the rear compartment) must be weighed carefully against the harms associated with a stiffer seat (James 1991). An attempt to protect rear-seat occupants by preventing front seats from deforming or rotating could be detrimental to the front occupant's safety (Edwards 2009). Field collision studies have shown that non-deforming seats are more likely to cause injury than yielding seats. Stiffening vehicle seatbacks poses the risk of increasing overall societal harm: it may injure more people than it protects (Warner 2008).

### Optimum Seatback Stiffness

For crashes with a delta V over 25 mph, the optimum range of seatback stiffness is in the mid-range of seatbacks offered in current production vehicles, as both lower neck compression and upper neck tension may increase with increasing seat stiffness (see Figure 26). This middle ground allows for the greatest protection against cervical injury - an injury that can lead to paralysis or death of the occupant. One case study found that a non-deforming seat could lead to neck fractures in severe crashes, whereas no fractures were observed in seats that deformed (Digges 1993). Several studies have found that "stiffened or rigid seat backs will not substantially mitigate severe and fatal injuries in rear impacts" (James 1991, Warner 2008).

**Figure 26.**  Effect of seatback stiffness on neck tension and compression (Burnett 2004).

## Analysis of Plaintiffs' Expert Opinions

### Roger Huckfeldt, M.D.

In his report dated July 11, 2024, Dr. Roger Huckfeldt opined that "it is more likely than not that the wounds on the back of George Voss's head and the fatal injuries sustained by Hope Shaffer are consistent with direct contact between the occiput of George Voss and the head/face of Hope Shaffer." However, Dr. Huckfeldt offered no support for this opinion. For example, he did not describe the timing of Ms. Shaffer's and Mr. Voss' kinematics and whether they would even be moving toward one another in a manner that would allow their heads to interact during the crash sequence. In addition, Dr. Huckfeldt did not analyze the amount of seat back deformation that the right front seat would have experienced or explain how Mr. Voss, who was belted in the right front seat, would have been able to move out of his seating position sufficient to contact his head with Ms. Shaffer's. He also did not consider Ms. Shaffer's pre-impact position, which was likely forward in her seat belt and looking to her right rear and how this would have affected the location of Ms. Shaffer's and Mr. Voss' respective injuries. There were no forces during the collision sequence that would have brought Ms. Shaffer inboard to impact the left rear of Mr. Voss' head. Instead, since she was most likely pre-positioned outboard at the time of the impact, she would have continued directly forward toward the passenger-side B pillar and right front seat back/head restraint.

### Mariusz Ziejewski, Ph.D.

In his report dated July 12, 2024, Dr. Mariusz Ziejewski opined that "[t]he location of the injuries to both occupants is consistent with the posterior aspects of Mr. Voss's head in contact with the anterior portion of Ms. Shaffer's head" and that "[t]he forces from head-to-head contact caused injuries at the fatality level." Although Dr. Ziejewski presented a photograph of a surrogate sitting in the right rear seat of an exemplar 2021 Corolla, he did not show how that surrogate would have interacted with an occupant in front of her to produce the injuries observed on Ms. Shaffer and Mr. Voss. Dr. Ziejewski claimed that the locations of Ms. Shaffer's and Mr. Voss' head injuries are consistent with head-to-head contact but did not describe how the two occupants moved during the crash sequence to produce said injuries. As with Dr. Huckfeldt, Dr. Ziejewski provided no information on the amount of seat back deformation experienced by the right front seat, the timing of the occupants' kinematics and their movements relative to one another, and how Ms. Shaffer's pre-impact position affected her movement and injury potential during the collision sequence.

Dr. Ziejewski also incorrectly characterized the location of Mr. Voss' head injury in Figure 24 of his report (reproduced below as the left side of Figure 27), with it being both superior and anterior compared to the area that Mr. Voss identified during his deposition on November 17, 2023 (see Figure 27), which itself was left and inferior of where the injury actually was (see Figure 7 and Figure 21) in the posterior parietal region, slightly biased to the right.



**Figure 27.** *Left*: Figure 24 from Mariusz Ziejewski's July 12, 2024, report: head impact location with respect to anatomical origin. *Right*: George Voss pointing to the location of his head injury during his deposition taken on November 17, 2023.

Moreover, Dr. Ziejewski did not explain how Mr. Voss was able to ramp up his seat back, over his head restraint, and out of the confines of his seat when he was properly wearing his shoulder and lap belt at the initial time of impact.

### Steven Meyer, P.E.

In his report dated July 16, 2024, Mr. Steven Meyer superimposed an image from a rear impact sled test performed on July 10, 2024 at SAFE Laboratories with that of a surrogate occupant in the right rear seat of an exemplar Corolla (reproduced below as Figure 28). However, this graphic neither depicts the specific characteristics of the subject collision (e.g., the significant intrusion of the Corolla's rear structures from the Silverado overriding the former's rear bumper structure), nor the particular injury mechanism that Dr. Ziejewski opined was the cause of Ms. Shaffer's death (i.e., head-to-head contact between Ms. Shaffer's and Mr. Voss' heads). Based on Figure 28, a front-seated 95th percentile male occupant would have contacted the torso region of a passenger seated directly behind it. This is not consistent with Ms. Shaffer's injuries, all of which were to her head and face.

In fact, there is no evidence that the "right front passenger's seat failed to remain reasonably upright" during the subject crash. According to Mr. Gregory Stephens at Collision Research Analysis, the right front seat back experienced only about 5 degrees of rearward deflection during the collision sequence. This degree of deformation would not have been sufficient to cause Mr. Voss to leave the confines of his seated position and allow his head to make injurious contact with Ms. Shaffer's.

Shaffer v Toyota                                                                                          July 30, 2024



**Figure 28**.  Figure 24 from Steven Meyers' July 16, 2024 report: superimposed surrogate occupant in rear seat.

## Opinions

1.  Hope Shaffer's fatal injuries were a result of a single direct blow to the left fronto-temporal region of the head by a small radius of curvature (i.e., narrow) rigid object.

2.  Ms. Shaffer's fatal head injury did not result from head-to-head contact with Mr. Voss.

3.  Front passenger seat yielding did not cause or contribute to Ms. Shaffer's fatal injuries.

4.  The subject collision, with a delta V of 18 to 22 mph, was in the top 6 to 11% of all tow-away rear collisions.

Please note that this report is based upon information available to me at the time of its preparation. Should substantial additional information that affects the contents of this report become available, an amended or supplementary report may be prepared.

If you have any questions, do not hesitate to contact me.

Sincerely,

_____
Elizabeth H. Raphael, M.D., F.A.C.E.P.

Delta V Biomechanics                                                                        Page 25 of 30