5:22-cv-151-R
**EXHIBIT**
**Plfs' 17**
Obj to Defs' Motion for Summary Judgment



# Shaffer v. Toyota, et al.

*PREPARED FOR:*
**Andy J. Campbell, Esq.**
*Maples, Nix & Diesselhorst*
15401 North May Ave
Edmond, OK 73013

**By**
**Steven E. Meyer, P.E.**

**July 16, 2024**



## TABLE OF CONTENTS

1. **INTRODUCTION**................................................................................................3
2. **MATERIALS REVIEWED**................................................................................3
   2.1  DOCUMENTS REVIEWED................................................................3
   2.2  FURTHER INVESTIGATIONS..........................................................4
   2.3  BASIS FOR OPINIONS.....................................................................5
3. **ACCIDENT DETAILS**........................................................................................6
   3.1 CRASH DETAILS AS DESCRIBED IN THE POLICE REPORT.....................6
   3.2 CRASH DETAILS AS RECONSTRUCTED BY DR. ZIEJEWSKI.................7
   3.3 OCCUPANT DETAILS AND INJURIES.................................................8
4. **ANALYSIS OF VEHICLE EVIDENCE**...........................................................9
   4.1 VEHICLE INSPECTION....................................................................9
   4.2 REMOVAL & DETRIM OF RIGHT FRONT SEAT.................................11
   4.3 ANALYSIS OF POLICE BODY WORN CAMERA.................................14
5. **DISCUSSION**.....................................................................................................16
   5.1  STRONGER SEATS / ALTERNATIVE DESIGNS................................30
6. **SUMMARY OF OPINIONS AND CONCLUSIONS**....................................36

APPENDIX 1...........................................................................................................38
   *List of References*
APPENDIX 2...........................................................................................................44
   *Curriculum Vitae of Steven E. Meyer, P.E.*
   *4-year Testimony List*
   *SAFE Fee Schedule*
APPENDIX 3...........................................................................................................61
   *SAFE Testing – 2020 Toyota Corolla Rear Impact Sled Testing*
APPENDIX 4.........................................................................................................180
   *SAFE Testing – 2002 Toyota Corolla Rear Impact Sled Testing with Chrysler Sebring Seat*

# 1. INTRODUCTION

The following report has been prepared regarding an analysis conducted in relation to a motor vehicle collision that occurred on January 15, 2020, at approximately 12:36 p.m. on the westbound I-240 off ramp approximately 72 feet west of South Byers Avenue in Oklahoma City, Oklahoma. A 2020 Toyota Corolla was struck from behind by a Chevrolet Silverado. During the accident, the right rear passenger, Ms. Hope Shaffer, was fatally injured.

# 2. MATERIALS REVIEWED

## 2.1. DOCUMENTS REVIEWED

The following documents and materials were reviewed in preparation for this report:

1. Police / First Responder Data:
   - ➢ Official Oklahoma Traffic Collision Report;
   - ➢ Oklahoma City Police Incident Report.

2. Photographs and Video:
   - ➢ Various photographs of the accident scene taken by police;
   - ➢ Police body camera video recordings;
   - ➢ Various photographs of the subject Toyota Corolla taken by unknown;
   - ➢ Various photographs of the accident scene taken by unknown;
   - ➢ Autopsy photographs of Hope Shaffer;
   - ➢ Photograph of Hope Shaffer prior to collision;
   - ➢ Photographs of the subject Toyota Corolla taken by Dr. Mariusz Ziejewski;
   - ➢ Vehicle inspection and seat detrim photographs taken by Steven E. Meyer on October 28, 2021;
   - ➢ Exemplar surrogate study (re: right rear occupant) photographs taken by SAFE on June 27, 2024;
   - ➢ Various photographs of the subject Toyota Corolla, accident scene, and impacting Chevrolet Silverado taken by Ron Blevins;
   - ➢ Various photographs of the impacting Chevrolet Silverado taken by unknown.

3. Various medical records of George Voss and Hope Shaffer.

4. Testing of various original equipment manufacturer (OEM) seat assemblies and designs conducted to evaluate and demonstrate seat assembly design and performance in rear impact collisions.

5. Vehicle data for the involved vehicles including:
   - ➢ Specifications by various publicly available sources;
   - ➢ Bosch CDR reports for the subject Toyota Corolla and impacting Chevrolet Silverado.

6. Depositions and exhibits taken in the subject matter:
   - George Voss (RF Passenger), 11/17/23;
   - Earl Reed (Firefighter), 9/15/23;
   - Matthew Capshaw (EMT), 9/15/23;
   - Terry Harrison (PD), 10/10/23;
   - Ashley Zepeda (PD), 8/22/23;
   - Charla Shaffer (Mother), 2/1/24;
   - Nick Shaffer (Father), 2/1/24.

7. Witness Statements:
   - Samuel Pace (Driver, 2000 Chevrolet Silverado);
   - Dwayne Doolittle (Witness);
   - Kyla Boydston (Witness).

8. Expert report of:
   - Biomechanist and Accident Reconstructionist Dr. Mariusz Ziejewski, Ph.D.

9. Review, analysis and inspection of various exemplar vehicle seat structures.

10. Documents and materials produced by the Toyota defendants in response to discovery in this case.

11. Numerous peer reviewed public studies, patents, reports, and articles regarding safety system analysis, accident investigations, reconstruction analysis and methodologies, including research relevant to the role of the occupant's seat in rear impacts (See Appendix 1).

12. Additionally, it is expected that demonstrative aids will be utilized during trial in this matter. Those items would include, but are not limited to, the subject Toyota vehicle and/or right front passenger's seat, an exemplar seat from a vehicle of the same platform, other exemplar seats, animations, drawings, and other demonstrative evidence.

## 2.2. FURTHER INVESTIGATIONS

In addition to reviewing the above materials, the undersigned inspected the subject 2020 Toyota Corolla in Edmond Oklahoma on October 28, 2021. The inspection included an examination of damage to the vehicle and evaluation of the vehicle's restraint systems. Additionally, the right front passenger's seat was removed from the vehicle and jointly detrimmed with representatives from all interested parties. Further documentation and analysis of the right front seat and its structural damage from the subject rear end collision was conducted. The right front seat was documented and scanned throughout various stages of the inspection.

Additionally, on June 27, 2024, a surrogate occupant of similar stature to that of the right rear passenger, Ms. Shaffer, was placed into an exemplar Toyota Corolla right rear passenger's seat within a substantially similar Toyota Corolla occupant compart.

Photographs and 3 dimensional scans of the surrogate occupant in the rear seat were taken.

Also, on July 10, 2024, a rear impact sled test was performed on an equivalent Toyota Corolla test buck with a 95th percentile hybrid III Anthropometric Test Device (ATD, or crash test dummy) positioned in the right front passenger's seat to evaluate the seat's dynamic performance and crashworthiness.

## 2.3. BASIS FOR OPINIONS

My opinions are based upon my education, training and experience as a Professional Engineer (Mechanical), in addition to my experience as a researcher, accident reconstructionist and automotive safety engineer involved with numerous studies in the field of accident investigation and automotive safety, particularly related to the field of automotive crashworthiness. My professional engineering experience has spanned 35 years, almost all of which has related directly to motor vehicle accident reconstruction, crashworthiness analysis and restraint system (including the seat) analysis. Over these past many years, I have been called upon to analyze thousands of real world accidents. I have been qualified and testified in both state and federal courts of law. I am a member of the Society of Automotive Engineers (SAE), American Society of Mechanical Engineers (ASME), National Society of Professional Engineers (NSPE), and the National Academy of Forensic Engineers (NAFE).

My opinions are also based upon my knowledge of world literature regarding vehicle crashes, accident reconstruction and automotive crashworthiness. The opinions, bases and methodology presented in this report are the same as I would provide had the manufacturer of the vehicle commissioned this work.

In my current position, as a Principal in the automotive engineering firms of Safety Analysis & Forensic Engineering (SAFE) and SAFE Laboratories, L.L.C., I am routinely called upon to evaluate vehicle accidents, perform analytical reconstructions of those subject accidents and evaluate various vehicle safety systems. I am currently, and have been, associated with many nationally recognized experts in the fields of automotive accident reconstruction, automotive safety and design, occupant kinematics, biomechanics, crashworthiness systems, and other automotive safety related disciplines. These include academics, industry experienced experts, as well as experts with governmental experience directly related to U.S. government standards and requirements as delineated by the National Highway Traffic Safety Administration (NHTSA).

My methodologies herein employed and the conclusions drawn or resulting therefrom enjoy general acceptance within this relevant scientific community. I have authored and co-authored numerous papers on topics of vehicle crashworthiness, occupant protection, automotive restraint systems and accident reconstruction. My opinions have a reliable basis in the knowledge and experience of my discipline and employ scientific reasoning and methodology relied upon by engineering as an applied science. The principles and methods employed throughout my analysis of the subject accident have been properly applied to the facts surrounding this incident, as they are known based upon the

aforementioned documents and materials. I have employed the same level of intellectual rigor that characterizes the practice of experts in my field.

My qualifications and experience are set out in my curriculum vitae, as well as a 5-year testimony history and fee schedule, attached here as Appendix 2.

## 3. ACCIDENT DETAILS

### 3.1. CRASH DETAILS AS DESCRIBED IN THE POLICE REPORT

According to the Official Oklahoma Traffic Collision Report, the subject accident occurred at approximately 12:36 p.m. on the afternoon of January 15, 2020. The accident occurred on the westbound I-240 off ramp approximately 72 feet west of South Byers Avenue in Oklahoma City, Oklahoma (See Figure 1 for Police Diagram). Coding (*italic*) from the police report indicates that the I-240 offramp at the accident location has an *uphill curve* to the *right* with *one lane* constructed of *asphalt*. It further describes that the collision occurred in *daylight* under *clear* weather conditions and that the roadway was *dry*. The speed limit was posted as *60* mph. The report narrative describes that accident as follows:

> "*Unit 1* [Toyota Corolla] *was westbound on I-240 exiting onto S.E. 74th Street at exit 3B for South Shields and South Santa Fe. Unit 1 was operated by a student driver. Unit 1 stopped on the ramp to look back to her right for vehicles which might be approaching west bound on S.E. 74th Street. The left lane of the S.E. 74th Street is marked with a solid white line and dashed lines to prevent vehicles using the left lane west bound on S.E. 74th Street. Therefore there is no reason to stop on the ramp and vehicles on S.E. 74th would yield to ramp traffic. Unit 2* [Chevrolet Silverado] *was also exiting I-240 and looked back to the east to check for west bound traffic on S.E. 74th Street. Unit 2 driver stated he thought Unit 1 had already driven forward. When Unit 2 driver looked back forward he observed Unit 1 still at a standstill. Unit 2 driver stated he was not able to stop and collided with Unit 1. Unit 2 front left and Unit 1 right rear collided. Unit 1 then traveled west to impact with curb and came to rest 98 feet west of impact with Unit 2, Unit 1 at rest facing N.W. Unit 2 traveled 58 feet N.W. after impact with Unit 1, coming to rest facing N.W. Unit 2 left 30 feet of visible skid marks to impact and 58 feet after impact to rest. Point of impact was 72 feet west of the west curb line of South Byers Ave. and 5 feet south of the south curb line of S.E. 74th Street.*"



**Figure 1: Police Diagram**

### 3.2. CRASH DETAILS AS RECONSTRUCTED BY DR. ZIEJEWSKI

According to the accident reconstruction performed by Dr. Ziejewski, the collision resulted in a 20.3 mph longitudinal delta V to the subject Toyota Corolla, with a -2.9 mph lateral delta V component resulting in a primary direction of force, or PDOF, of 5:30 to 6:00.

### 3.3. OCCUPANT DETAILS AND INJURIES

At the time of the collision, the 2020 Toyota Corolla was carrying the driver, Ms. Ayhana Rogers, right front passenger, Mr. George Voss, and right rear passenger, Ms. Hope Shaffer. Ms. Rogers and Ms. Shaffer were student drivers and Mr. Voss was their driving instructor. Relevant occupant anthropometric data, as well as occupant data and injuries, are summarized in Figure 2 below.



**Figure 2: Occupant Data Summary**

According to biomechanicist, Dr. Mariusz Ziejewski, Ms. Hope Shaffer received fatal blunt force traumatic head injuries as the result of her head being impacted by Mr. Voss's head during the rear impact collision. The head-to-head contact occurred as a result of Mr. Voss's seatback excessively deflecting rearward in response to the rear impact which caused his body to ramp up his seatback, over the head restraint, out of the confines of his seat into Ms. Shaffer's occupant space. Evidence of blunt trauma and X-rays of skull fractures are depicted in Figure 3 and Figure 4 below.



**Figure 3: Autopsy Photographs Indicating Blunt Trauma to Front Left Side of Head**



**Figure 4: X-ray Images Illustrating Multiple Left Frontal Skull Fractures**

## 4. ANALYSIS OF VEHICLE EVIDENCE

### 4.1 VEHICLE INSPECTION

The subject Shaffer accident vehicle, a black 2020 model year Toyota Corolla, LE trim, four door sedan with vehicle identification number (VIN) 5YFEPRAE1LP057494 and date of manufacture 09/19, was inspected on October 28, 2021, at a storage facility located at 11420 South Sooner Road in Edmond, Oklahoma (See Figure 5). The vehicle was found to be equipped with an automatic transmission, manually adjustable bucket seats for the driver and right front seated occupant, bench seat for the rear-seated occupants with three-point lap/torso belts for all three positions. The vehicle was equipped with frontal airbags, side curtain airbags, and side torso seat mounted airbags; none of which had deployed. The vehicle was found equipped with a brake pedal at the right front seating position consistent with a student driver equipped vehicle. The

vehicle was found labeled with "Student Driver" on the rear and "Brown's Driving School" on the front doors.



**Figure 5: Subject Toyota Corolla**

The vehicle was found to have sustained an impact to its rear end offset to the passenger side, the primary direction of which was from rear to front. The maximum residual rear-to-front crush occurred at the right rear quarter panel and the right rear corner of the body which was displaced forward to a point approximately coincident with the right rear wheel hub. The crush was fairly consistent and uniform from the right rear corner to the left through approximately 16 to 18 inches where it reduced uniformly to a few inches at the left rear corner. The rear impact crush exhibited an override-type characteristic as the crush was deepest above the bumper level. Crush at the bumper level was relatively minimal and the impact of the vehicle clearly overrode the rear bumper. The welds at the quarter panel above the bumper were found pulled away and the sheet metal was found to be displaced forward up to the top of the C-pillar. An inspection of the interior of the vehicle revealed that the crush above the bumper level at the right C-pillar resulted in some intrusion and forward displacement at the top of the right rear seat back. It appeared that the top of the right rear seat back was approximately coincident with the top of the C-pillar.

In addition to the rear impact damage, the vehicle was found to have a dent in the hood just to the left of center. The front bumper fascia was found displaced and pulled off of the quarter panel.

The vehicles glazing on the front windshield and left side windows were found to be in place and intact. The glazing on the right rear window and rear back light were found to be fractured and broken out. At the time of the inspection, it could not be identified whether the right front window was broken out, or whether it was simply rolled down, however, a review of body camera video shows the window was up at the time of the collision. Neither door on the right side of the vehicle were able to be opened. All of the vehicle's tires were found to be well treaded, inflated, and free to rotate.

An inspection of the interior of the vehicle revealed the right front seat to be a manually adjustable bucket seat with cloth upholstery. The seat was adjusted fore and aft such that the upper seat track was approximately 3 ¼ to 3 3/8 inches rearward of the lower seat track as measured at the forward edge of the outboard track. The inboard seat track was found to be approximately 3 to 3 1/8 inches rearward of the lower seat track at the forward edge. The seat cushion was found at a nose-up pitch angle at approximately 21 degrees. The seatback was found at a recline angle of approximately 67 degrees from horizontal or approximately 23 degrees of recline. The recliner lever on the right front seat was found to be somewhat lifted.

An inspection of the seatbelt system for both the driver and right front passenger revealed them to be equipped with a 3-point combination lap and torso belt with a single pass-through non-cinching latch plate and adjustable D-ring. An inspection of the right front seat belt webbing and hardware revealed evidence of seat belt use during the collision, consistent with belt status as recorded by the airbag control module. The airbag control module imaging also reported that no seat belt pretensioners were commanded to deploy during the collision.

An inspection of the right rear belt revealed that the visible portion was extended with approximately 56 inches of webbing outside of the retractor measured from the seat bite near the label consistent with the belt being worn and in use at the time of the accident. The rest of the belt was found to be bound up at the retractor which was in the crush zone at the top of the package shelf behind the right side of the upper seat back for the right rear seat position.

## 4.2 REMOVAL & DETRIM OF RIGHT FRONT SEAT

During the undersigned's October 28, 2021 inspection, the right front passenger seat of the subject Toyota Corolla was removed from the vehicle and detrimmed for further analysis jointly with representatives from all interested parties pursuant to an agreed upon protocol. Once removed, the seat was placed on a table for further inspection. The seat was then detrimmed to allow for inspection and documentation of the underlying seat structure and evaluation of any residual or plastic seat deformation (See Figure 6). The seat and it's components were photographed and scanned with a 3D scanner.

 

**Figure 6: Right Front Passenger's Seat**

An inspection of the detrimmed seat revealed deformation of the seat base side members, inboard recliner plate, and the outboard seat base side member to seat track connecting members consistent with occupant rearward loading during the rear end collision. When compared to an exemplar right front seat adjusted to the same seat track and recliner positions, the accident vehicle seat was found to have statically deformed approximately 13 degrees on the outboard side, and approximately 16 degrees on the inboard side. The top cross member of the seat, which supports the head restraint system, was found to have a few more degrees of additional deformation. Dynamically, the seat would have deformed an additional 10 to 20 degrees, as seen in Toyota's dynamic sled testing. Additionally, it was noted that the "as found" recline position of the accident right front seat was one position rearward of the full forward or first engaged position.



Outboard Deformation                    Inboard Deformation

**Figure 7: Static Seat Deformation Analysis**

Additionally, while the seat was removed from the vehicle, the interior of the vehicle was 3 dimensionally scanned in order to quantify the amount of right rear seat intrusion resulting from the subject collision. The scan was aligned with an exemplar vehicle buck as depicted below in Figure 8.



**Figure 8: Right Rear Seating Position Intrusion**

### 4.3 ANALYSIS OF POLICE BODY WORN CAMERA

Police body worn video camera footage of the officers responding to the subject accident were obtained and reviewed. The body camera footage of Ashley Copeland in particular documented vehicle and occupant evidence shortly after the time of the collision. The following evidence was noted.

- Hope Shaffer's torso belt properly routed over her torso and shoulder (see Figure 9).



**Figure 9: Body Camera Still Shot Showing Hope Shaffer's Belt Use**

- The right front seat was moved at the accident scene near the time the first responders were extricating Hope from the vehicle (see Figure 10).



**Figure 10: Body Camera Still Shots Showing Seat Moved at Scene**

- Prior to the right front seat being moved, the right front seat back is seen to be deformed in recline such that it is intruding into the right rear occupant space (see Figure 11). Utilizing a photogrammetric type analysis, including adjusting the 3 dimensional scan of the accident seat to match the position of the seat and seatback as depicted below establishes that the right front seat at the scene, prior to being moved, was in the full rear track position and the seat back was reclined rearward approximately 8 degrees more than as found at the undersigned's inspection. This indicates the post impact right front seat back angle was approximately 31° of recline (23° + 8°) as scene in the early body camera video of Figure 11.



**Figure 11: Body Camera Still Showing Right Front Seat Deformed into Right Rear Occupant Space**

## 5. DISCUSSION

It has long been recognized within the automotive industry and automotive safety community that injuries to vehicle occupants often occur from contact with interior vehicle surfaces and that from an occupant protection standpoint, effective occupant restraint requires a system capable of providing non-injurious occupant ride down of anticipated crash forces while avoiding or preventing injurious contacts. This is not only the case for frontal collisions, where occupant restraint is provided primarily by seatbelts and airbags, but it is also critical for other crash modes such as side impacts, rear impacts, rollovers, as well as multiple impact events. In the rear impact crash mode, occupant restraint is provided primarily by the seat backs, head restraints, and to some extent the seat belts.

Foundationally, therefore, what becomes fundamental to the seat back's role in rear impact occupant protection is its ability to contain the occupant within the seat, prevent the occupant from ramping up and out / over the seat, as well as preventing dangerous intrusion of the front seat and its occupant into the rear occupant's survival space where contact with rear compartment components and / or rear seated occupants present a significant injury risk.

In a rear impact the seat back itself is depended upon to provide occupant ride down and, depending on the crash severity and the size of the occupant, this ride down will oftentimes result in some yielding of the seat structure. As described by Severy in 1976:

> "A fundamental parameter of safety is 'restraint compliance', the change in restraint geometry induced by occupant inertial forces. A seat should be designed to transmit these forces to the vehicle, and then moderate them so that occupant displacement and acceleration avoid levels causing physiological trauma. In short a seat should minimize injury to its occupant in the event of a collision... "[1]

Controlled yielding of the seat structure can provide some energy absorbing benefits; however, it has long been recognized that excessive yielding and / or catastrophic failure can greatly enhance injury potential by virtue of the occupant ramping up the seat back such that injurious contacts with rear components and / or rear seated occupants present significant risk of injury. These injuries typically involve the head and / or neck of front seated occupants, and such ramping can also result in significant head or chest injury to rear seated occupants. Excessive rearward seat back deflection can also result in full or partial ejection of the front seated occupant(s). With commonly utilized vehicle mounted seat belts, as the seat back rotates rearward the occupant is typically decoupled from the shoulder portion of the seat belt to the extent that the lap belt can only provide limited restraint. Moreover, an excessive amount of allowed rearward seat back rotation effectively results in intrusion into the rear survival space and has been shown to greatly enhance the risk of injury to rear seated occupants.

The Federal Motor Vehicle Safety Standards (FMVSS) have, since their inception, focused a great deal on occupant protection in frontal collisions, which are statistically the most common collision mode. For instance, FMVSS 208 contains numerous frontal crash test

---

[1] D. M. Severy et al., Designing Safety Seats, *Automotive Engineering*, Volume 84, No. 10 (October 1976).

requirements which include dynamic crash tests for both restrained and unrestrained front seat occupants. Unfortunately, though rear impacts account for a significant percentage of total collisions, the FMVSS do not include a dynamic rear impact seat test or requirement wherein the seat is required to be occupied by an anthropometric test device (ATD) and injury data or injury risk is assessed at speeds over 10 mph.

FMVSS 207 does include a seat strength test requirement, however this minimal standard does not provide for the presence of an occupant. Rather, FMVSS 207 simply calls for application of a minimal static load on the upper seat member (See Figure 12). This standard has been part of the standards since the 1960s but has since then been clearly established to be inadequate relative to prediction of real-world crash performance. Simple compliance with the minimal standard of FMVSS 207 will not ensure a seat structure's safe design in a dynamic crash environment. Although compliance with FMVSS 207 will likely ensure that the seat back will not break when leaned on by an occupant or while accessing the rear seat, it will in no way ensure a seat's safe performance when occupied by an occupant and loaded dynamically in a rear end crash. In fact, testing conducted by the undersigned and others have shown that light weight folding beach chairs, banquet chairs, and even a seat made of cardboard, will pass the minimal strength requirements of FMVSS 207.[2]



**Figure 12: FMVSS 207 Test Setup Diagram**

Toyota, has, necessarily, performed such testing on the subject right front passenger's seat design provided for the subject Toyota Corolla and the seat did pass this minimal standard. Again, however, simple compliance with FMVSS 207 in no way establishes that a seat is adequately designed or appropriate in terms of rearward crash protection. In fact, in 1996, The National Highway Traffic Safety Administration (NHTSA) officially acknowledged that the 207 standard was inadequate[3], stating:

> *"There have been several valid criticisms of the current Federal Motor Vehicle Safety Standard No. 207 which addresses seating systems. Generally, it is acknowledged that the current standard requires inadequate seat strength to insure that the seat does not fail when a car is subject to a severe rear impact. Furthermore, advances in technology have made possible significant improvement in the ability of the car seat to add appreciable crash victim occupant protection, especially with the advent of integrated seat concepts."*

---

[2] Muzzy et al., "Comparative Testing of Commercial, Modified & Non-Automotive Seat Backs," ASME Advances in Bioengineering, 2000.
[3] NHTSA website, "B.01.19 Seat Back Strength".

Understanding that this requirement is minimal, Toyota's engineering standard recommends that after the required load has been achieved, the test is to be continued until failure (see Figure 13). Loading the seat to failure at least allows for analysis of the ultimate load the seat can bear in that loading configuration and helps identify the "weak links" in the seating system.



**Figure 13: Toyota Engineering Standard for Moment Test (TOY-SHAFFER-00011358)**

To date, Toyota has only produced one test of a Corolla right front passenger's seat pursuant to this standard. A review of the test report and provided photographs of the test make it clear they did not conduct the test to failure, providing minimal information regarding the strength of the seat or its yielding characteristics.

In the early 1990s, General Motors (and Dr. David Viano) initiated significant research into designing seats with increased seat strength and occupant retention capabilities over and above those which may be related to simply passing the minimal FMVSS 207 standard.

This research by General Motors, as well as by others, made clear that if the seat back was allowed to deform excessively rearward, the ability of the seat back to retain the occupant and prevent rearward occupant ramping was defeated. Research and testing using ATDs, or crash test dummies, has consistently demonstrated that dynamic seat back angles approaching or exceeding 60 degrees from vertical result in a significant risk of occupant ramping and will prevent a seat's ability to contain the occupant. More recent testing and research using human cadavers suggests that ramping up the seat back can occur sooner, at recline angles exceeding 45 degrees.[4] Dr. Viano, once an engineer at General Motors, wrote in a 1992 Society of Automotive Engineers (SAE) paper[5] that:

> *"Sled tests conducted in the early 1980s showed that an unbelted dummy rode up and off the seatback in rear-end crashes when the total rotation of the seatback exceeded 60°."*

Additionally, Dr. Viano published in his book[6] on the subject:

> *"In late 1989, I returned to seat performance in rear crashes…It was clear that the more severe a crash, the greater the acceleration of the occupant, and the greater the seatback deflection. This effect meant that the rotation of the seatback would increase with crash severity until the seatback angle exceeded 60° with a subsequent loss of occupant retention. In this case, even belted occupants can ramp up the seatback and slide out of the lap belt."*

This work by General Motors is but one example of knowledge by automobile manufacturers that the need for controlling and / or limiting the amount of rearward rotation of the seat plays a significant role in both front and rear seated occupant protection in a rear impact circumstance. As a result of this, several seat and car manufacturers, including Toyota, have developed performance criteria regarding how much seat back rotation should be allowed under a given impact circumstance. There is evidence that, at the time of the manufacture of the subject Toyota, the automotive industry recognized that a seat back that displaces rearward without absorbing significant energy is dangerous. It has been and is, also appreciated that an infinitely rigid seat is also undesirable and, therefore, a balance must be reached between too weak and too rigid. To address this issue, various manufacturers and researchers proposed and adopted dynamic test requirements regarding the performance (rearward deflection) of a seat in a rear impact that would allow for some amount of controlled rearward deflection (energy absorption) while still limiting rearward rotation to minimize occupant ramping and rear occupant compartment intrusion. One such requirement, proposed by EASi Engineering and Johnson Controls in a 1997 report[7] states, *"30 degrees seat back rotation from the design position is selected as the maximum allowable for the 95th percentile dummy under a 30-mph rear impact crash pulse. This seat back rotation angle is consistent with the current industry practice."* Similar dynamic

---

[4] Petit, P., et al., "Investigation on Occupant ejection in high severity rear impact based on post mortem human subject sled tests," Stapp Car Crash J, 55L 91-113, 2011.

[5] Viano, D., "Restraint of a Belted or Unbelted Occupant by the Seat in Rear-End Crashes," SAE Paper Number 922522, 1992.

[6] Viano, D., "Role of the Seat in Rear Crash Safety," SAE International ISBN 0-7680-0847-6, p. xii, 2002.

[7] Gupta, V., et al, "Advanced Integrated Structural Seat" Contract Number DTNH22-92-D-07323, Task-11, Final Report, February 1997.

requirements have been proposed and/or adopted by other manufacturers such as Ford, Chrysler, General Motors, Honda, Mitsubishi, Volvo, Kia, Aston Martin, and even Toyota.

Toyota has also demonstrated its knowledge and understanding of these issues by developing their own dynamic test requirement for rear impact seat performance. This test requirement was first implemented in the late 1990's and become known as the sled test requirement associated with Toyota's "Whiplash Injury Lessening" (WIL) seat design (See Figure 14). This WIL seat design has been described by Toyota as an improved seat intended to better control the kinematics of an occupant's head, neck and torso through improved seat design as a means to reduce injuries in rear impacts[8].



**Figure 14: Toyota's Early Dynamic Sled Test Criteria (WIL Standard)**

Toyota's dynamic sled test criteria demonstrates their appreciation for the importance of limiting dynamic rearward seat back deflection as a necessary component to controlling occupant kinematics and thereby reducing injury risk to both the seated occupant as well as those in the rear seat. Toyota corporate representative, Motoki Shibata, has testified previously[9] regarding the WIL seat that:

---

[8] Sekizuka, M., "Seat Designs for Whiplash Injury Lessening," Paper Number 98-S7-O-06, 1998 ESV Conference, Windsor, Ontario, Canada, May 31- June 4, 1998.
[9] Kisling v. Toyota, 8/23/12 (38:11-18)

> *"in order to keep the occupant torso contained in the seatback or to increase the likelihood of that, it was necessary to increase the rigidity of the seatback. An increase in the rigidity of the seatback as a result created a situation where the seatback strength became higher."*

The original Toyota sled test requirement, applying to the late 1990's model year Toyota vehicles, called for testing the seat dynamically with a 50th percentile male Anthropometric Test Device (ATD) with the sled experiencing a 20 mph rearward delta V with a 130 ms pulse duration and peak accelerations of 11 Gs. The 50th percentile ATD is approximately 5'9" and weighs approximately 172 pounds. Toyota's requirement under these conditions allowed for no more than 25 degrees of dynamic seat back deflection.

Toyota has since slightly changed this standard into what is now referred to as Toyota Engineering Standard TSF6252G. This standard calls for two separate rear impact sled tests, one conducted at 30 km/h (18.6 mph) and one at 36 km/h (22.4 mph). The pulse shape was defined as a triangular shaped pulse with target peak G's of 17G and pulse length of 92 milliseconds for the 18.6 mph pulse and target peak G's of 22G and pulse length of 90 milliseconds for the 22.4 mph pulse. The seatback deflection criteria for the 18.6 mph test is limited to 25 degrees, and the allowable deflection in the 22.4 mph test was set at 30 degrees (see Figure 15). These tests all call for using a 50th percentile male ATD at approximately 172 pounds.



### TOYOTA  ENGINEERING  STANDARD

NO.:    **TSF6252G-1**

TITLE:    **Criteria for seat assembly dynamic test**

2.2 Rear Collision ( $\triangle$ V = 30 km/h)
(1) The maximum seat back dynamic backward tilting angle shall be within 25 °.
When a test is conducted at $\triangle$ V = 36 km/h, the maximum seat back dynamic backward tilting angle is within 30 °, it shall be judged that the angle falls within 25 ° at $\triangle$ V = 30 km/h.

**Figure 15: Criteria for Toyota Dynamic Sled Test**

Toyota produced two sled tests on front manual Corolla seats pursuant to this standard; TS-1708-325 subtitled 30 km/h rear collision sled test and TS-1708-324 subtitled 36km/h rear collision sled test. A review of the "30 km/h" test indicates its purpose was to "confirm the TSF6252G" performance of the seat, however, its target is inconsistent with their own standard and states, "the maximum seat back dynamic backward tilting angle shall be within 30°." The report results indicate the actual delta V in the test was 31.7 km/h (19.7 mph), and the displaced seatback angle was 24.5°. The video analysis resulted in the outboard side of the seat deforming 26° (more than the TSF6252G criteria) and the inboard side deformed 23° (see Figure 16). Bending of the recliner plates and deformation of the seat base side members is observed in the post test photographs.



**Figure 16: Toyota's Video Analysis of 30km/h Sled Test**

The undersigned has performed a similar independent video analysis of the 30 km/h test (TS-1708-325), which indicates more dynamic deformation than presented by Toyota (see Figure 17) and a failure of Toyota's TSF6252G criteria. The undersigned's analysis indicates 28° of dynamic deformation to the outboard side, and 25° to the inboard side. The residual static seatback deformation was also quantified to evaluate the elastic deformation (~10° elasticity).



**Figure 17: SAFE Video Analysis of Toyota 30 km/h Test**

After reviewing Toyota's 36 km/h test report, TS-1708-324, it appears Toyota did not perform a dynamic seat deformation analysis pursuant to the TSF6252G criteria. No mention of the 30 degree deformation criteria is mentioned, and no video analysis has been identified. The report indicates the test resulted in a 37.8 km/h (23.4 mph) delta V. The undersigned performed a video analysis of the test, which resulted in approximately 43 degrees of dynamic deformation (see Figure 18), again failing the Toyota TSF6252G 36 km/h criteria. A review of the video shows the ATD moving rearward relative to the seat, and ramping up the seatback (see Figure 20). Analysis of before and after photographs give a rough measurement of static seat back deformation during this test as 24 degrees, indicating the elasticity of the seat in this test was ~19 degrees (43° - 24° = 19°) (see Figure 18 and Figure 19).



**Figure 18: SAFE Analysis of Dynamic Deformation of Toyota 36km/h Test**



**Figure 19: SAFE Analysis of Static Deformation of Toyota 36km/h Test**



**Figure 20: Toyota 36km/h Test Showing Occupant Ramping**

Toyota's failure to comply with its own minimal engineering standard in the above rear impact sled tests poses risk of injury for both the front seated occupant, as well as rear seated occupants seated behind a front passenger. In the early 2000's when the WIL seats were being developed, the purpose of the deflection limit criteria was described as to protect the rear occupants from harmful contact with the deforming front seat. Toyota PMK, Motoki Shibata, has testified to this regard in a previous case regarding the WIL sled standard (which evolved into the TSF6252G standard):

> "*As I said, with the 2002 ES 300, headrest height became higher and seat back itself became higher. So the possibility of contact between the front seat back and the rear seat became possible. That is why we had the target of dynamic maximum reaward deflection angle of 25 degrees or less in the sled testing, which is equivalent to 30-miles-per-hour rear impact, so that we are able to provide reasonable safety and reasonable performance in order to reduce the risks of contact between the rear seated occupant versus the front seat.*"

As Toyota's test (Figure 19) demonstrates, allowing the occupant's head to ramp up and over the head restraint presents similar injury risk to rear seat occupants.

Toyota produced only a single full scale rear impact test in the form of an FMVSS 301R for the equivalent range of Corolla. Toyota conducted this test with a 3,011 pound deformable

barrier at an impact velocity of 54.8 mph. Data traces contained in the test report indicate the resulting delta V on part of the tested Corolla was approximately 25.7 mph. 50th percentile ATD's were placed in the front seats of the vehicle during the tests. No interior cameras were utilized in order to evaluate the front seat's performance, or its intrusion into the rear passenger compartment. A review of the offboard video shows the front seat backs deforming rearward to the extent that the ATD's heads disappear below the window opening line in proximity to the second row seat back (see Figure 21).



**Figure 21: Toyota FMVSS 301R Test R1809-0962**

During a rear impact event, the seat must be able to adequately resist the force exerted on the seatback from the occupant, as well as be able to withstand and absorb a given amount of energy, all while restraining and containing the occupant withing the confines of the seat and ensuring the seat does not dangerously intrude into the rear occupant space. From a physics point of view, both the force and energy exerted onto the seatback in a rear impact event are linearly dependent on the mass, or weight, of the occupant in the seat. The H-III 50th percentile male ATD weighs approximately 172 pounds, while the H-III 95th percentile male ATD weighs approximately 223 pounds. There would be approximately 30% more force and energy exerted on the seat back in a test with a 95th percentile ATD compared to a test with a 50th percentile ATD run at the same collision pulse. Because any given seat structure or design will have its own unique static and dynamic deflection characteristics, to assume that because a particular seat may have performed similarly with a 50th and 95th, all seats would perform similarly, is inappropriate and not sound engineering judgement.

In this case, there is absolutely no evidence produced to suggest that the Corolla seat was designed with any size occupant in mind other than the 50th percentile ATD (5'9", 172 pounds) in the rear impact environment. A review of U.S. CDC data indicates that for 2020, the model year of the subject vehicle, the 50th percentile adult male in the U.S. weighed approximately 192.6 pounds[10]. Clearly the anticipated occupants and users of the Toyota Corolla will include occupants larger than the 50th percentile ATD. Toyota's design criteria limiting the occupant weight to 172 pounds at their chosen and specified relatively minimal delta Vs will not provide any information with respect to the seat's crashworthiness under more foreseeable crash circumstances including larger statured occupants. The undersigned has seen specifications from other vehicle and seat manufacturers which utilize the larger 95th percentile ATD in rear impact collision testing including, Aston Martin, BMW, Chrysler, Ford, General Motors, Recaro, and Nissan.

To better understand the rear impact occupant kinematics and seat performance in a rear impact with a foreseeably larger occupant, rear impact sled testing was performed on July 10, 2024 at SAFE Laboratories. An OEM equivalent Toyota Corolla 4-way manual right front passenger's seat was installed in a Toyota Corolla buck which was mounted to a crash testing sled device. The seat track was adjusted to the full rear position and the recliner was adjusted to 10 degrees from the 1st engaged position as represented in design drawings for the subject seat. A 95th percentile male ATD was positioned in the right front seat. The sled was then subjected to a 22.4 mph delta V with 19.7 peak G's, similar to the Toyota TSF6252G 36 km/h test pulse. This test is not only consistent with Toyota's own test criteria simply using the more appropriate larger occupant / ATD, but from a crash energy perspective is nearly identical to the subject collision with the 20 mph delta V and the weight of the right front occupant Mr. Voss seated in the right front seat. A series of still shots below shows the ATD's kinematics during the test. The right front passenger's seat was seen to deform rearward into the rear passenger's compartment allowing the ATD to ramp up the seatback and impact the rear seatback with the ATD's head (see Figure 22). Measuring the seat back deflection from the test video results in 51 degrees of dynamic deformation, and 30 degrees of static deformation, grossly exceeded Toyota's deflection criteria of 30 degrees (see Figure 23).

---

[10] National Center for Health Statistics. Anthropometric Reference Data for Children and Adults: United States, 2015-2018. US Department of Health and Human Services CDC. January 2021



**Figure 22: SAFE OEM Sled Test**



**Figure 23: Seat Deformation Video Analysis of SAFE Sled Test**

Superimposing a surrogate occupant into the right rear seat of the test video clearly shows the front ATD grossly intruded into the rear seated occupants survival space in a rear impact collision with similar energy levels to that of the subject accident, even without any intrusion to the rear seat (see Figure 24). Toyota's own testing with only a 172 pound occupant demonstrates seat deflection beyond their own criteria while also demonstrating occupant ramping up the seat back and over the head restraint while intruding into the rear occupant space (Figure 18). Toyota's FMVSS 301 test shows similar results / performance, again with only a 172 pound occupant. As noted above, Toyota understood (as described by

corporate representative Shibata) the risk of such performance to rear seated occupants. Furthermore, the SAFE laboratory test (Figure 22 through Figure 24) demonstrates that with the additional load associated with foreseeably larger occupants in the seat, the risk of ramping and intrusion (front occupant and front seat into rear occupant space) injuries dramatically increases.



**Figure 24: Superimposed Surrogate Occupant in Rear Seat**

Although the vehicle was equipped with seat belt pretensioners, they were not programmed or commanded to deploy during the subject, or any, rear impact collision. The SAFE sled test did not fire the belt pretensioners in the rear impact sled test consistent with that condition. Had the pretensioners been deployed, the ramping allowed by the subject seat design would have likely been reduced to some extent due to a tighter belt.

### 5.1 STRONGER SEATS / ALTERNATIVE DESIGNS

Examples of safer alternative seat designs that have been shown to provide both the benefits of increased strength, energy absorption and improved occupant retention capability include seats referred to as all-belts-to-seat type designs (ABTS), or also referred to as seat integrated restraint designs (SIR). These ABTS or SIR designs are such that the seat belt is mounted to the seat frame and contained and included as part of the seat itself rather than the seat belt being mounted to the vehicle structure. These seats are typically much stronger than non ABTS or SIR seats due to the fact that they must also withstand seat belt loads in frontal impacts and, therefore, correspondingly are also much stronger / more resistant to rearward deflection. As such, these ABTS or SIR type seats have been shown to provide much better occupant retention capability in rear impact circumstances equivalent to and / or more severe than the subject 20 mph delta-V collision. Additionally, by attaching the seat belt to the seat, improved coupling between the occupant and the seat is accomplished, even with seat back deflection, by virtue of the seat belt moving along with the occupant as the seat deforms. These more

robust seats were not only technologically and economically feasible in 2020 but were seen in production vehicles of multiple car manufacturers many years prior to the manufacture of the subject vehicle.

Numerous comparative dynamic tests have been run by the undersigned and others to demonstrate side by side comparison between weak or failing seats allowing occupant ramping and rear occupant space intrusion versus stronger seat structures that limit intrusive ramping and contain/retain the occupant. Figure 25 through Figure 32 below provide rear impact test comparisons between weaker versus stronger seats.



**Figure 25: Sled Test with a Strong versus Weak Seat[11]**



Post Test - Left Front Dummy in Weak Seat
**Figure 26: SAFE Gutcher Test (27.1 mph, 218 lb ATD)**

[11] Saczalski, K., et al., "Multi-Variable Experimental Matched-Pair Comparison of Rear Impact Occupant Protection Performance of Strong Belt-Integrated Vehicle Seats Versus Weaker Non-Belt-Integrated Types," FISITA PAPER - F2010-C-112




Post Test - Left Front Dummy in Strong ABTS Seat          Post Test - Right Front Dummy in Weak Seat

**Figure 27: SAFE Waters Test (24.3 mph, 219 lb ATD)**




Weak Seat (with failed Recliner)          Strong Seat (Occupant Retained)

**Figure 28: SAFE Garcia Sled Test (~25 mph, 180 lb ATD)**





Left Front Dummy in Weak Seat          Right Front Dummy in Chrysler Sebring ABTS Seat

**Figure 29:  KARCO Floyd Test (~ 33 mph, 232 lb ATD)**

 

Left Front Dummy in Weak Seat            Right Front Dummy in Dodge Ram ABTS Seat

**Figure 30:  SAFE Clark Test (~ 29 mph, 230 lb ATD)**

 

Left Front Dummy in Weak Seat            Right Front Dummy in Celica Seat

**Figure 31: SAFE Stevenson Test (~23.6 mph, 194 lb ATD)**

 

INITIAL POSITION                    MAXIMUM DYNAMIC DEFLECTION

**Figure 32:  2008 Chrysler Town & Country ABTS Seat Test [12]**
**(~ 33 mph, 226.6 lb ATD)**

---

[12] Wichita State University Report No. CDL-TH19D-01-01, 2/25/19.

Although it is certainly recognized that some yielding of the seat structure is beneficial from an energy absorption or ride down point of view, as the above figures demonstrate, the seat cannot be allowed to collapse beyond its ability to retain the occupant and / or allow for dangerous intrusion into the rear occupant's survival space.  To do so places the front occupant in a vulnerable, head-leading orientation which exposes the front occupant to head and/or neck impacts with rear structure, rear seated occupants, or ejection portals and exposes rear seated occupants to risk of injury from contact with front occupants without the benefit of restraint from the seatback or the belt restraint system.

On September 4, 2010, SAFE laboratories conducted a rear impact sled test of a 2002 Chrysler Sebring driver's seat in a 2002 Toyota Corolla test buck. An instrumented 50th percentile ATD was ballasted to 219 pounds and was positioned in the seat. The sled test buck and seats were subjected to a 24.3 mph delta-V. This test resulted in a higher crash energy than the subject impact.  The occupant was contained in the seat and intrusion into the rear occupant compartment was greatly reduced. This test shows the Chrysler Sebring seat effectively restrains occupants in rear impact collisions at crash energy levels similar to, or slightly above those experienced by Mr. George Voss, and without causing injury or allowing gross intrusion into the rear occupant compartment (see Figure 33).



**Figure 33: SAFE Alternate Design Test**

Even though ABTS/SIR designs typically produce seats with fairly robust seat back strength, incorporation of basic mechanical engineering design principles have shown that non-ABTS/SIR design seats can also be made safe. By incorporating techniques such as the elimination of stress risers, using proper material selection, effective cross section design, consideration of structural bending / yielding, proper recliner selection / design, all proven by dynamic testing, non-ABTS/SIR seats have also been shown to be capable of being sufficiently robust to provide safe and effective support and restraint of the occupant in rear impacts.

## 6. SUMMARY OF OPINIONS AND CONCLUSIONS

Based on the analysis described above, and a review of the material described herein, the opinions and conclusions of the undersigned can be summarized as follows. These opinions and conclusion are stated to a reasonable degree of engineering certainty and / or probability:

➢ The rear impact sustained by the subject 2020 Toyota Corolla was foreseeable in both impact mode (rear impact) and severity (approximately 20 mph delta V).

➢ At the start of the collision sequence, the driver and both passengers were wearing their provided lap and shoulder belt.

➢ During the rear impact, the right front passenger's seat back failed to remain reasonably upright. This excessive seat back rearward rotation allowed for seat back and Mr. Voss to grossly intrude into the rear seating compartment and make forcible contact with Ms. Hope Shaffer seated in the right rear seat resulting in her fatal head injury.

➢ The excessive deflection of the right front seat back is a result of design deficiencies / defects related to the strength and retention / restraint capabilities of the seat structure. These design deficiencies should have been apparent to Toyota had they not ignored their own rear impact seat strength standard as written with a 50th percentile occupant. These design deficiencies render the subject right front seat unreasonably dangerous and, therefore, defective relative to rear impact crashworthiness.

➢ The subject vehicle's right front passenger seating system is unreasonably defective and dangerous and were defective and dangerous when the 2020 Toyota Corolla left Toyota's control. The subject 2020 Toyota Corolla seats and restraint systems were not able to safely restrain George Voss in the subject rear-end collision.

➢ Toyota's seat design criteria and testing relative to rear impact crashworthiness of the subject seats is inadequate and falls below a reasonable standard of care. The design criteria and testing are insufficient to establish or demonstrate safe rear impact crash performance in reasonably foreseeable and anticipated crash

circumstances including those involving occupants weighing more than the 50th percentile ATD at 172 pounds.

➢ Toyota knew or reasonably should have known that front seating systems that are weak or that would collapse in reasonably foreseeable rear-end impacts, like the subject crash, would result in serious and catastrophic injuries to both front and rear seat passengers. Toyota knew or had reason to know that the subject seating system created a high degree of risk of injury.

➢ Scientifically, technologically, and economically feasible alternative seat and seat component designs and processes were known and available at the time of the manufacture of the subject 2020 model year Toyota Corolla. The use of these safer technologies would have reduced the rearward seat displacement, increased the energy absorbed by the seat, and improved the occupant restraint and thereby reduce the potential for fatal injury to Ms. Shaffer.

If and when additional material becomes available, additional analysis may be warranted and the opinions and conclusions expressed herein may be subject to supplementation.

Should any additional questions arise or additional materials be produced, please do not hesitate to contact me directly.

Respectfully yours,

Steven E. Meyer, P.E.